| Attorney or Party Name, Address, Telephone & FAX Nos., State Bar No. & Email Address | FOR COURT USE ONLY |
|---|---|
| Valerie F. Horn, Esq. (151161)<br>Valerie F. Horn & Associates, APLC<br>1901 Avenue of the Stars, Suite 1900<br>Los Angeles, CA 90067<br>Telephone: (310) 888-8494<br>Facsimile: (310) 888-8499<br>Email: the hornbooklaw@gmail.com | |
| ☐ *Individual appearing without attorney*<br>☒ *Attorney for:* Movant | |

**UNITED STATES BANKRUPTCY COURT**
**CENTRAL DISTRICT OF CALIFORNIA - LOS ANGELES DIVISION**

| In re:<br><br>CLARENCE DEMETRIUS TATE SR. | CASE NO.: 2:22-bk-12104-SK<br>CHAPTER: 13 |
|---|---|
| | **NOTICE OF MOTION AND MOTION FOR RELIEF FROM THE AUTOMATIC STAY OR FOR ORDER CONFIRMING THAT THE AUTOMATIC STAY DOES NOT APPLY UNDER 11 U.S.C. § 362(l)**<br>**(with supporting declarations)**<br>**(UNLAWFUL DETAINER)** |
| Debtor(s). | DATE: ▉▉▉▉ 06/29/2022<br>TIME: 8:30 am<br>COURTROOM: 1575 |

**Movant:** Kylale, LLC, a California Limited Liability Company

1. **Hearing Location:**
   - ☒ 255 East Temple Street, Los Angeles, CA 90012
   - ☐ 21041 Burbank Boulevard, Woodland Hills, CA 91367
   - ☐ 3420 Twelfth Street, Riverside, CA 92501
   - ☐ 411 West Fourth Street, Santa Ana, CA 92701
   - ☐ 1415 State Street, Santa Barbara, CA 93101

2. Notice is given to the Debtor and trustee (*if any*)(Responding Parties), their attorneys (*if any*), and other interested parties that on the date and time and in the courtroom stated above, Movant will request that this court enter an order granting relief from the automatic stay as to Debtor and Debtor's bankruptcy estate on the grounds set forth in the attached Motion.

3. To file a response to the motion, you may obtain an approved court form at www.cacb.uscourts.gov/forms for use in preparing your response (optional LBR form F 4001-1.RFS.RESPONSE), or you may prepare your response using the format required by LBR 9004-1 and the Court Manual.

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

June 2014                    Page 1                    F 4001-1.RFS.UD.MOTION

4. When serving a response to the motion, serve a copy of it upon the Movant's attorney (or upon Movant, if the motion was filed by an unrepresented individual) at the address set forth above.

5. If you fail to timely file and serve a written response to the motion, or fail to appear at the hearing, the court may deem such failure as consent to granting of the motion.

6. ☒ This motion is being heard on REGULAR NOTICE pursuant to LBR 9013-1(d). If you wish to oppose this motion, you must file and serve a written response to this motion no later than 14 days before the hearing and appear at the hearing.

7. ☐ This motion is being heard on SHORTENED NOTICE pursuant to LBR 9075-1(b). If you wish to oppose this motion, you must file and serve a response no later than (date) _____ and (time) _____; and, you may appear at the hearing.

   a. ☐ An application for order setting hearing on shortened notice was not required (according to the calendaring procedures of the assigned judge).

   b. ☐ An application for order setting hearing on shortened notice was filed and was granted by the court and such motion and order have been or are being served upon the Debtor and upon the trustee (if any).

   c. ☐ An application for order setting hearing on shortened notice was filed and remains pending. After the court rules on that application, you will be served with another notice or an order that specifies the date, time and place of the hearing on the attached motion and the deadline for filing and serving a written opposition to the motion.

Date: 05/24/2022

Valerie F. Horn & Associates, APLC
Printed name of law firm (if applicable)

Valerie F. Horn, Esq.
Printed name of individual Movant or attorney for Movant

Signature of individual Movant or attorney for Movant

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

June 2014                    Page 2                    F 4001-1.RFS.UD.MOTION

## MOTION FOR RELIEF FROM THE AUTOMATIC STAY OR FOR ORDER CONFIRMING THAT THE AUTOMATIC STAY DOES NOT APPLY
### (Unlawful Detainer)

1. **Movant is the:**

   a. ☒ Owner of the Property
   b. ☐ Authorized Agent of the owner of the Property
   c. ☐ Other (*specify*):

2. **The Property at Issue (Property):**

   Type of Property: ☐ Residential  ☒ Nonresidential

   *Street Address*: 3138 W. Pico Blvd.
   *Unit/Suite Number*:
   *City, State, Zip Code*: Los Angeles, CA  90019

3. **Bankruptcy Case History:**

   a. ☒ A voluntary  ☐ An involuntary  petition under chapter  ☐ 7 ☐ 11 ☐ 12 ☒ 13
   was filed on (*date*): 04/14/2022

   b. ☐ An order to convert this case to chapter  ☐ 7 ☐ 11 ☐ 12 ☐ 13
   was entered on (*date*):

   c. ☐ A plan was confirmed on (*date*):

4. **Pursuant to 11.U.S.C. § 362(b)(22) and (23) there is no stay because (*check all that apply*):**

   a. ☐ Movant commenced an eviction, unlawful detainer action or similar proceeding against the Debtor involving residential property in which the Debtor resides and:

      (1) ☐ The Debtor has not filed and served on Movant the certification required under 11 U.S.C. § 362(l)(1).

      (2) ☐ The Debtor or adult dependent of the Debtor has not deposited with the clerk any rent that would become due during the 30-day period after the filing of the petition.

      (3) ☐ The Debtor or adult dependent of the Debtor has not filed and served on Movant the further certification required under 11 U.S.C. § 362(l)(2) that the entire monetary default that gave rise to the judgment has been cured.

      (4) ☐ Movant filed and served an objection to the Debtor's certification.  A copy of the objection is attached as Exhibit _____.  A hearing on this objection is set for (*date*) _____.

5. **Grounds for Relief from Stay:** (*check all that apply*)

   a. ☒ Pursuant to 11 U.S.C. § 362(d)(1), cause exists because, as of the bankruptcy petition date, the Debtor had no right to continued occupancy of the premises, as follows:

      (1) ☐ Movant caused a notice to quit to be served on the Debtor.

      (2) ☒ An unlawful detainer proceeding was commenced on (*date*) 05/09/2022. Debtor is not the tenant under the lease. Debtor is not a personal guarantor of the lease. Follow the Leader Food Service, Inc., a Florida

      (3) ☐ An unlawful detainer judgment was entered on (*date*) _____. Corporation is the tenant and the
      Unlawful Detainer Action is Against the corporate tenant who is
      not a debtor in bankruptcy but debtor claims a right to possession.

---

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

(4) ☐ Movant acquired title to the Property by foreclosure sale before the bankruptcy petition was filed and recorded the deed within the period provided by state law for perfection.

(5) ☐ Movant acquired title to the Property by foreclosure sale after the bankruptcy petition was filed and recorded the deed within the period provided by state law for perfection.

b. ☒ Pursuant to 11 U.S.C. § 362(d)(1) the Debtor's right to possession should be terminated because (*check all that apply*):

(1) ☐ The lease or other right of occupancy expired by its terms on (*date*) _____.

(2) ☐ The lease has matured, been rejected or deemed rejected by operation of law on (*date*) _____.

(3) ☒ Lease payments have not been made after the filing of the bankruptcy petition. The Corporate tenant Follow the Leader Food Service, Inc. failed to pay the rent. Only possession is sought against Debtor.

(4) ☐ An unlawful detainer action was filed to obtain possession of the Property on grounds of endangerment of the Property or because of illegal use of controlled substances on the Property and Movant filed and served upon the Debtor a certification that ☐ such an action was filed or ☐ that within the 30 days preceding the certification, the Debtor has endangered the subject Property or illegally allowed the use of controlled substances on the Property. A copy of Movant's certification is attached as Exhibit _____. The Debtor ☐ has ☐ has not filed an objection to Movant's certification. A copy of the Debtor's objection, if any, is attached as Exhibit _____. A hearing on this objection is set for (*date*) _____.

(5) ☐ The bankruptcy case was filed in bad faith:

(A) ☐ Movant is the only creditor or one of few creditors listed in the Debtor's case commencement documents.

(B) ☐ Other bankruptcy cases have been filed in which an interest in the Property was asserted.

(C) ☐ The Debtor filed only a few case commencement documents. No schedules or statement of financial affairs (or chapter 13 plan, if appropriate) has been filed.

(D) ☐ There was a recent transfer of all or part ownership of, or other interest in the Property without the consent of the Movant or court approval.

c. ☒ Pursuant to 11 U.S.C. § 362(d)(2)(A), the Debtor has no equity in the Property; and pursuant to 11 U.S.C. § 362(d)(2)(B), the Property is not necessary to an effective reorganization.

6. **Grounds for Annulment of the Stay.** Movant took postpetition actions against the Property or the Debtor:

a. ☐ These actions were taken before Movant knew the bankruptcy petition was filed, and Movant would have been entitled to relief from stay to proceed with these actions.

b. ☐ Movant knew the bankruptcy case had been filed, but Movant previously obtained relief from stay to proceed with these enforcement actions in prior bankruptcy cases affecting the Property as set forth in Exhibit _____.

c. ☐ Other:

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

7. **Evidence in Support of Motion:** (*Important Note: Declaration(s) in support of the Motion MUST be signed under penalty of perjury and attached to this motion.*)

    a.    The UNLAWFUL DETAINER DECLARATION on page 7.

    b.  ☒  Supplemental declaration(s).

    c.  ☐  Other (*specify*):

**Movant requests the following relief.**

1.  Relief from stay pursuant to:  ☒ 11 U.S.C. § 362(d)(1)  ☒ 11 U.S.C. § 362(d)(2)

2.  ☒  Movant (and any successors or assigns) may proceed under applicable nonbankruptcy law to enforce its remedies to obtain possession of the Property.

3.  ☐  Confirmation that there is no stay in effect.

4.  ☐  The stay is annulled retroactive to the bankruptcy petition date. Any postpetition acts taken by Movant to enforce its remedies regarding the Property shall not constitute a violation of the stay.

5.  ☐  The co-debtor stay of 11 U.S.C. § 1201(a) or § 1301(a) is terminated, modified or annulled as to the co-debtor, on the same terms and conditions as to the Debtor.

6.  ☐  The 14-day stay prescribed by FRBP 4001(a)(3) is waived.

7.  ☐  A designated law enforcement officer may evict the Debtor and any other occupant from the Property regardless of any future bankruptcy filing concerning the Property for a period of 180 days from the hearing of this motion:
    ☐ without further notice.
    ☐ upon recording of a copy of the order or giving appropriate notice of its entry in compliance with applicable nonbankruptcy law.

8.  ☐  Relief from stay is granted under 11 U.S.C. § 362(d)(4), if the order granting this motion is recorded in compliance with state laws governing notices of interest or liens in real property, the order is binding in any other case under this title purporting to affect the Property filed not later than two years after the date of entry of such order, except that a debtor in a subsequent case under this title may move for relief from the order based upon changed circumstances or for good cause shown, after notice and a hearing.

9.  ☐  The order is binding and effective in any bankruptcy case commenced by or against any debtor who claims any interest in the Property for a period of 180 days from the hearing of this Motion:
    ☐ without further notice.
    ☐ upon recording of a copy of this order or giving appropriate notice of its entry in compliance with applicable nonbankruptcy law.

10.  ☐  The order is binding in any other bankruptcy case purporting to affect the Property filed not later than 2 years after the date of entry of such order, except that a debtor in a subsequent case may move for relief from the order based upon changed circumstances or for good cause shown, after notice and hearing.

11.  ☐  The order is binding and effective in any bankruptcy case commenced by or against the Debtor for a period of 180 days, so that no further automatic stay shall arise in that case as to the Property.

---

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

*June 2014*                         Page 5                        **F 4001-1.RFS.UD.MOTION**

12. ☐ If relief from stay is not granted with respect to the Property because the Property is the subject of a lease that may be assumable;

    a. ☐ Establishment of a deadline for assumption or rejection of the lease.

    b. ☐ Adequate protection in the form of regular payments at the lease rate from petition date until assumption or rejection of the lease.

13. ☐ Other relief requested.

Date: 05/24/2022

                         VALERIE F. HORN & ASSOCIATES, APLC

                         Print name of law firm (*if applicable*)

                         Valerie F. Horn, Esq.

                         Print name of individual Movant or attorney for Movant (*if applicable*)

                         Signature of individual Movant or attorney for Movant

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.

*June 2014*                                        Page 6                          F 4001-1.RFS.UD.MOTION

# UNLAWFUL DETAINER DECLARATION

I, (name of declarant) _Hasty Yadegaran_____, declare as follows:

1. I have personal knowledge of the matters set forth in this declaration and, if called upon to testify, I could and would competently testify thereto. I am over 18 years of age. I have knowledge regarding Movant's interest in the Property because (specify):

   a. ☐ I am the Movant and owner of the Property.

   b. ☒ I manage the Property as the authorized agent for the Movant.

   c. ☐ I am employed by Movant as (title and capacity):

   d. ☐ Other (specify):

2. a. ☐ I am one of the custodians of the books, records and files of Movant as to those books, records and files that pertain to the rental of this Property. I have personally worked on books, records and files, and as to the following facts, I know them to be true of my own knowledge or I have gained knowledge of them from the business records of Movant on behalf of Movant, which were made at or about the time of the events recorded, and which are maintained in the ordinary course of Movant's business at or near the time of the acts, conditions or events to which they relate. Any such document was prepared in the ordinary course of business of Movant by a person who had personal knowledge of the event being recorded and had or has a business duty to record accurately such event. The business records are available for inspection and copies can be submitted to the court if required.

   b. ☐ Other (see attached):

3. The Property is:

   ☐ Residential   ☒ Nonresidential

   *Street Address*: 3138 W. Pico Blvd.
   *Unit/Suite Number*:
   *City, State, Zip Code*: Los Angeles, CA  90019

4. Movant is the   ☒ legal owner of the Property, or   ☐ the owner's legally authorized agent. A true and correct copy of the trustee's deed upon sale, lease, rental agreement, or other document evidencing Movant's interest in the Property is attached as Exhibit _1___. A true and correct copy of the applicable document establishing Movant's authority as agent for the owner is attached as Exhibit _2___.

5. The Debtor asserts a possessory interest in the Property based upon:

   (1) ☐ a month-to-month tenancy

   (2) ☐ a lease that is in default

   (3) ☐ after a foreclosure sale that was held on (date): _____.

   (4) ☒ other (specify): Claim of Right to Possession under lease signed by corporate tenant Follow the Leader

   Food Service, Inc., a Florida Corporation, which corporation is not in bankruptcy.

6. The Debtor failed to pay:

   a. ☐ The monthly rent of $_____ beginning on (date): _____.

---

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

b. ☐ Other obligations including:

    (1) ☐ Common area maintenance charges

    (2) ☐ Property taxes

    (3) ☐ Other obligations (*specify*):

7. Procedural status

a. ☐ The lease matured or was rejected on (*date*) _____:

    (1) ☐ by operation of law.

    (2) ☐ by order of the court.

b. ☒ Movant caused a notice to quit to be served upon the Debtor on (*date*) __5/2_/2022_, and a true and correct copy is attached as Exhibit _3____.   Corporate Tenant Follow the Leader Food Service, Inc.,

c. ☐ Before the bankruptcy petition was filed:

    (1) ☐ Movant filed a complaint for unlawful detainer against the Debtor on (*date*) _____, and a true and correct copy is attached as Exhibit _____.

    (2) ☐ Trial was held on (*date*) _____.

    (3) ☐ Trial was continued to (*date*) _____.

    (4) ☐ An unlawful detainer judgment against the Debtor was entered on the complaint for unlawful detainer on (*date*) _____, and a true and correct copy is attached as Exhibit _____.

    (5) ☐ A writ of possession for the Property was issued on (*date*) _____, and a true and correct copy is attached as Exhibit _____.

d. After the bankruptcy petition was filed:

    (1) ☐ The Debtor has not filed and served on the Movant the certification required under 11 U.S.C. § 362(l)(1).

    (2) ☐ The Debtor or adult dependent of the Debtor has not deposited with the clerk any rent that would become due during the 30-day period after the filing of the bankruptcy petition.

    (3) ☐ The Debtor or adult dependent of the Debtor has not filed and served on the Movant the further certification required under 11 U.S.C. § 362(l)(2) that the entire monetary default that gave rise to the judgment has been cured.

    (4) ☐ The Debtor filed and served on the Movant the certification required under 11 U.S.C. § 362(d)(1).

        (A) ☐ Movant filed and served an objection a copy of which is attached as Exhibit _____. A hearing on this objection is set for (*date*) _____.

        (B) ☐ Movant has not filed and served an objection.

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

June 2014                                   Page 8                                   **F 4001-1.RFS.UD.MOTION**

(5) ☐ An unlawful detainer action was filed to obtain possession of the Property on grounds of endangerment of the Property or because of illegal use of controlled substances on the Property and Movant has filed a certification that ☐ such action was filed or ☐ that the Debtor has endangered the Property within 30 days preceding the certification or allowed the illegal use of controlled substances on the Property. A copy of Movant's certification is attached hereto as Exhibit _____. The Debtor ☐ has ☐ has not filed an objection to Movant's certification. A copy of the Debtor's objection, if filed, is attached as Exhibit ____. A hearing on this objection is set for: _____.

(6) ☐ Regular lease payments have not been made after the bankruptcy petition was filed.

8. ☒ The Debtor does not have an interest in the Property that could be assumed or assigned under 11 U.S.C. § 365.

9. ☒ The Property is not necessary to an effective reorganization because it is:

a. ☐ Residential, and is not producing income for the Debtor.

b. ☒ Commercial, but no reorganization is reasonably in prospect.

c. ☐ No longer property of the estate.

d. ☒ Other (*specify*):
The lease was signed by Follow the Leader Food Service, Inc., a Florida Corporation. The lease is not property of the bankruptcy estate, but debtor claims a right to possession in the premises.

10. ☐ The bankruptcy case was filed in bad faith:

a. ☐ Movant is the only creditor or one of few creditors listed in the Debtor's case commencement documents.

b. ☐ Other bankruptcy cases have been filed in which an interest in the Property was asserted.

c. ☐ The Debtor filed only a few case commencement documents. Schedules and a statement of financial affairs (or chapter 13 plan, if appropriate) have not been filed.

d. ☐ Other (*specify*):

11. ☐ The filing of the bankruptcy petition was part of a scheme to delay, hinder or defraud creditors that involved:

a. ☐ The transfer of all or part ownership of, or other interest in, the Property without the consent of Movant or court approval. See attached continuation page of facts establishing the scheme.

b. ☐ Multiple bankruptcy cases affecting the Property include:

(1) Case name: _____
Chapter: _____    Case number: _____
Date filed: _____    Date discharged: _____    Date dismissed: _____
Relief from stay regarding the Property ☐ was ☐ was not  granted.

(2) Case name: _____
Chapter: _____    Case number: _____
Date filed: _____    Date discharged: _____    Date dismissed: _____
Relief from stay regarding the Property ☐ was ☐ was not  granted.

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

June 2014                                    Page 9                          F 4001-1.RFS.UD.MOTION

(3) Case name: _____

    Chapter: _____    Case number: _____

    Date filed: _____    Date discharged: _____    Date dismissed: _____

    Relief from stay regarding the Property ☐ was ☐ was not granted.

☐ See attached continuation page for information about other bankruptcy cases affecting the Property.

☐ See attached continuation page for additional facts establishing that the multiple bankruptcy cases were part of a scheme to delay, hinder, or defraud creditors.

12. ☐ Enforcement actions taken after the bankruptcy petition was filed are specified in the attached supplemental declaration(s).

    a. ☐ These actions were taken before Movant knew the bankruptcy petition was filed, and Movant would have been entitled to relief from stay to proceed with these actions.

    b. ☐ Movant knew the bankruptcy case had been filed, but Movant previously obtained relief from stay to proceed with these enforcement actions in prior bankruptcy cases affecting the Property as set forth in Exhibit _____.

    c. ☐ For other facts justifying annulment, see attached continuation page.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

05/24/2022    Hasty Yadagaran
Date          Printed Name                 Signature

This form is mandatory. It has been approved for use in the United States Bankruptcy Court for the Central District of California.

June 2014                  Page 10           F 4001-1.RFS.UD.MOTION

# EXHIBIT "1"



# STANDARD INDUSTRIAL/COMMERCIAL MULTI-TENANT LEASE - NET

**1.    Basic Provisions ("Basic Provisions").**

1.1    **Parties.** This Lease ("**Lease**"), dated for reference purposes only ___July 26, 2021___ , is made by and between ___Kylale, LLC, a California limited liability company___ ("**Lessor**") and ___Follow The Leader Food Service Inc., a Florida corporation___ ("**Lessee**"), (collectively the "**Parties**", or individually a "**Party**").

1.2(a)    **Premises:** That certain real property, including all improvements therein or to be provided by Lessor under the terms of this Lease, commonly known as (street address, unit/suite, city, state, zip): ___3138 W Pico Blvd, Los Angeles, CA 90019___ ("**Premises**"). The Premises are located in the County of ___Los Angeles___ , and are generally described as (describe briefly the nature of the Premises and the "Project"): ___an approximate 5,176 square foot commercial unit, part of a larger building___ . In addition to Lessee's rights to use and occupy the Premises as hereinafter specified, Lessee shall have non-exclusive rights to any utility raceways of the building containing the Premises ("**Building**") and to the Common Areas (as defined in Paragraph 2.7 below), but shall not have any rights to the roof, or exterior walls of the Building or to any other buildings in the Project. The Premises, the Building, the Common Areas, the land upon which they are located, along with all other buildings and improvements thereon, are herein collectively referred to as the "**Project**." (See also Paragraph 2)

1.2(b)    **Parking:** ___Nine (9)___ unreserved vehicle parking spaces. (See also Paragraph 2.6)

1.3    **Term:** ___Five (5)___ years and ___Two (2)___ months ("**Original Term**") commencing ___August 1, 2021___ ("**Commencement Date**") and ending ___September 30, 2026___ ("**Expiration Date**"). (See also Paragraph 3)

1.4    **Early Possession:** If the Premises are available Lessee may have non-exclusive possession of the Premises commencing ___upon Lease execution___ ("**Early Possession Date**"). (See also Paragraphs 3.2 and 3.3)

1.5    **Base Rent:** ___$4,554.88___ per month ("**Base Rent**"), payable on the ___first (1st)___ day of each month commencing ___August 1, 2021___ . (See also Paragraph 4)

☑ If this box is checked, there are provisions in this Lease for the Base Rent to be adjusted. See Paragraph ___59___ .

1.6    **Lessee's Share of Common Area Operating Expenses:** ___Thirty-Four___ percent ( ___34___ %) ("**Lessee's Share**"). In the event that the size of the Premises and/or the Project are modified during the term of this Lease, Lessor shall recalculate Lessee's Share to reflect such modification.

1.7    **Base Rent and Other Monies Paid Upon Execution:**

(a)    **Base Rent:** ___$4,554.88___ for the period ___August 1, 2021 - August 31, 2021___ .

(b)    **Common Area Operating Expenses:** The current estimate for the period ___August 1, 2021 - August 31, 2021___ is ___$2,588.00___ .

(c)    **Security Deposit:** ___$11,646.00___ ("**Security Deposit**"). (See also Paragraph 5)

(d)    **Other:** _____ for _____ .

(e)    **Total Due Upon Execution of this Lease:** ___$18,788.88___ .

1.8    **Agreed Use:** ___food preparation and delivery with no on-site food serving ever___ . (See also Paragraph 6)

1.9    **Insuring Party.** Lessor is the "**Insuring Party**". (See also Paragraph 8)

1.10    **Real Estate Brokers.** (See also Paragraphs 15 and 25)

(a)    **Representation:** Each Party acknowledges receiving a Disclosure Regarding Real Estate Agency Relationship, confirms and consents to the following agency relationships in this Lease with the following real estate brokers ("**Broker(s)**") and/or their agents ("**Agent(s)**"):

Lessor's Brokerage Firm ___DAUM Commercial Real Estate Services___ License No. ___01129558___ Is the broker of (check one): ☐ the Lessor; or ☑ both the Lessee and Lessor (dual agent).

Lessor's Agent ___Carlos Castillo / David Muir___ License No. ___01451618 / 01210653___ is (check one): ☐ the Lessor's Agent (salesperson or broker associate); or ☑ both the Lessee's Agent and the Lessor's Agent (dual agent).

Lessee's Brokerage Firm ___DAUM Commercial Real Estate Services___ License No. ___01129558___ Is the broker of (check one): ☐ the Lessee; or ☑ both the Lessee and Lessor (dual agent).

Lessee's Agent ___Carlos Castillo / David Muir___ License No. ___01451618 / 01210653___ is (check one): ☐ the Lessee's Agent (salesperson or broker associate); or ☑ both the Lessee's Agent and the Lessor's Agent (dual agent).

(b)    **Payment to Brokers.** Upon execution and delivery of this Lease by both Parties, Lessor shall pay to the Brokers the brokerage fee agreed to in a separate written agreement ~~(or if there is no such agreement, the sum of _____ or _____ % of the total Base Rent)~~ for the brokerage services rendered by the Brokers.

1.11    **Guarantor.** The obligations of the Lessee under this Lease are to be guaranteed by ___Kumi Kawamura___ ("**Guarantor**"). (See also Paragraph 37)

1.12    **Attachments.** Attached hereto are the following, all of which constitute a part of this Lease:

☑ an Addendum consisting of Paragraphs ___50___ through ___59___ To the extent the provisions of the Addendum conflict with the other provisions of the Lease, the provisions of the Addendum shall prevail;

☐ a site plan depicting the Premises;

☐ a site plan depicting the Project;

☐ a current set of the Rules and Regulations for the Project;

☐ a current set of the Rules and Regulations adopted by the owners' association;

☐ a Work Letter;

☑ other (specify): ___Agency Disclosure; Uniform Disclosure and Limitation of Liability Forms___ .

**2.    Premises.**

2.1    **Letting.** Lessor hereby leases to Lessee, and Lessee hereby leases from Lessor, the Premises, for the term, at the rental, and upon all of the terms, covenants and conditions set forth in this Lease. While the approximate square footage of the Premises may have been used in the marketing of the Premises for purposes of comparison, the Base Rent stated herein is NOT tied to square footage and is not subject to adjustment should the actual size be determined to be different. **NOTE: Lessee is advised to verify the actual size prior to executing this Lease.**

2.2    **Condition.** See Paragraph 50. ~~Lessor shall deliver that portion of the Premises contained within the Building ("Unit") to Lessee broom clean and free of debris on the Commencement Date or the Early Possession Date, whichever first occurs ("Start Date"), and, so long as the required service contracts described in Paragraph 7.1(b) below are obtained by Lessee and in effect within thirty days following the Start Date, warrants that the existing electrical, plumbing, fire sprinkler, lighting, heating, ventilating and air conditioning systems ("HVAC"), loading doors, sump pumps, if any, and all other such elements in the Unit, other than those constructed by Lessee, shall be in good operating condition on said date, that the structural elements of the roof, bearing walls and foundation of the Unit shall be free of material defects, and that the Unit does not contain hazardous levels of any mold or fungi defined as toxic under applicable state or federal law. If a non-compliance with such warranty exists as of the Start Date, or if one of such systems or elements should malfunction or fail within the appropriate warranty period, Lessor shall, as Lessor's sole obligation with respect to such matter, except as otherwise provided in this Lease, promptly after receipt of written notice from Lessee setting forth with specificity the nature and extent of such non-compliance, malfunction or failure, rectify same at Lessor's expense. The warranty periods shall~~

___Hy___

___CT___
___KK___

INITIALS

INITIALS

© 2019 AIR CRE.  All Rights Reserved.

MTN-26.30, Revised 10-22-2020

be as follows: (i) 6 months as to the HVAC systems, and (ii) 30 days as to the remaining systems and other elements of the Unit.  If Lessee does not give Lessor the required notice within the appropriate warranty period, correction of any such non-compliance, malfunction or failure shall be the obligation of Lessee at Lessee's sole cost and expense (except for the repairs to the fire sprinkler systems, roof, foundations, and/or bearing walls - see Paragraph 7).  Lessor also warrants, that unless otherwise specified in writing, Lessor is unaware of (i) any recorded Notices of Default affecting the Premise; (ii) any delinquent amounts due under any loan secured by the Premises; and (iii) any bankruptcy proceeding affecting the Premises.

2.3    **Compliance**.  See Paragraph 50.  Lessor does not warrants that to the best of its knowledge the improvements on the Premises comply with the building codes, applicable laws, covenants or restrictions of record, regulations, and ordinances ("**Applicable Requirements**") that were in effect at the time that each improvement, or portion thereof, was constructed.  Said warranty does not apply to the use to which Lessee will put the Premises, modifications which may be required by the Americans with Disabilities Act or any similar laws as a result of Lessee's use (see Paragraph 49), or to any Alterations or Utility Installations (as defined in Paragraph 7.3(a)) made or to be made by Lessee.  **NOTE: Lessee is responsible for determining whether or not the Applicable Requirements, and especially the zoning are appropriate for Lessee's intended use, and acknowledges that past uses of the Premises may no longer be allowed.**  If the kitchen requires more installations (such as a grease trap) or electrical capacity than the coin laundry (seems unlikely, but is possible), Lessee is responsible. If the Premises do not comply with said warranty, Lessor shall, except as otherwise provided, promptly after receipt of written notice from Lessee setting forth with specificity the nature and extent of such non-compliance, rectify the same at Lessor's expense.  If Lessee does not give Lessor written notice of a non-compliance with this warranty within 6 months following the Start Date, correction of that non-compliance shall be the obligation of Lessee at Lessee's sole cost and expense.  If the Applicable Requirements are hereafter changed so as to require during the term of this Lease the construction of an addition to or an alteration of the Unit, Premises and/or Building, the remediation of any Hazardous Substance, or the reinforcement or other physical modification of the Unit, Premises and/or Building ("**Capital Expenditure**"), Lessor and Lessee shall allocate the cost of such work as follows:

(a)    Subject to Paragraph 2.3(c) below, if such Capital Expenditures are required as a result of the specific and unique use of the Premises by Lessee as compared with uses by tenants in general, Lessee shall be fully responsible for the cost thereof, provided, however, that if such Capital Expenditure is required during the last 2 years of this Lease and the cost thereof exceeds 6 months' Base Rent, Lessee may instead terminate this Lease unless Lessor notifies Lessee, in writing, within 10 days after receipt of Lessee's termination notice that Lessor has elected to pay the difference between the actual cost thereof and the amount equal to 6 months' Base Rent. If Lessee elects termination, Lessee shall immediately cease the use of the Premises which requires such Capital Expenditure and deliver to Lessor written notice specifying a termination date at least 90 days thereafter. Such termination date shall, however, in no event be earlier than the last day that Lessee could legally utilize the Premises without commencing such Capital Expenditure.

(b)    If such Capital Expenditure is not the result of the specific and unique use of the Premises by Lessee (such as, governmentally mandated seismic modifications), then Lessor shall pay for such Capital Expenditure and Lessee shall only be obligated to pay, each month during the remainder of the term of this Lease or any extension thereof, on the date that on which the Base Rent is due, an amount equal to 1/144th of the portion of such costs reasonably attributable to the Premises.  Lessee shall pay Interest on the balance but may prepay its obligation at any time.  If, however, such Capital Expenditure is required during the last 2 years of this Lease or if Lessor reasonably determines that it is not economically feasible to pay its share thereof, Lessor shall have the option to terminate this Lease upon 90 days prior written notice to Lessee unless Lessee notifies Lessor, in writing, within 10 days after receipt of Lessor's termination notice that Lessee will pay for such Capital Expenditure.  If Lessor does not elect to terminate, and fails to tender its share of any such Capital Expenditure, Lessee may advance such funds and deduct same, with Interest, from Rent until Lessor's share of such costs have been fully paid.  If Lessee is unable to finance Lessor's share, or if the balance of the Rent due and payable for the remainder of this Lease is not sufficient to fully reimburse Lessee on an offset basis, Lessee shall have the right to terminate this Lease upon 30 days written notice to Lessor.

(c)    Notwithstanding the above, the provisions concerning Capital Expenditures are intended to apply only to non-voluntary, unexpected, and new Applicable Requirements.  If the Capital Expenditures are instead triggered by Lessee as a result of an actual or proposed change in use, change in intensity of use, or modification to the Premises then, and in that event, Lessee shall either: (i) immediately cease such changed use or intensity of use and/or take such other steps as may be necessary to eliminate the requirement for such Capital Expenditure, or (ii) complete such Capital Expenditure at its own expense.  Lessee shall not have any right to terminate this Lease.

2.4    **Acknowledgements**.  Lessee acknowledges that: (a) it has been given an opportunity to inspect and measure the Premises; (b) it has been advised by Lessor and/or Brokers to satisfy itself with respect to the size and condition of the Premises (including but not limited to the electrical, HVAC and fire sprinkler systems, security, environmental  aspects, and compliance with Applicable Requirements and the Americans with Disabilities Act), and their suitability for Lessee's intended use; (c) Lessee has made such investigation as it deems necessary with reference to such matters and assumes all responsibility therefor as the same relate to its occupancy of the Premises; (d) it is not relying on any representation as to the size of the Premises made by Brokers or Lessor; (e) the square footage of the Premises was not material to Lessee's decision to lease the Premises and pay the Rent stated herein; and (f) neither Lessor, Lessor's agents, nor Brokers have made any oral or written representations or warranties with respect to said matters other than as set forth in this Lease.  In addition, Lessor acknowledges that: (i) Brokers have made no representations, promises or warranties concerning Lessee's ability to honor the Lease or suitability to occupy the Premises and (ii) it is Lessor's sole responsibility to investigate the financial capability and/or suitability of all proposed tenants.

2.5    **Lessee as Prior Owner/Occupant**.  The warranties made by Lessor in Paragraph 2 shall be of no force or effect if immediately prior to the Start Date Lessee was the owner or occupant of the Premises.  In such event, Lessee shall be responsible for any necessary corrective work.

2.6    **Vehicle Parking**.  Lessee shall be entitled to use the number of Parking Spaces specified in Paragraph 1.2(b) on those portions of the Common Areas designated from time to time by Lessor for parking.  Lessee shall not use more parking spaces than said number.  Said parking spaces shall be used for parking by vehicles no larger than full-size passenger automobiles or pick-up trucks, herein called "**Permitted Size Vehicles**."  Lessor may regulate the loading and unloading of vehicles by adopting Rules and Regulations as provided in Paragraph 2.9.  No vehicles other than Permitted Size Vehicles may be parked in the Common Area without the prior written permission of Lessor. In addition:

(a)    Lessee shall not permit or allow any vehicles that belong to or are controlled by Lessee or Lessee's employees, suppliers, shippers, customers, contractors or invitees to be loaded, unloaded, or parked in areas other than those designated by Lessor for such activities.

(b)    Lessee shall not service or store any vehicles in the Common Areas.

(c)    If Lessee permits or allows any of the prohibited activities described in this Paragraph 2.6, then Lessor shall have the right, without notice, in addition to such other rights and remedies that it may have, to remove or tow away the vehicle involved and charge the cost to Lessee, which cost shall be immediately payable upon demand by Lessor.

2.7    **Common Areas - Definition**.  The term "**Common Areas**" is defined as all areas and facilities outside the Premises and within the exterior boundary line of the Project and interior utility raceways and installations within the Unit that are provided and designated by the Lessor from time to time for the general non-exclusive use of Lessor, Lessee and other tenants of the Project and their respective employees, suppliers, shippers, customers, contractors and invitees, including parking areas, loading and unloading areas, trash areas, roofs, roadways, walkways, driveways and landscaped areas.

2.8    **Common Areas - Lessee's Rights**.  Lessor grants to Lessee, for the benefit of Lessee and its employees, suppliers, shippers, contractors, customers and invitees, during the term of this Lease, the non-exclusive right to use, in common with others entitled to such use, the Common Areas as they exist from time to time, subject to any rights, powers, and privileges reserved by Lessor under the terms hereof or under the terms of any rules and regulations or restrictions governing the use of the Project.  Under no circumstances shall the right herein granted to use the Common Areas be deemed to include the right to store any property, temporarily or permanently, in the Common Areas.  Any such storage shall be permitted only by the prior written consent of Lessor or Lessor's designated agent, which consent may be revoked at any time.  In the event that any unauthorized storage shall occur, then Lessor shall have the right, without notice, in addition to such other rights and remedies that it may have, to remove the property and charge the cost to Lessee, which cost shall be immediately payable upon demand by Lessor.

2.9    **Common Areas - Rules and Regulations**.  Lessor or such other person(s) as Lessor may appoint shall have the exclusive control and management of the Common Areas and shall have the right, from time to time, to establish, modify, amend and enforce reasonable rules and regulations ("**Rules and Regulations**") for the management, safety, care, and cleanliness of the grounds, the parking and unloading of vehicles and the preservation of good order, as well as for the convenience of other occupants or tenants of the Building and the Project and their invitees.  Lessee agrees to abide by and conform to all such Rules and Regulations, and shall use its best efforts to cause its employees, suppliers, shippers, customers, contractors and invitees to so abide and conform.  Lessor shall not be responsible to Lessee for the non-compliance with said Rules and Regulations by other tenants of the Project.

2.10    **Common Areas - Changes**.  Lessor shall have the right, in Lessor's sole discretion, from time to time:

(a)    To make changes to the Common Areas, including, without limitation, changes in the location, size, shape and number of driveways, entrances, parking spaces, parking areas, loading and unloading areas, ingress, egress, direction of traffic, landscaped areas, walkways and utility raceways;

(b)    To close temporarily any of the Common Areas for maintenance purposes so long as reasonable access to the Premises remains available;

(c)    To designate other land outside the boundaries of the Project to be a part of the Common Areas;

(d)    To add additional buildings and improvements to the Common Areas;

(e)    To use the Common Areas while engaged in making additional improvements, repairs or alterations to the Project, or any portion thereof; and

(f)    To do and perform such other acts and make such other changes in, to or with respect to the Common Areas and Project as Lessor may, in the exercise of sound business judgment, deem to be appropriate.

Hy ____                                                    CT ____
                                                                 KK ____
INITIALS                                                  INITIALS

© 2019 AIR CRE.  All Rights Reserved.                              Last Edited: 7/30/2021 11:42 AM
MTN-26.30, Revised 10-22-2020

**3.    Term.**

3.1    **Term**.  The Commencement Date, Expiration Date and Original Term of this Lease are as specified in Paragraph 1.3.

3.2    **Early Possession**.  Any provision herein granting Lessee Early Possession of the Premises is subject to and conditioned upon the Premises being available for such possession prior to the Commencement Date.  Any grant of Early Possession only conveys a non-exclusive right to occupy the Premises.  If Lessee totally or partially occupies the Premises prior to the Commencement Date, the obligation to pay Base Rent shall be abated for the period of such Early Possession.  All other terms of this Lease (including but not limited to the obligations to pay Lessee's Share of Common Area Operating Expenses, Real Property Taxes and insurance premiums and to maintain the Premises) shall be in effect during such period.  Any such Early Possession shall not affect the Expiration Date.

3.3    **Delay In Possession**.  Lessor agrees to use commercially reasonable efforts to deliver exclusive possession of the Premises to Lessee by the Commencement Date.  If, despite such efforts, Lessor is unable to deliver possession by such date, Lessor shall not be subject to any liability therefor, nor shall such failure affect the validity of this Lease or change the Expiration Date.  Lessee shall not, however, be obligated to pay Rent or perform its other obligations until Lessor delivers possession of the Premises and any period of rent abatement that Lessee would otherwise have enjoyed shall run from the date of delivery of possession and continue for a period equal to what Lessee would otherwise have enjoyed under the terms hereof, but minus any days of delay caused by the acts or omissions of Lessee.  If possession is not delivered within 60 days after the Commencement Date, as the same may be extended under the terms of any Work Letter executed by Parties, Lessee may, at its option, by notice in writing within 10 days after the end of such 60 day period, cancel this Lease, in which event the Parties shall be discharged from all obligations hereunder.  If such written notice is not received by Lessor within said 10 day period, Lessee's right to cancel shall terminate.  If possession of the Premises is not delivered within 120 days after the Commencement Date, this Lease shall terminate unless other agreements are reached between Lessor and Lessee, in writing.

3.4    **Lessee Compliance**.  Lessor shall not be required to tender possession of the Premises to Lessee until Lessee complies with its obligation to provide evidence of insurance (Paragraph 8.5).  Pending delivery of such evidence, Lessee shall be required to perform all of its obligations under this Lease from and after the Start Date, including the payment of Rent, notwithstanding Lessor's election to withhold possession pending receipt of such evidence of insurance.  Further, if Lessee is required to perform any other conditions prior to or concurrent with the Start Date, the Start Date shall occur but Lessor may elect to withhold possession until such conditions are satisfied.

**4.    Rent.**

4.1.    **Rent Defined**.  All monetary obligations of Lessee to Lessor under the terms of this Lease (except for the Security Deposit) are deemed to be rent ("**Rent**").

4.2    **Common Area Operating Expenses**.  Lessee shall pay to Lessor during the term hereof, in addition to the Base Rent, Lessee's Share (as specified in Paragraph 1.6) of all Common Area Operating Expenses, as hereinafter defined, during each calendar year of the term of this Lease, in accordance with the following provisions:

(a)    "**Common Area Operating Expenses**" are defined, for purposes of this Lease, as all costs relating to the ownership and operation of the Project, including, but not limited to, the following:

(i)    The operation, repair and maintenance, in neat, clean, good order and condition, and if necessary the replacement, of the following:

(aa)    The Common Areas and Common Area improvements, including parking areas, loading and unloading areas, trash areas, roadways, parkways, walkways, driveways, landscaped areas, bumpers, irrigation systems, Common Area lighting facilities, fences and gates, elevators, roofs, exterior walls of the buildings, building systems and roof drainage systems.

(bb)    Exterior signs and any tenant directories.

(cc)    Any fire sprinkler systems.

(dd)    All other areas and improvements that are within the exterior boundaries of the Project but outside of the Premises and/or any other space occupied by a tenant.

(ii)    The cost of water, gas, electricity and telephone to service the Common Areas and any utilities not separately metered.

(iii)    The cost of trash disposal, pest control services, property management, security services, owners' association dues and fees, the cost to repaint the exterior of any structures and the cost of any environmental inspections.

(iv)    Reserves set aside for maintenance, repair and/or replacement of Common Area improvements and equipment.

(v)    Real Property Taxes (as defined in Paragraph 10).

(vi)    The cost of the premiums for the insurance maintained by Lessor pursuant to Paragraph 8.

(vii)    Any deductible portion of an insured loss concerning the Building or the Common Areas.

(viii)    Auditors', accountants' and attorneys' fees and costs related to the operation, maintenance, repair and replacement of the Project.

(ix)    The cost of any capital improvement to the Building or the Project not covered under the provisions of Paragraph 2.3 provided; however, that Lessor shall allocate the cost of any such capital improvement over a 12 year period and Lessee shall not be required to pay more than Lessee's Share of 1/144th of the cost of such capital improvement in any given month.  Lessee shall pay Interest on the unamortized balance but may prepay its obligation at any time.

(x)    The cost of any other services to be provided by Lessor that are stated elsewhere in this Lease to be a Common Area Operating Expense.

(b)    Any Common Area Operating Expenses and Real Property Taxes that are specifically attributable to the Unit, the Building or to any other building in the Project or to the operation, repair and maintenance thereof, shall be allocated entirely to such Unit, Building, or other building.  However, any Common Area Operating Expenses and Real Property Taxes that are not specifically attributable to the Building or to any other building or to the operation, repair and maintenance thereof, shall be equitably allocated by Lessor to all buildings in the Project.

(c)    The inclusion of the improvements, facilities and services set forth in Subparagraph 4.2(a) shall not be deemed to impose an obligation upon Lessor to either have said improvements or facilities or to provide those services unless the Project already has the same, Lessor already provides the services, or Lessor has agreed elsewhere in this Lease to provide the same or some of them.

(d)    Lessee's Share of Common Area Operating Expenses is payable monthly on the same day as the Base Rent is due hereunder.  The amount of such payments shall be based on Lessor's estimate of the annual Common Area Operating Expenses.  Within 60 days after written request (but not more than once each year) Lessor shall deliver to Lessee a reasonably detailed statement showing Lessee's Share of the actual Common Area Operating Expenses for the preceding year.  If Lessee's payments during such year exceed Lessee's Share, Lessor shall credit the amount of such over-payment against Lessee's future payments.  If Lessee's payments during such year were less than Lessee's Share, Lessee shall pay to Lessor the amount of the deficiency within 10 days after delivery by Lessor to Lessee of the statement.

(e)    Common Area Operating Expenses shall not include any expenses paid by any tenant directly to third parties, or as to which Lessor is otherwise reimbursed by any third party, other tenant, or insurance proceeds.

4.3    **Payment**.  Lessee shall cause payment of Rent to be received by Lessor in lawful money of the United States, without offset or deduction (except as specifically permitted in this Lease), on or before the day on which it is due.  All monetary amounts shall be rounded to the nearest whole dollar.  In the event that any statement or invoice prepared by Lessor is inaccurate such inaccuracy shall not constitute a waiver and Lessee shall be obligated to pay the amount set forth in this Lease.  Rent for any period during the term hereof which is for less than one full calendar month shall be prorated based upon the actual number of days of said month.  Payment of Rent shall be made to Lessor at its address stated herein or to such other persons or place as Lessor may from time to time designate in writing.  Acceptance of a payment which is less than the amount then due shall not be a waiver of Lessor's rights to the balance of such Rent, regardless of Lessor's endorsement of any check so stating.  In the event that any check, draft, or other instrument of payment given by Lessee to Lessor is dishonored for any reason, Lessee agrees to pay to Lessor the sum of $25 in addition to any Late Charge to compensate Lessor for additional time and expenses incurred in handling the dishonored payment and Lessor, at its option, may require all future Rent be paid by cashier's check.  Payments will be applied first to accrued late charges and attorney's fees, second to accrued interest, then to Base Rent and Common Area Operating Expenses, and any remaining amount to any other outstanding charges or costs.

**5.    Security Deposit.**  Lessee shall deposit with Lessor upon  execution hereof the Security Deposit as security for Lessee's faithful performance of its obligations under this Lease.  If Lessee fails to pay Rent, or otherwise Defaults under this Lease, Lessor may use, apply or retain all or any portion of said Security Deposit for the payment of any amount already due Lessor, for Rents which will be due in the future, and/ or to reimburse or compensate Lessor for any liability, expense, loss or damage which Lessor may suffer or incur by reason thereof.  If Lessor uses or applies all or any portion of the Security Deposit, Lessee shall within 10 days after written request therefor deposit monies with Lessor sufficient to restore said Security Deposit to the full amount required by this Lease.  If the Base Rent increases during the term of this Lease, Lessee shall, upon written request from Lessor, deposit additional monies with Lessor so that the total amount of the Security Deposit shall at all times bear the same proportion to the increased Base Rent as the initial Security Deposit bore to the initial Base Rent.  Should the Agreed Use be amended to accommodate a material change in the business of Lessee or to accommodate a sublessee or assignee, Lessor shall have the right to increase the Security Deposit to the extent necessary, in Lessor's reasonable judgment, to account for any increased wear and tear that the Premises may suffer as a result thereof.  If a change in control of Lessee occurs during this Lease and following such change the financial condition of Lessee is, in Lessor's reasonable judgment, significantly reduced, Lessee shall deposit such additional monies with Lessor as shall be sufficient to cause the Security Deposit to be at a commercially reasonable level based on such change in

Hy ____

CT ____
KK ____

INITIALS

INITIALS

© 2019 AIR CRE.  All Rights Reserved.
MTN-26.30, Revised 10-22-2020

financial condition. Lessor shall not be required to keep the Security Deposit separate from its general accounts. Within 90 days after the expiration or termination of this Lease, Lessor shall return that portion of the Security Deposit not used or applied by Lessor. Lessor shall upon written request provide Lessee with an accounting showing how that portion of the Security Deposit that was not returned was applied. No part of the Security Deposit shall bear interest or be considered prepayment for any monies to be paid by Lessee under this Lease. THE SECURITY DEPOSIT SHALL NOT BE USED BY LESSEE IN LIEU OF PAYMENT OF THE LAST MONTH'S RENT.

**6.    Use.**

6.1    **Use.** Lessee shall use and occupy the Premises only for the Agreed Use, or any other legal use which is reasonably comparable thereto, and for no other purpose. Lessee shall not use or permit the use of the Premises in a manner that is unlawful, creates damage, waste or a nuisance, or that disturbs occupants of or causes damage to neighboring premises or properties. Other than guide, signal and seeing eye dogs, Lessee shall not keep or allow in the Premises any pets, animals, birds, fish, or reptiles. Lessor shall not unreasonably withhold or delay its consent to any written request for a modification of the Agreed Use, so long as the same will not impair the structural integrity of the Building or the mechanical or electrical systems therein, and/or is not significantly more burdensome to the Project. If Lessor elects to withhold consent, Lessor shall within 7 days after such request give written notification of same, which notice shall include an explanation of Lessor's objections to the change in the Agreed Use.

6.2    **Hazardous Substances.**

(a)    **Reportable Uses Require Consent.** The term "**Hazardous Substance**" as used in this Lease shall mean any product, substance, or waste whose presence, use, manufacture, disposal, transportation, or release, either by itself or in combination with other materials expected to be on the Premises, is either: (i) potentially injurious to the public health, safety or welfare, the environment or the Premises, (ii) regulated or monitored by any governmental authority, or (iii) a basis for potential liability of Lessor to any governmental agency or third party under any applicable statute or common law theory. Hazardous Substances shall include, but not be limited to, hydrocarbons, petroleum, gasoline, and/or crude oil or any products, by-products or fractions thereof. Lessee shall not engage in any activity in or on the Premises which constitutes a Reportable Use of Hazardous Substances without the express prior written consent of Lessor and timely compliance (at Lessee's expense) with all Applicable Requirements. "**Reportable Use**" shall mean (i) the installation or use of any above or below ground storage tank, (ii) the generation, possession, storage, use, transportation, or disposal of a Hazardous Substance that requires a permit from, or with respect to which a report, notice, registration or business plan is required to be filed with, any governmental authority, and/or (iii) the presence at the Premises of a Hazardous Substance with respect to which any Applicable Requirements requires that a notice be given to persons entering or occupying the Premises or neighboring properties. Notwithstanding the foregoing, Lessee may use any ordinary and customary materials reasonably required to be used in the normal course of the Agreed Use, ordinary office supplies (copier toner, liquid paper, glue, etc.) and common household cleaning materials, so long as such use is in compliance with all Applicable Requirements, is not a Reportable Use, and does not expose the Premises or neighboring property to any meaningful risk of contamination or damage or expose Lessor to any liability therefor. In addition, Lessor may condition its consent to any Reportable Use upon receiving such additional assurances as Lessor reasonably deems necessary to protect itself, the public, the Premises and/or the environment against damage, contamination, injury and/or liability, including, but not limited to, the installation (and removal on or before Lease expiration or termination) of protective modifications (such as concrete encasements) and/or increasing the Security Deposit.

(b)    **Duty to Inform Lessor.** If Lessee knows, or has reasonable cause to believe, that a Hazardous Substance has come to be located in, on, under or about the Premises, other than as previously consented to by Lessor, Lessee shall immediately give written notice of such fact to Lessor, and provide Lessor with a copy of any report, notice, claim or other documentation which it has concerning the presence of such Hazardous Substance.

(c)    **Lessee Remediation.** Lessee shall not cause or permit any Hazardous Substance to be spilled or released in, on, under, or about the Premises (including through the plumbing or sanitary sewer system) and shall promptly, at Lessee's expense, comply with all Applicable Requirements and take all investigatory and/or remedial action reasonably recommended, whether or not formally ordered or required, for the cleanup of any contamination of, and for the maintenance, security and/or monitoring of the Premises or neighboring properties, that was caused or materially contributed to by Lessee, or pertaining to or involving any Hazardous Substance brought onto the Premises during the term of this Lease, by or for Lessee, or any third party.

(d)    **Lessee Indemnification.** Lessee shall indemnify, defend and hold Lessor, its agents, employees, lenders and ground lessor, if any, harmless from and against any and all loss of rents and/or damages, liabilities, judgments, claims, expenses, penalties, and attorneys' and consultants' fees arising out of or involving any Hazardous Substance brought onto the Premises by or for Lessee, or any third party (provided, however, that Lessee shall have no liability under this Lease with respect to underground migration of any Hazardous Substance under the Premises from areas outside of the Project not caused or contributed to by Lessee). Lessee's obligations shall include, but not be limited to, the effects of any contamination or injury to person, property or the environment created or suffered by Lessee, and the cost of investigation, removal, remediation, restoration and/or abatement, and shall survive the expiration or termination of this Lease. No termination, cancellation or release agreement entered into by Lessor and Lessee shall release Lessee from its obligations under this Lease with respect to Hazardous Substances, unless specifically so agreed by Lessor in writing at the time of such agreement.

(e)    **Lessor Indemnification.** Except as otherwise provided in paragraph 8.7, Lessor and its successors and assigns shall indemnify, defend, reimburse and hold Lessee, its employees and lenders, harmless from and against any and all environmental damages, including the cost of remediation, which are suffered as a direct result of Hazardous Substances on the Premises prior to Lessee taking possession or which are caused by the gross negligence or willful misconduct of Lessor, its agents or employees. Lessor's obligations, as and when required by the Applicable Requirements, shall include, but not be limited to, the cost of investigation, removal, remediation, restoration and/or abatement, and shall survive the expiration or termination of this Lease.

(f)    **Investigations and Remediations.** Lessor shall retain the responsibility and pay for any investigations or remediation measures required by governmental entities having jurisdiction with respect to the existence of Hazardous Substances on the Premises prior to the Lessee taking possession, unless such remediation measure is required as a result of Lessee's use (including "Alterations", as defined in paragraph 7.3(a) below) of the Premises, in which event Lessee shall be responsible for such payment. Lessee shall cooperate fully in any such activities at the request of Lessor, including allowing Lessor and Lessor's agents to have reasonable access to the Premises at reasonable times in order to carry out Lessor's investigative and remedial responsibilities.

(g)    **Lessor Termination Option.** If a Hazardous Substance Condition (see Paragraph 9.1(e)) occurs during the term of this Lease, unless Lessee is legally responsible therefor (in which case Lessee shall make the investigation and remediation thereof required by the Applicable Requirements and this Lease shall continue in full force and effect, but subject to Lessor's rights under Paragraph 6.2(d) and Paragraph 13), Lessor may, at Lessor's option, either (i) investigate and remediate such Hazardous Substance Condition, if required, as soon as reasonably possible at Lessor's expense, in which event this Lease shall continue in full force and effect, or (ii) if the estimated cost to remediate such condition exceeds 12 times the then monthly Base Rent or $100,000, whichever is greater, give written notice to Lessee, within 30 days after receipt by Lessor of knowledge of the occurrence of such Hazardous Substance Condition, of Lessor's desire to terminate this Lease as of the date 60 days following the date of such notice. In the event Lessor elects to give a termination notice, Lessee may, within 10 days thereafter, give written notice to Lessor of Lessee's commitment to pay the amount by which the cost of the remediation of such Hazardous Substance Condition exceeds an amount equal to 12 times the then monthly Base Rent or $100,000, whichever is greater. Lessee shall provide Lessor with said funds or satisfactory assurance thereof within 30 days following such commitment. In such event, this Lease shall continue in full force and effect, and Lessor shall proceed to make such remediation as soon as reasonably possible after the required funds are available. If Lessee does not give such notice and provide the required funds or assurance thereof within the time provided, this Lease shall terminate as of the date specified in Lessor's notice of termination.

6.3    **Lessee's Compliance with Applicable Requirements.** Except as otherwise provided in this Lease, Lessee shall, at Lessee's sole expense, fully, diligently and in a timely manner, materially comply with all Applicable Requirements, the requirements of any applicable fire insurance underwriter or rating bureau, and the recommendations of Lessor's engineers and/or consultants which relate in any manner to the Premises, without regard to whether said Applicable Requirements are now in effect or become effective after the Start Date. Lessee shall, within 10 days after receipt of Lessor's written request, provide Lessor with copies of all permits and other documents, and other information evidencing Lessee's compliance with any Applicable Requirements specified by Lessor, and shall immediately upon receipt, notify Lessor in writing (with copies of any documents involved) of any threatened or actual claim, notice, citation, warning, complaint or report pertaining to or involving the failure of Lessee or the Premises to comply with any Applicable Requirements. Likewise, Lessee shall immediately give written notice to Lessor of: (i) any water damage to the Premises and any suspected seepage, pooling, dampness or other condition conducive to the production of mold; or (ii) any mustiness or other odors that might indicate the presence of mold in the Premises.

6.4    **Inspection; Compliance.** Lessor and Lessor's "**Lender**" (as defined in Paragraph 30) and consultants authorized by Lessor shall have the right to enter into Premises at any time in the case of an emergency, and otherwise at reasonable times after reasonable notice, for the purpose of inspecting and/or testing the condition of the Premises and/or for verifying compliance by Lessee with this Lease. The cost of any such inspections shall be paid by Lessor, unless a violation of Applicable Requirements, or a Hazardous Substance Condition (see Paragraph 9.1(e)) is found to exist or be imminent, or the inspection is requested or ordered by a governmental authority. In such case, Lessee shall upon request reimburse Lessor for the cost of such inspection, so long as such inspection is reasonably related to the violation or contamination. In addition, Lessee shall provide copies of all relevant material safety data sheets (**MSDS**) to Lessor within 10 days of the receipt of written request therefor. Lessee acknowledges that any failure on its part to allow such inspections or testing will expose Lessor to risks and potentially cause Lessor to incur costs not contemplated by this Lease, the extent of which will be extremely difficult to ascertain. Accordingly, should the Lessee fail to allow such inspections and/or testing in a timely fashion the Base Rent shall be automatically increased, without any requirement for notice to Lessee, by an amount equal to 10% of the then existing Base Rent or $100, whichever is greater for the remainder to the Lease. The Parties agree that such increase in Base Rent represents fair and reasonable compensation for the additional risk/costs that Lessor will incur by reason of Lessee's failure to allow such inspection and/or testing. Such increase in Base Rent shall in no event constitute a waiver of Lessee's Default or Breach with respect to such failure nor prevent the exercise of any of the other rights and remedies granted hereunder.

Hy
_____
INITIALS

CT
_____
KK
_____
INITIALS

© 2019 AIR CRE.  All Rights Reserved.
MTN-26.30, Revised 10-22-2020

**7.    Maintenance; Repairs; Utility Installations; Trade Fixtures and Alterations.**

7.1    **Lessee's Obligations.**

(a)    **In General.**  Subject to the provisions of Paragraph 2.2 (Condition), 2.3 (Compliance), 6.3 (Lessee's Compliance with Applicable Requirements), 7.2 (Lessor's Obligations), 9 (Damage or Destruction), and 14 (Condemnation), Lessee shall, at Lessee's sole expense, keep the Premises, Utility Installations (intended for Lessee's exclusive use, no matter where located), and Alterations in good order, condition and repair (whether or not the portion of the Premises requiring repairs, or the means of repairing the same, are reasonably or readily accessible to Lessee, and whether or not the need for such repairs occurs as a result of Lessee's use, any prior use, the elements or the age of such portion of the Premises), including, but not limited to, all equipment or facilities, such as plumbing, HVAC equipment, electrical, lighting facilities, boilers, pressure vessels, fixtures, interior walls, interior surfaces of exterior walls, ceilings, floors, windows, doors, plate glass, and skylights but excluding any items which are the responsibility of Lessor pursuant to Paragraph 7.2.  Lessee, in keeping the Premises in good order, condition and repair, shall exercise and perform good maintenance practices, specifically including the procurement and maintenance of the service contracts required by Paragraph 7.1(b) below.  Lessee's obligations shall include restorations, replacements or renewals when necessary to keep the Premises and all improvements thereon or a part thereof in good order, condition and state of repair.

(b)    **Service Contracts.**  Lessee shall, at Lessee's sole expense, procure and maintain contracts, with copies to Lessor, in customary form and substance for, and with contractors specializing and experienced in the maintenance of the following equipment and improvements, if any, if and when installed on the Premises:  (i) HVAC equipment, (ii) boiler and pressure vessels, and (iii) clarifiers.  However, Lessor reserves the right, upon notice to Lessee, to procure and maintain any or all of such service contracts, and Lessee shall reimburse Lessor, upon demand, for the cost thereof.

(c)    **Failure to Perform.**  If Lessee fails to perform Lessee's obligations under this Paragraph 7.1, Lessor may enter upon the Premises after 10 days' prior written notice to Lessee (except in the case of an emergency, in which case no notice shall be required), perform such obligations on Lessee's behalf, and put the Premises in good order, condition and repair, and Lessee shall promptly pay to Lessor a sum equal to 115% of the cost thereof.

(d)    **Replacement.**  Subject to Lessee's indemnification of Lessor as set forth in Paragraph 8.7 below, and without relieving Lessee of liability resulting from Lessee's failure to exercise and perform good maintenance practices, if an item described in Paragraph 7.1(b) cannot be repaired other than at a cost which is in excess of 50% of the cost of replacing such item, then such item shall be replaced by Lessor, and the cost thereof shall be prorated between the Parties and Lessee shall only be obligated to pay, each month during the remainder of the term of this Lease or any extension thereof, on the date on which Base Rent is due, an amount equal to the product of multiplying the cost of such replacement by a fraction, the numerator of which is one, and the denominator of which is 144 (i.e. 1/144th of the cost per month).  Lessee shall pay Interest on the unamortized balance but may prepay its obligation at any time.

7.2    **Lessor's Obligations.**  Subject to the provisions of Paragraphs 2.2 (Condition), 2.3 (Compliance), 4.2 (Common Area Operating Expenses), 6 (Use), 7.1 (Lessee's Obligations), 9 (Damage or Destruction) and 14 (Condemnation), Lessor, subject to reimbursement pursuant to Paragraph 4.2, shall keep in good order, condition and repair the foundations, exterior walls, structural condition of interior bearing walls, exterior roof, fire sprinkler system, Common Area fire alarm and/or smoke detection systems, fire hydrants, parking lots, walkways, parkways, driveways, landscaping, fences, signs and utility systems serving the Common Areas and all parts thereof, as well as providing the services for which there is a Common Area Operating Expense pursuant to Paragraph 4.2.  Lessor shall not be obligated to paint the exterior or interior surfaces of exterior walls nor shall Lessor be obligated to maintain, repair or replace windows, doors or plate glass of the Premises.

7.3    **Utility Installations; Trade Fixtures; Alterations.**

(a)    **Definitions.**  The term "**Utility Installations**" refers to all floor and window coverings, air and/or vacuum lines, power panels, electrical distribution, security and fire protection systems, communication cabling, lighting fixtures, HVAC equipment, plumbing, and fencing in or on the Premises.  The term "**Trade Fixtures**" shall mean Lessee's machinery and equipment that can be removed without doing material damage to the Premises.  The term "**Alterations**" shall mean any modification of the improvements, other than Utility Installations or Trade Fixtures, whether by addition or deletion.  "**Lessee Owned Alterations and/or Utility Installations**" are defined as Alterations and/or Utility Installations made by Lessee that are not yet owned by Lessor pursuant to Paragraph 7.4(a).

(b)    **Consent.**  Lessee shall not make any Alterations or Utility Installations to the Premises without Lessor's prior written consent.  Lessee may, however, make non-structural Alterations or Utility Installations to the interior of the Premises (excluding the roof) without such consent but upon notice to Lessor, as long as they are not visible from the outside, do not involve puncturing, relocating or removing the roof or any existing walls, will not affect the electrical, plumbing, HVAC, and/or life safety systems, do not trigger the requirement for additional modifications and/or improvements to the Premises resulting from Applicable Requirements, such as compliance with Title 24, and/or life safety systems, and the cumulative cost thereof during this Lease as extended does not exceed a sum equal to 3 month's Base Rent in the aggregate or a sum equal to one month's Base Rent in any one year.  Notwithstanding the foregoing, Lessee shall not make or permit any roof penetrations and/or install anything on the roof without the prior written approval of Lessor.  Lessor may, as a precondition to granting such approval, require Lessee to utilize a contractor chosen and/or approved by Lessor.  Any Alterations or Utility Installations that Lessee shall desire to make and which require the consent of the Lessor shall be presented to Lessor in written form with detailed plans.  Consent shall be deemed conditioned upon Lessee's: (i) acquiring all applicable governmental permits, (ii) furnishing Lessor with copies of both the permits and the plans and specifications prior to commencement of the work, and (iii) compliance with all conditions of said permits and other Applicable Requirements in a prompt and expeditious manner.  Any Alterations or Utility Installations shall be performed in a workmanlike manner with good and sufficient materials.  Lessee shall promptly upon completion furnish Lessor with as-built plans and specifications.  For work which costs an amount in excess of one month's Base Rent, Lessee may condition its consent upon Lessee providing a lien and completion bond in an amount equal to 150% of the estimated cost of such Alteration or Utility Installation and/or upon Lessee's posting an additional Security Deposit with Lessor.

(c)    **Liens; Bonds.**  Lessee shall pay, when due, all claims for labor or materials furnished or alleged to have been furnished to or for Lessee at or for use on the Premises, which claims are or may be secured by any mechanic's or materialmen's lien against the Premises or any interest therein.  Lessee shall give Lessor not less than 10 days notice prior to the commencement of any work in, on or about the Premises, and Lessor shall have the right to post notices of non-responsibility.  If Lessee shall contest the validity of any such lien, claim or demand, then Lessee shall, at its sole expense defend and protect itself, Lessor and the Premises against the same and shall pay and satisfy any such adverse judgment that may be rendered thereon before the enforcement thereof.  If Lessor shall require, Lessee shall furnish a surety bond in an amount equal to 150% of the amount of such contested lien, claim or demand, indemnifying Lessor against liability for the same.  If Lessor elects to participate in any such action, Lessee shall pay Lessor's attorneys' fees and costs.

7.4    **Ownership; Removal; Surrender; and Restoration.**

(a)    **Ownership.**  Subject to Lessor's right to require removal or elect ownership as hereinafter provided, all Alterations and Utility Installations made by Lessee shall be the property of Lessee, but considered a part of the Premises.  Lessor may, at any time, elect in writing to be the owner of all or any specified part of the Lessee Owned Alterations and Utility Installations.  Unless otherwise instructed per paragraph 7.4(b) hereof, all Lessee Owned Alterations and Utility Installations shall, at the expiration or termination of this Lease, become the property of Lessor and be surrendered by Lessee with the Premises.

(b)    **Removal.**  By delivery to Lessee of written notice from Lessor not earlier than 90 and not later than 30 days prior to the end of the term of this Lease, Lessor may require that any or all Lessee Owned Alterations or Utility Installations be removed by the expiration or termination of this Lease.  Lessor may require the removal at any time of all or any part of any Lessee Owned Alterations or Utility Installations made without the required consent.

(c)    **Surrender; Restoration.**  Lessee shall surrender the Premises by the Expiration Date or any earlier termination date, with all of the improvements, parts and surfaces thereof broom clean and free of debris, and in good operating order, condition and state of repair, ordinary wear and tear excepted.  "Ordinary wear and tear" shall not include any damage or deterioration that would have been prevented by good maintenance practice.  Notwithstanding the foregoing and the provisions of Paragraph 7.1(a), if the Lessee occupies the Premises for 12 months or less, then Lessee shall surrender the Premises in the same condition as delivered to Lessee on the Start Date with NO allowance for ordinary wear and tear.  Lessee shall repair any damage occasioned by the installation, maintenance or removal of Trade Fixtures, Lessee owned Alterations and/or Utility Installations, furnishings, and equipment as well as the removal of any storage tank installed by or for Lessee.  Lessee shall also remove from the Premises any and all Hazardous Substances brought onto the Premises by or for Lessee, or any third party (except Hazardous Substances which were deposited via underground migration from areas outside of the Project) to the level specified in Applicable Requirements.  Trade Fixtures shall remain the property of Lessee and shall be removed by Lessee.  Any personal property of Lessee not removed on or before the Expiration Date or any earlier termination date shall be deemed to have been abandoned by Lessee and may be disposed of or retained by Lessor as Lessor may desire.  The failure by Lessee to timely vacate the Premises pursuant to this Paragraph 7.4(c) without the express written consent of Lessor shall constitute a holdover under the provisions of Paragraph 26 below.

**8.    Insurance; Indemnity.**

8.1    **Payment of Premiums.**  The cost of the premiums for the insurance policies required to be carried by Lessor, pursuant to Paragraphs 8.2(b), 8.3(a) and 8.3(b), shall be a Common Area Operating Expense.  Premiums for policy periods commencing prior to, or extending beyond, the term of this Lease shall be prorated to coincide with the corresponding Start Date or Expiration Date.

8.2    **Liability Insurance.**

(a)    **Carried by Lessee.**  Lessee shall obtain and keep in force a Commercial General Liability policy of insurance protecting Lessee and Lessor as an additional insured against claims for bodily injury, personal injury and property damage based upon or arising out of the ownership, use, occupancy or maintenance of the Premises and all areas appurtenant thereto.  Such insurance shall be on an occurrence basis providing single limit coverage in an amount not less than $1,000,000 per occurrence with an annual aggregate of not less than $2,000,000.  Lessee shall add Lessor as an additional insured by means of an endorsement at least as broad as the Insurance Service Organization's "Additional Insured-Managers or Lessors of Premises" Endorsement.  The policy shall not contain any intra-insured exclusions as between insured persons or organizations, but shall include coverage for liability assumed under this Lease as an "**insured contract**" for the performance of Lessee's

| Hy | CT |
|---|---|
|  | KK |
| INITIALS | INITIALS |

© 2019 AIR CRE.  All Rights Reserved.
Last Edited: 7/30/2021 11:42 AM
MTN-26.30, Revised 10-22-2020

indemnity obligations under this Lease. The limits of said insurance shall not, however, limit the liability of Lessee nor relieve Lessee of any obligation hereunder. Lessee shall provide an endorsement on its liability policy(ies) which provides that its insurance shall be primary and not contributory with any similar insurance carried by Lessor, whose insurance shall be considered excess insurance only.

    (b)    **Carried by Lessor**.  Lessor shall maintain liability insurance as described in Paragraph 8.2(a), in addition to, and not in lieu of, the insurance required to be maintained by Lessee.  Lessee shall not be named as an additional insured therein.

    8.3    **Property Insurance - Building, Improvements and Rental Value**.

    (a)    **Building and Improvements**.  Lessor shall obtain and keep in force a policy or policies of insurance in the name of Lessor, with loss payable to Lessor, any ground-lessor, and to any Lender insuring loss or damage to the Premises.  The amount of such insurance shall be equal to the full insurable replacement cost of the Premises, as the same shall exist from time to time, or the amount required by any Lender, but in no event more than the commercially reasonable and available insurable value thereof.  Lessee Owned Alterations and Utility Installations, Trade Fixtures, and Lessee's personal property shall be insured by Lessee not by Lessor.  If the coverage is available and commercially appropriate, such policy or policies shall insure against all risks of direct physical loss or damage (except including the perils of flood and/or earthquake unless required by a Lender), including coverage for debris removal and the enforcement of any Applicable Requirements requiring the upgrading, demolition, reconstruction or replacement of any portion of the Premises as the result of a covered loss.  Said policy or policies shall also contain an agreed valuation provision in lieu of any coinsurance clause, waiver of subrogation, and inflation guard protection causing an increase in the annual property insurance coverage amount by a factor of not less than the adjusted U.S. Department of Labor Consumer Price Index for All Urban Consumers for the city nearest to where the Premises are located.  If such insurance coverage has a deductible clause, the deductible amount shall not exceed $5,000 per occurrence.

    (b)    **Rental Value**.  Lessor shall also obtain and keep in force a policy or policies in the name of Lessor with loss payable to Lessor and any Lender, insuring the loss of the full Rent for one year with an extended period of indemnity for an additional 180 days ("Rental Value insurance").  Said insurance shall contain an agreed valuation provision in lieu of any coinsurance clause, and the amount of coverage shall be adjusted annually to reflect the projected Rent otherwise payable by Lessee, for the next 12 month period.

    (c)    **Adjacent Premises**.  Lessee shall pay for any increase in the premiums for the property insurance of the Building and for the Common Areas or other buildings in the Project if said increase is caused by Lessee's acts, omissions, use or occupancy of the Premises.

    (d)    **Lessee's Improvements**.  Since Lessor is the Insuring Party, Lessor shall not be required to insure Lessee Owned Alterations and Utility Installations unless the item in question has become the property of Lessor under the terms of this Lease.

    8.4    **Lessee's Property; Business Interruption Insurance; Worker's Compensation Insurance**.

    (a)    **Property Damage**.  Lessee shall obtain and maintain insurance coverage on all of Lessee's personal property, Trade Fixtures, and Lessee Owned Alterations and Utility Installations.  Such insurance shall be full replacement cost coverage with a deductible of not to exceed $1,000 per occurrence.  The proceeds from any such insurance shall be used by Lessee for the replacement of personal property, Trade Fixtures and Lessee Owned Alterations and Utility Installations.

    (b)    **Business Interruption**.  Lessee shall obtain and maintain loss of income and extra expense insurance in amounts as will reimburse Lessee for direct or indirect loss of earnings attributable to all perils commonly insured against by prudent lessees in the business of Lessee or attributable to prevention of access to the Premises as a result of such perils.

    (c)    **Worker's Compensation Insurance**.  Lessee shall obtain and maintain Worker's Compensation Insurance in such amount as may be required by Applicable Requirements.  Such policy shall include a 'Waiver of Subrogation' endorsement.  Lessee shall provide Lessor with a copy of such endorsement along with the certificate of insurance or copy of the policy required by paragraph 8.5.

    (d)    **No Representation of Adequate Coverage**.  Lessor makes no representation that the limits or forms of coverage of insurance specified herein are adequate to cover Lessee's property, business operations or obligations under this Lease.

    8.5    **Insurance Policies**.  Insurance required herein shall be by companies maintaining during the policy term a "General Policyholders Rating" of at least A-, VII, as set forth in the most current issue of "Best's Insurance Guide", or such other rating as may be required by a Lender.  Lessee shall not do or permit to be done anything which invalidates the required insurance policies.  Lessee shall, prior to the Start Date, deliver to Lessor certified copies of policies of such insurance or certificates with copies of the required endorsements evidencing the existence and amounts of the required insurance.  No such policy shall be cancelable or subject to modification except after 30 days prior written notice to Lessor.  Lessee shall, at least 10 days prior to the expiration of such policies, furnish Lessor with evidence of renewals or "insurance binders" evidencing renewal thereof, or Lessor may increase his liability insurance coverage and charge the cost thereof to Lessee, which amount shall be payable by Lessee to Lessor upon demand.  Such policies shall be for a term of at least one year, or the length of the remaining term of this Lease, whichever is less.  If either Party shall fail to procure and maintain the insurance required to be carried by it, the other Party may, but shall not be required to, procure and maintain the same.

    8.6    **Waiver of Subrogation**.  Without affecting any other rights or remedies, Lessee and Lessor each hereby release and relieve the other, and waive their entire right to recover damages against the other, for loss of or damage to its property arising out of or incident to the perils required to be insured against herein.  The effect of such releases and waivers is not limited by the amount of insurance carried or required, or by any deductibles applicable hereto.  The Parties agree to have their respective property damage insurance carriers waive any right to subrogation that such companies may have against Lessor or Lessee, as the case may be, so long as the insurance is not invalidated thereby.

    8.7    **Indemnity**.  Except for Lessor's gross negligence or willful misconduct, Lessee shall indemnify, protect, defend and hold harmless the Premises, Lessor and its agents, Lessor's master or ground lessor, partners and Lenders, from and against any and all claims, loss of rents and/or damages, liens, judgments, penalties, attorneys' and consultants' fees, expenses and/or liabilities arising out of, involving, or in connection with, a Breach of the Lease by Lessee and/or the use and/or occupancy of the Premises and/or Project by Lessee and/or by Lessee's employees, contractors or invitees . If any action or proceeding is brought against Lessor by reason of any of the foregoing matters, Lessee shall upon notice defend the same at Lessee's expense by counsel reasonably satisfactory to Lessor and Lessor shall cooperate with Lessee in such defense.  Lessor need not have first paid any such claim in order to be defended or indemnified.

    8.8    **Exemption of Lessor and its Agents from Liability**.  Notwithstanding the negligence or breach of this Lease by Lessor or its agents, neither Lessor nor its agents shall be liable under any circumstances for: (i) injury or damage to the person or goods, wares, merchandise or other property of Lessee, Lessee's employees, contractors, invitees, customers, or any other person in or about the Premises, whether such damage or injury is caused by or results from fire, steam, electricity, gas, water or rain, indoor air quality, the presence of mold or from the breakage, leakage, obstruction or other defects of pipes, fire sprinklers, wires, appliances, plumbing, HVAC or lighting fixtures, or from any other cause, whether the said injury or damage results from conditions arising upon the Premises or upon other portions of the Building, or from other sources or places; (ii) any damages arising from any act or neglect of any other tenant of Lessor or from the failure of Lessor or its agents to enforce the provisions of any other lease in the Project; or (iii) injury to Lessee's business or for any loss of income or profit therefrom.  Instead, it is intended that Lessee's sole recourse in the event of such damages or injury be to file a claim on the insurance policy(ies) that Lessee is required to maintain pursuant to the provisions of paragraph 8.

    8.9    **Failure to Provide Insurance**.  Lessee acknowledges that any failure on its part to obtain or maintain the insurance required herein will expose Lessor to risks and potentially cause Lessor to incur costs not contemplated by this Lease, the extent of which will be extremely difficult to ascertain.  Accordingly, for any month or portion thereof that Lessee does not maintain the required insurance and/or does not provide Lessor with the required binders or certificates evidencing the existence of the required insurance, the Base Rent shall be automatically increased, without any requirement for notice to Lessee, by an amount equal to 10% of the then existing Base Rent or $100, whichever is greater.  The parties agree that such increase in Base Rent represents fair and reasonable compensation for the additional risk/costs that Lessee will incur by reason of Lessee's failure to maintain the required insurance.  Such increase in Base Rent shall in no event constitute a waiver of Lessee's Default or Breach with respect to the failure to maintain such insurance, prevent the exercise of any of the other rights and remedies granted hereunder, nor relieve Lessee of its obligation to maintain the insurance specified in this Lease.

**9.**    **Damage or Destruction.**

    9.1    **Definitions**.

    (a)    **"Premises Partial Damage"** shall mean damage or destruction to the improvements on the Premises, other than Lessee Owned Alterations and Utility Installations, which can reasonably be repaired in 3 months or less from the date of the damage or destruction, and the cost thereof does not exceed a sum equal to 6 month's Base Rent.  Lessor shall notify Lessee in writing within 30 days from the date of the damage or destruction as to whether or not the damage is Partial or Total.

    (b)    **"Premises Total Destruction"** shall mean damage or destruction to the improvements on the Premises, other than Lessee Owned Alterations and Utility Installations and Trade Fixtures, which cannot reasonably be repaired in 3 months or less from the date of the damage or destruction and/or the cost thereof exceeds a sum equal to 6 month's Base Rent.  Lessor shall notify Lessee in writing within 30 days from the date of the damage or destruction as to whether or not the damage is Partial or Total.

    (c)    **"Insured Loss"** shall mean damage or destruction to improvements on the Premises, other than Lessee Owned Alterations and Utility Installations and Trade Fixtures, which was caused by an event required to be covered by the insurance described in Paragraph 8.3(a), irrespective of any deductible amounts or coverage limits involved.

    (d)    **"Replacement Cost"** shall mean the cost to repair or rebuild the improvements owned by Lessor at the time of the occurrence to their condition existing immediately prior thereto, including demolition, debris removal and upgrading required by the operation of Applicable Requirements, and without deduction for depreciation.

Hy
_____
INITIALS

CT
KK
_____
INITIALS

© 2019 AIR CRE.  All Rights Reserved.
MTN-26.30, Revised 10-22-2020

Last Edited: 7/30/2021 11:42 AM

(e)   "**Hazardous Substance Condition**" shall mean the occurrence or discovery of a condition involving the presence of, or a contamination by, a Hazardous Substance, in, on, or under the Premises which requires restoration.

9.2   **Partial Damage - Insured Loss**.  If a Premises Partial Damage that is an Insured Loss occurs, then Lessor shall, at Lessor's expense, repair such damage (but not Lessee's Trade Fixtures or Lessee Owned Alterations and Utility Installations) as soon as reasonably possible and this Lease shall continue in full force and effect; provided, however, that Lessee shall, at Lessor's election, make the repair of any damage or destruction the total cost to repair of which is $10,000 or less, and, in such event, Lessor shall make any applicable insurance proceeds available to Lessee on a reasonable basis for that purpose.  Notwithstanding the foregoing, if the required insurance was not in force or the insurance proceeds are not sufficient to effect such repair, the Insuring Party shall promptly contribute the shortage in proceeds as and when required to complete said repairs.  In the event, however, such shortage was due to the fact that, by reason of the unique nature of the improvements, full replacement cost insurance coverage was not commercially reasonable and available, Lessor shall have no obligation to pay for the shortage in insurance proceeds or to fully restore the unique aspects of the Premises unless Lessee provides Lessor with the funds to cover same, or adequate assurance thereof, within 10 days following receipt of written notice of such shortage and request therefor.  If Lessor receives said funds or adequate assurance thereof within said 10 day period, the party responsible for making the repairs shall complete them as soon as reasonably possible and this Lease shall remain in full force and effect.  If such funds or assurance are not received, Lessor may nevertheless elect by written notice to Lessee within 10 days thereafter to:  (i) make such restoration and repair as is commercially reasonable with Lessor paying any shortage in proceeds, in which case this Lease shall remain in full force and effect, or (ii) have this Lease terminate 30 days thereafter.  Lessee shall not be entitled to reimbursement of any funds contributed by Lessee to repair any such damage or destruction.  Premises Partial Damage due to flood or earthquake shall be subject to Paragraph 9.3, notwithstanding that there may be some insurance coverage, but the net proceeds of any such insurance shall be made available for the repairs if made by either Party.

9.3   **Partial Damage - Uninsured Loss**.  If a Premises Partial Damage that is not an Insured Loss occurs, unless caused by a negligent or willful act of Lessee (in which event Lessee shall make the repairs at Lessee's expense), Lessor may either:  (i) repair such damage as soon as reasonably possible at Lessor's expense (subject to reimbursement pursuant to Paragraph 4.2), in which event this Lease shall continue in full force and effect, or (ii) terminate this Lease by giving written notice to Lessee within 30 days after receipt by Lessor of knowledge of the occurrence of such damage.  Such termination shall be effective 60 days following the date of such notice.  In the event Lessor elects to terminate this Lease, Lessee shall have the right within 10 days after receipt of the termination notice to give written notice to Lessor of Lessee's commitment to pay for the repair of such damage without reimbursement from Lessor.  Lessee shall provide Lessor with said funds or satisfactory assurance thereof within 30 days after making such commitment.  In such event this Lease shall continue in full force and effect, and Lessor shall proceed to make such repairs as soon as reasonably possible after the required funds are available.  If Lessee does not make the required commitment, this Lease shall terminate as of the date specified in the termination notice.

9.4   **Total Destruction**.  Notwithstanding any other provision hereof, if a Premises Total Destruction occurs, this Lease shall terminate 60 days following such Destruction.  If the damage or destruction was caused by the gross negligence or willful misconduct of Lessee, Lessor shall have the right to recover Lessor's damages from Lessee, except as provided in Paragraph 8.6.

9.5   **Damage Near End of Term**.  If at any time during the last 6 months of this Lease there is damage for which the cost to repair exceeds one month's Base Rent, whether or not an Insured Loss, Lessor may terminate this Lease effective 60 days following the date of occurrence of such damage by giving a written termination notice to Lessee within 30 days after the date of occurrence of such damage.  Notwithstanding the foregoing, if Lessee at that time has an exercisable option to extend this Lease or to purchase the Premises, then Lessee may preserve this Lease by (a) exercising such option and (b) providing Lessor with any shortage in insurance proceeds (or adequate assurance thereof) needed to make the repairs on or before the earlier of (i) the date which is 10 days after Lessee's receipt of Lessor's written notice purporting to terminate this Lease, or (ii) the day prior to the date upon which such option expires.  If Lessee duly exercises such option during such period and provides Lessor with funds (or adequate assurance thereof) to cover any shortage in insurance proceeds, Lessor shall, at Lessor's commercially reasonable expense, repair such damage as soon as reasonably possible and this Lease shall continue in full force and effect.  If Lessee fails to exercise such option and provide such funds or assurance during such period, then this Lease shall terminate on the date specified in the termination notice and Lessee's option shall be extinguished.

9.6   **Abatement of Rent; Lessee's Remedies**.

(a)   **Abatement**.  In the event of Premises Partial Damage or Premises Total Destruction or a Hazardous Substance Condition for which Lessee is not responsible under this Lease, the Rent payable by Lessee for the period required for the repair, remediation or restoration of such damage shall be abated in proportion to the degree to which Lessee's use of the Premises is impaired, but not to exceed the proceeds received from the Rental Value insurance.  All other obligations of Lessee hereunder shall be performed by Lessee, and Lessor shall have no liability for any such damage, destruction, remediation, repair or restoration except as provided herein.

(b)   **Remedies**.  If Lessor is obligated to repair or restore the Premises and does not commence, in a substantial and meaningful way, such repair or restoration within 90 days after such obligation shall accrue, Lessee may, at any time prior to the commencement of such repair or restoration, give written notice to Lessor and to any Lenders of which Lessee has actual notice, of Lessee's election to terminate this Lease on a date not less than 60 days following the giving of such notice.  If Lessee gives such notice and such repair or restoration is not commenced within 30 days thereafter, this Lease shall terminate as of the date specified in said notice.  If the repair or restoration is commenced within such 30 days, this Lease shall continue in full force and effect.  "Commence" shall mean either the unconditional authorization of the preparation of the required plans, or the beginning of the actual work on the Premises, whichever first occurs.

9.7   **Termination; Advance Payments**.  Upon termination of this Lease pursuant to Paragraph 6.2(g) or Paragraph 9, an equitable adjustment shall be made concerning advance Base Rent and any other advance payments made by Lessee to Lessor.  Lessor shall, in addition, return to Lessee so much of Lessee's Security Deposit as has not been, or is not then required to be, used by Lessor.

10.   **Real Property Taxes.**

10.1   **Definition**.  As used herein, the term "**Real Property Taxes**" shall include any form of assessment; real estate, general, special, ordinary or extraordinary, or rental levy or tax (other than inheritance, personal income or estate taxes); improvement bond; and/or license fee imposed upon or levied against any legal or equitable interest of Lessor in the Project, Lessor's right to other income therefrom, and/or Lessor's business of leasing, by any authority having the direct or indirect power to tax and where the funds are generated with reference to the Project address.  The term "Real Property Taxes" shall also include any tax, fee, levy, assessment or charge, or any increase therein: (i) imposed by reason of events occurring during the term of this Lease, including but not limited to, a change in the ownership of the Project, (ii) a change in the improvements thereon, and/or (iii) levied or assessed on machinery or equipment provided by Lessor to Lessee pursuant to this Lease.  In calculating Real Property Taxes for any calendar year, the Real Property Taxes for any real estate tax year shall be included in the calculation of Real Property Taxes for such calendar year based upon the number of days which such calendar year and tax year have in common.

10.2   **Payment of Taxes**.  Except as otherwise provided in Paragraph 10.3, Lessor shall pay the Real Property Taxes applicable to the Project, and said payments shall be included in the calculation of Common Area Operating Expenses in accordance with the provisions of Paragraph 4.2.

10.3   **Additional Improvements**.  Common Area Operating Expenses shall not include Real Property Taxes specified in the tax assessor's records and work sheets as being caused by additional improvements placed upon the Project by other lessees or by Lessor for the exclusive enjoyment of such other lessees.  Notwithstanding Paragraph 10.2 hereof, Lessee shall, however, pay to Lessor at the time Common Area Operating Expenses are payable under Paragraph 4.2, the entirety of any increase in Real Property Taxes if assessed solely by reason of Alterations, Trade Fixtures or Utility Installations placed upon the Premises by Lessee or at Lessee's request or by reason of any alterations or improvements to the Premises made by Lessee subsequent to the execution of this Lease by the Parties.

10.4   **Joint Assessment**.  If the Building is not separately assessed, Real Property Taxes allocated to the Building shall be an equitable proportion of the Real Property Taxes for all of the land and improvements included within the tax parcel assessed, such proportion to be determined by Lessor from the respective valuations assigned in the assessor's work sheets or such other information as may be reasonably available.  Lessor's reasonable determination thereof, in good faith, shall be conclusive.

10.5   **Personal Property Taxes**.  Lessee shall pay prior to delinquency all taxes assessed against and levied upon Lessee Owned Alterations and Utility Installations, Trade Fixtures, furnishings, equipment and all personal property of Lessee contained in the Premises.  When possible, Lessee shall cause its Lessee Owned Alterations and Utility Installations, Trade Fixtures, furnishings, equipment and all other personal property to be assessed and billed separately from the real property of Lessor.  If any of Lessee's said property shall be assessed with Lessor's real property, Lessee shall pay Lessor the taxes attributable to Lessee's property within 10 days after receipt of a written statement setting forth the taxes applicable to Lessee's property.

11.   **Utilities and Services.**

11.1   Lessee shall pay for all water, gas, heat, light, power, telephone, trash disposal and other utilities and services supplied to the Premises, together with any taxes thereon.  Notwithstanding the provisions of Paragraph 4.2, if at any time in Lessor's sole judgment, Lessor determines that Lessee is using a disproportionate amount of water, electricity or other commonly metered utilities, or that Lessee is generating such a large volume of trash as to require an increase in the size of the trash receptacle and/or an increase in the number of times per month that it is emptied, then Lessor may increase Lessee's Base Rent by an amount equal to such increased costs.  There shall be no abatement of Rent and Lessor shall not be liable in any respect whatsoever for the inadequacy, stoppage, interruption or discontinuance of any utility or service due to riot, strike, labor dispute, breakdown, accident, repair or other cause beyond Lessor's reasonable control or in cooperation with governmental request or directions.

Hy ____                                                          CT ____
                                                                KK ____
_____                                                         _____
INITIALS                                                        INITIALS

© 2019 AIR CRE.  All Rights Reserved.                         Last Edited: 7/30/2021 11:42 AM
MTN-26.30, Revised 10-22-2020

11.2  Within fifteen days of Lessor's written request, Lessee agrees to deliver to Lessor such information, documents and/or authorization as Lessor needs in order for Lessor to comply with new or existing Applicable Requirements relating to commercial building energy usage, ratings, and/or the reporting thereof.

**12.   Assignment and Subletting.**

12.1  **Lessor's Consent Required**.

(a)   Lessee shall not voluntarily or by operation of law assign, transfer, mortgage or encumber (collectively, "**assign or assignment**") or sublet all or any part of Lessee's interest in this Lease or in the Premises without Lessor's prior written consent.

(b)   Unless Lessee is a corporation and its stock is publicly traded on a national stock exchange, a change in the control of Lessee shall constitute an assignment requiring consent.  The transfer, on a cumulative basis, of 25% or more of the voting control of Lessee shall constitute a change in control for this purpose.

(c)   The involvement of Lessee or its assets in any transaction, or series of transactions (by way of merger, sale, acquisition, financing, transfer, leveraged buy-out or otherwise), whether or not a formal assignment or hypothecation of this Lease or Lessee's assets occurs, which results or will result in a reduction of the Net Worth of Lessee by an amount greater than 25% of such Net Worth as it was represented at the time of the execution of this Lease or at the time of the most recent assignment to which Lessor has consented, or as it exists immediately prior to said transaction or transactions constituting such reduction, whichever was or is greater, shall be considered an assignment of this Lease to which Lessor may withhold its consent.  "**Net Worth of Lessee**" shall mean the net worth of Lessee (excluding any guarantors) established under generally accepted accounting principles.

(d)   An assignment or subletting without consent shall, at Lessor's option, be a Default curable after notice per Paragraph 13.1(d), or a non-curable Breach without the necessity of any notice and grace period.  If Lessor elects to treat such unapproved assignment or subletting as a non-curable Breach, Lessor may either: (i) terminate this Lease, or (ii) upon 30 days written notice, increase the monthly Base Rent to 110% of the Base Rent then in effect.  Further, in the event of such Breach and rental adjustment, (i) the purchase price of any option to purchase the Premises held by Lessee shall be subject to similar adjustment to 110% of the price previously in effect, and (ii) all fixed and non-fixed rental adjustments scheduled during the remainder of the Lease term shall be increased to 110% of the scheduled adjusted rent.

(e)   Lessee's remedy for any breach of Paragraph 12.1 by Lessor shall be limited to compensatory damages and/or injunctive relief.

(f)   Lessor may reasonably withhold consent to a proposed assignment or subletting if Lessee is in Default at the time consent is requested.

(g)   Notwithstanding the foregoing, allowing a de minimis portion of the Premises, i.e. 20 square feet or less, to be used by a third party vendor in connection with the installation of a vending machine or payphone shall not constitute a subletting.

12.2  **Terms and Conditions Applicable to Assignment and Subletting**.

(a)   Regardless of Lessor's consent, no assignment or subletting shall : (i) be effective without the express written assumption by such assignee or sublessee of the obligations of Lessee under this Lease, (ii) release Lessee of any obligations hereunder, or (iii) alter the primary liability of Lessee for the payment of Rent or for the performance of any other obligations to be performed by Lessee.

(b)   Lessor may accept Rent or performance of Lessee's obligations from any person other than Lessee pending approval or disapproval of an assignment.  Neither a delay in the approval or disapproval of such assignment nor the acceptance of Rent or performance shall constitute a waiver or estoppel of Lessor's right to exercise its remedies for Lessee's Default or Breach.

(c)   Lessor's consent to any assignment or subletting shall not constitute a consent to any subsequent assignment or subletting.

(d)   In the event of any Default or Breach by Lessee, Lessor may proceed directly against Lessee, any Guarantors or anyone else responsible for the performance of Lessee's obligations under this Lease, including any assignee or sublessee, without first exhausting Lessor's remedies against any other person or entity responsible therefor to Lessor, or any security held by Lessor.

(e)   Each request for consent to an assignment or subletting shall be in writing, accompanied by information relevant to Lessor's determination as to the financial and operational responsibility and appropriateness of the proposed assignee or sublessee, including but not limited to the intended use and/or required modification of the Premises, if any, together with a fee of $1,000 500 as consideration for Lessor's considering and processing said request.  Lessee agrees to provide Lessor with such other or additional information and/or documentation as may be reasonably requested. (See also Paragraph 36)

(f)   Any assignee of, or sublessee under, this Lease shall, by reason of accepting such assignment, entering into such sublease, or entering into possession of the Premises or any portion thereof, be deemed to have assumed and agreed to conform and comply with each and every term, covenant, condition and obligation herein to be observed or performed by Lessee during the term of said assignment or sublease, other than such obligations as are contrary to or inconsistent with provisions of an assignment or sublease to which Lessor has specifically consented to in writing.

(g)   Lessor's consent to any assignment or subletting shall not transfer to the assignee or sublessee any Option granted to the original Lessee by this Lease unless such transfer is specifically consented to by Lessor in writing. (See Paragraph 39.2)

12.3  **Additional Terms and Conditions Applicable to Subletting**.  The following terms and conditions shall apply to any subletting by Lessee of all or any part of the Premises and shall be deemed included in all subleases under this Lease whether or not expressly incorporated therein:

(a)   Lessee hereby assigns and transfers to Lessor all of Lessee's interest in all Rent payable on any sublease, and Lessor may collect such Rent and apply same toward Lessee's obligations under this Lease; provided, however, that until a Breach shall occur in the performance of Lessee's obligations, Lessee may collect said Rent.  In the event that the amount collected by Lessor exceeds Lessee's then outstanding obligations any such excess shall be refunded to Lessee.  Lessor shall not, by reason of the foregoing or any assignment of such sublease, nor by reason of the collection of Rent, be deemed liable to the sublessee for any failure of Lessee to perform and comply with any of Lessee's obligations to such sublessee.  Lessee hereby irrevocably authorizes and directs any such sublessee, upon receipt of a written notice from Lessor stating that a Breach exists in the performance of Lessee's obligations under this Lease, to pay to Lessor all Rent due and to become due under the sublease.  Sublessee shall rely upon any such notice from Lessor and shall pay all Rents to Lessor without any obligation or right to inquire as to whether such Breach exists, notwithstanding any claim from Lessee to the contrary.

(b)   In the event of a Breach by Lessee, Lessor may, at its option, require sublessee to attorn to Lessor, in which event Lessor shall undertake the obligations of the sublessor under such sublease from the time of the exercise of said option to the expiration of such sublease; provided, however, Lessor shall not be liable for any prepaid rents or security deposit paid by such sublessee to such sublessor or for any prior Defaults or Breaches of such sublessor.

(c)   Any matter requiring the consent of the sublessor under a sublease shall also require the consent of Lessor.

(d)   No sublessee shall further assign or sublet all or any part of the Premises without Lessor's prior written consent.

(e)   Lessor shall deliver a copy of any notice of Default or Breach by Lessee to the sublessee, who shall have the right to cure the Default of Lessee within the grace period, if any, specified in such notice.  The sublessee shall have a right of reimbursement and offset from and against Lessee for any such Defaults cured by the sublessee.

**13.   Default; Breach; Remedies.**

13.1  **Default; Breach**.  A "**Default**" is defined as a failure by the Lessee to comply with or perform any of the terms, covenants, conditions or Rules and Regulations under this Lease.  A "**Breach**" is defined as the occurrence of one or more of the following Defaults, and the failure of Lessee to cure such Default within any applicable grace period:

(a)   The abandonment of the Premises; the vacating of the Premises prior to the expiration or termination of this Lease without providing a commercially reasonable level of security, or where the coverage of the property insurance described in Paragraph 8.3 is jeopardized as a result thereof, or without providing reasonable assurances to minimize potential vandalism; or failure to deliver to Lessor exclusive possession of the entire Premises in accordance herewith prior to the expiration or termination of this Lease.

(b)   The failure of Lessee to (i) make any payment of Rent or any Security Deposit required to be made by Lessee hereunder, whether to Lessor or to a third party, when due, (ii) to provide reasonable evidence of insurance or surety bond, or (iii) to fulfill any obligation under this Lease which endangers or threatens life or property, where such failure continues for a period of 3 business days following written notice to Lessee.  THE ACCEPTANCE BY LESSOR OF A PARTIAL PAYMENT OF RENT OR SECURITY DEPOSIT SHALL NOT CONSTITUTE A WAIVER OF ANY OF LESSOR'S RIGHTS, INCLUDING LESSOR'S RIGHT TO RECOVER POSSESSION OF THE PREMISES.

(c)   The failure of Lessee to allow Lessor and/or its agents access to the Premises or the commission of waste, act or acts constituting public or private nuisance, and/or an illegal activity on the Premises by Lessee, where such actions continue for a period of 3 business days following written notice to Lessee.  In the event that Lessee commits waste, a nuisance or an illegal activity a second time then, the Lessor may elect to treat such conduct as a non-curable Breach rather than a Default.

(d)   The failure by Lessee to provide (i) reasonable written evidence of compliance with Applicable Requirements, (ii) the service contracts, (iii) the rescission of an unauthorized assignment or subletting, (iv) an Estoppel Certificate or financial statements, (v) a requested subordination, (vi) evidence concerning any guaranty and/or Guarantor, (vii) any document requested under Paragraph 41, (viii) material safety data sheets (MSDS), or (ix) any other documentation or information which Lessor may reasonably require of Lessee under the terms of this Lease, where any such failure continues for a period of 10 days following written notice to Lessee.

(e)   A Default by Lessee as to the terms, covenants, conditions or provisions of this Lease, or of the rules adopted under Paragraph 2.9 hereof, other than those described in subparagraphs 13.1(a), (b), (c) or (d), above, where such Default continues for a period of 30 days after written notice; provided, however, that if the nature of Lessee's Default is such that more than 30 days are reasonably required for its cure, then it shall not be deemed to be a Breach if Lessee commences

Hy

_____
INITIALS

CT

KK

_____
INITIALS

© 2019 AIR CRE.  All Rights Reserved.

Last Edited: 7/30/2021 11:42 AM

such cure within said 30 day period and thereafter diligently prosecutes such cure to completion.

(f)    The occurrence of any of the following events:  (i) the making of any general arrangement or assignment for the benefit of creditors; (ii) becoming a "**debtor**" as defined in 11 U.S.C. § 101 or any successor statute thereto (unless, in the case of a petition filed against Lessee, the same is dismissed within 60 days); (iii) the appointment of a trustee or receiver to take possession of substantially all of Lessee's assets located at the Premises or of Lessee's interest in this Lease, where possession is not restored to Lessee within 30 days; or (iv) the attachment, execution or other judicial seizure of substantially all of Lessee's assets located at the Premises or of Lessee's interest in this Lease, where such seizure is not discharged within 30 days; provided, however, in the event that any provision of this subparagraph is contrary to any applicable law, such provision shall be of no force or effect, and not affect the validity of the remaining provisions.

(g)    The discovery that any financial statement of Lessee or of any Guarantor given to Lessor was materially false.

(h)    If the performance of Lessee's obligations under this Lease is guaranteed:  (i) the death of a Guarantor, (ii) the termination of a Guarantor's liability with respect to this Lease other than in accordance with the terms of such guaranty, (iii) a Guarantor's becoming insolvent or the subject of a bankruptcy filing, (iv) a Guarantor's refusal to honor the guaranty, or (v) a Guarantor's breach of its guaranty obligation on an anticipatory basis, and Lessee's failure, within 60 days following written notice of any such event, to provide written alternative assurance or security, which, when coupled with the then existing resources of Lessee, equals or exceeds the combined financial resources of Lessee and the Guarantors that existed at the time of execution of this Lease.

13.2  **Remedies.**  If Lessee fails to perform any of its affirmative duties or obligations, within 10 days after written notice (or in case of an emergency, without notice), Lessor may, at its option, perform such duty or obligation on Lessee's behalf, including but not limited to the obtaining of reasonably required bonds, insurance policies, or governmental licenses, permits or approvals.  Lessee shall pay to Lessor an amount equal to 115% of the costs and expenses incurred by Lessor in such performance upon receipt of an invoice therefor.  In the event of a Breach, Lessor may, with or without further notice or demand, and without limiting Lessor in the exercise of any right or remedy which Lessor may have by reason of such Breach:

(a)    Terminate Lessee's right to possession of the Premises by any lawful means, in which case this Lease shall terminate and Lessee shall immediately surrender possession to Lessor.  In such event Lessor shall be entitled to recover from Lessee:  (i) the unpaid Rent which had been earned at the time of termination; (ii) the worth at the time of award of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that the Lessee proves could have been reasonably avoided; (iii) the worth at the time of award of the amount by which the unpaid rent for the balance of the term after the time of award exceeds the amount of such rental loss that the Lessee proves could be reasonably avoided; and (iv) any other amount necessary to compensate Lessor for all the detriment proximately caused by the Lessee's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom, including but not limited to the cost of recovering possession of the Premises, expenses of reletting, including necessary renovation and alteration of the Premises, reasonable attorneys' fees, and that portion of any leasing commission paid by Lessor in connection with this Lease applicable to the unexpired term of this Lease.  Lessor and Lessee agree that the damages to be incurred by the Lessor in the event of Lessee's default of the Lease would be difficult or impossible to calculate and the parties therefore intend to provide by the foregoing for liquidated damages and not a penalty and agree that the sum provided is a reasonable pre-estimate of the probable loss.  The worth at the time of award of the amount referred to in provision (iii) of the immediately preceding sentence shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of the District within which the Premises are located at the time of award plus one percent.  Efforts by Lessor to mitigate damages caused by Lessee's Breach of this Lease shall not waive Lessor's right to recover any damages to which Lessor is otherwise entitled.  If termination of this Lease is obtained through the provisional remedy of unlawful detainer, Lessor shall have the right to recover in such proceeding any unpaid Rent and damages as are recoverable therein, or Lessor may reserve the right to recover all or any part thereof in a separate suit.  If a notice and grace period required under Paragraph 13.1 was not previously given, a notice to pay rent or quit, or to perform or quit given to Lessee under the unlawful detainer statute shall also constitute the notice required by Paragraph 13.1.  In such case, the applicable grace period required by Paragraph 13.1 and the unlawful detainer statute shall run concurrently, and the failure of Lessee to cure the Default within the greater of the two such grace periods shall constitute both an unlawful detainer and a Breach of this Lease entitling Lessor to the remedies provided for in this Lease and/or by said statute.

(b)    Continue the Lease and Lessee's right to possession and recover the Rent as it becomes due, in which event Lessee may sublet or assign, subject only to reasonable limitations.  Acts of maintenance, efforts to relet, and/or the appointment of a receiver to protect the Lessor's interests, shall not constitute a termination of the Lessee's right to possession.

(c)    Pursue any other remedy now or hereafter available under the laws or judicial decisions of the state wherein the Premises are located.  The expiration or termination of this Lease and/or the termination of Lessee's right to possession shall not relieve Lessee from liability under any indemnity provisions of this Lease as to matters occurring or accruing during the term hereof or by reason of Lessee's occupancy of the Premises.

13.3  **Inducement Recapture.**  Any agreement for free or abated rent or other charges, the cost of tenant improvements for Lessee paid for or performed by Lessor, or for the giving or paying by Lessor to or for Lessee of any cash or other bonus, inducement or consideration for Lessee's entering into this Lease, all of which concessions are hereinafter referred to as "**Inducement Provisions**," shall be deemed conditioned upon Lessee's full and faithful performance of all of the terms, covenants and conditions of this Lease.  Upon Breach of this Lease by Lessee, any such Inducement Provision shall automatically be deemed deleted from this Lease and of no further force or effect, and any rent, other charge, bonus, inducement or consideration theretofore abated, given or paid by Lessor under such an Inducement Provision shall be immediately due and payable by Lessee to Lessor, notwithstanding any subsequent cure of said Breach by Lessee.  The acceptance by Lessor of rent or the cure of the Breach which initiated the operation of this paragraph shall not be deemed a waiver by Lessor of the provisions of this paragraph unless specifically so stated in writing by Lessor at the time of such acceptance.

13.4  **Late Charges.**  Lessee hereby acknowledges that late payment by Lessee of Rent will cause Lessor to incur costs not contemplated by this Lease, the exact amount of which will be extremely difficult to ascertain.  Such costs include, but are not limited to, processing and accounting charges, and late charges which may be imposed upon Lessor by any Lender.  Accordingly, if any Rent shall not be received by Lessor within 5 days after such amount shall be due, then, without any requirement for notice to Lessee, Lessee shall immediately pay to Lessor a one-time late charge equal to 10% of each such overdue amount or $100, whichever is greater.  The parties hereby agree that such late charge represents a fair and reasonable estimate of the costs Lessor will incur by reason of such late payment.  Acceptance of such late charge by Lessor shall in no event constitute a waiver of Lessee's Default or Breach with respect to such overdue amount, nor prevent the exercise of any of the other rights and remedies granted hereunder.  In the event that a late charge is payable hereunder, whether or not collected, for 3 consecutive installments of Base Rent, then notwithstanding any provision of this Lease to the contrary, Base Rent shall, at Lessor's option, become due and payable quarterly in advance.

13.5  **Interest.**  Any monetary payment due Lessor hereunder, other than late charges, not received by Lessor, when due shall bear interest from the 31st day after it was due.  The interest ("**Interest**") charged shall be computed at the rate of 10% per annum but shall not exceed the maximum rate allowed by law.  Interest is payable in addition to the potential late charge provided for in Paragraph 13.4.

13.6  **Breach by Lessor.**

(a)    **Notice of Breach.**  Lessor shall not be deemed in breach of this Lease unless Lessor fails within a reasonable time to perform an obligation required to be performed by Lessor.  For purposes of this Paragraph, a reasonable time shall in no event be less than 30 days after receipt by Lessor, and any Lender whose name and address shall have been furnished to Lessee in writing for such purpose, of written notice specifying wherein such obligation of Lessor has not been performed; provided, however, that if the nature of Lessor's obligation is such that more than 30 days are reasonably required for its performance, then Lessor shall not be in breach if performance is commenced within such 30 day period and thereafter diligently pursued to completion.

(b)    **Performance by Lessee on Behalf of Lessor.**  In the event that neither Lessor nor Lender cures said breach within 30 days after receipt of said notice, or if having commenced said cure they do not diligently pursue it to completion, then Lessee may elect to cure said breach at Lessee's expense and offset from Rent the actual and reasonable cost to perform such cure, provided however, that such offset shall not exceed an amount equal to the greater of one month's Base Rent or the Security Deposit, reserving Lessee's right to reimbursement from Lessor for any such expense in excess of such offset.  Lessee shall document the cost of said cure and supply said documentation to Lessor.

**14.  Condemnation.**  If the Premises or any portion thereof are taken under the power of eminent domain or sold under the threat of the exercise of said power (collectively "**Condemnation**"), this Lease shall terminate as to the part taken as of the date the condemning authority takes title or possession, whichever first occurs.  If more than 10% of the floor area of the Unit, or more than 25% of the parking spaces is taken by Condemnation, Lessee may, at Lessee's option, to be exercised in writing within 10 days after Lessor shall have given Lessee written notice of such taking (or in the absence of such notice, within 10 days after the condemning authority shall have taken possession) terminate this Lease as of the date the condemning authority takes such possession.  If Lessee does not terminate this Lease in accordance with the foregoing, this Lease shall remain in full force and effect as to the portion of the Premises remaining, except that the Base Rent shall be reduced in proportion to the reduction in utility of the Premises caused by such Condemnation.  Condemnation awards and/or payments shall be the property of Lessor, whether such award shall be made as compensation for diminution in value of the leasehold, the value of the part taken, or for severance damages; provided, however, that Lessee shall be entitled to any compensation paid by the condemnor for Lessee's relocation expenses, loss of business goodwill and/or Trade Fixtures, without regard to whether or not this Lease is terminated pursuant to the provisions of this Paragraph.  All Alterations and Utility Installations made to the Premises by Lessee, for purposes of Condemnation only, shall be considered the property of the Lessee and Lessee shall be entitled to any and all compensation which is payable therefor.  In the event that this Lease is not terminated by reason of the Condemnation, Lessor shall repair any damage to the Premises caused by such Condemnation.

Hy

CT
KK

INITIALS                                                                                                INITIALS

© 2019 AIR CRE.  All Rights Reserved.                                        Last Edited: 7/30/2021 11:42 AM

**15.  Brokerage Fees.**

~~15.1  Additional Commission.  In addition to the payments owed pursuant to Paragraph 1.10 above, Lessor agrees that: (a) if Lessee exercises any Option, (b) if Lessee or anyone affiliated with Lessee acquires from Lessor any rights to the Premises or other premises owned by Lessor and located within the Project, (c) if Lessee remains in possession of the Premises, with the consent of Lessor, after the expiration of this Lease, or (d) if Base Rent is increased, whether by agreement or operation of an escalation clause herein, then, Lessor shall pay Brokers a fee in accordance with the fee schedule of the Brokers in effect at the time the Lease was executed.  The provisions of this paragraph are intended to supersede the provisions of any earlier agreement to the contrary.~~

15.2  **Assumption of Obligations.**  Any buyer or transferee of Lessor's interest in this Lease shall be deemed to have assumed Lessor's obligation hereunder.  Brokers shall be third party beneficiaries of the provisions of Paragraphs 1.10, 15, 22 and 31.  If Lessor fails to pay to Brokers any amounts due as and for brokerage fees pertaining to this Lease when due, then such amounts shall accrue Interest.  In addition, if Lessor fails to pay any amounts to Lessee's Broker when due, Lessee's Broker may send written notice to Lessor and Lessee of such failure and if Lessor fails to pay such amounts within 10 days after said notice, Lessee shall pay said monies to its Broker and offset such amounts against Rent.  In addition, Lessee's Broker shall be deemed to be a third party beneficiary of any commission agreement entered into by and/or between Lessor and Lessor's Broker for the limited purpose of collecting any brokerage fee owed.

15.3  **Representations and Indemnities of Broker Relationships.**  Lessee and Lessor each represent and warrant to the other that it has had no dealings with any person, firm, broker, agent or finder (other than the Brokers and Agents, if any) in connection with this Lease, and that no one other than said named Brokers and Agents is entitled to any commission or finder's fee in connection herewith.  Lessee and Lessor do each hereby agree to indemnify, protect, defend and hold the other harmless from and against liability for compensation or charges which may be claimed by any such unnamed broker, finder or other similar party by reason of any dealings or actions of the indemnifying Party, including any costs, expenses, attorneys' fees reasonably incurred with respect thereto.

**16.  Estoppel Certificates.**

(a)  Each Party (as "**Responding Party**") shall within 10 days after written notice from the other Party (the "**Requesting Party**") execute, acknowledge and deliver to the Requesting Party a statement in writing in form similar to the then most current "**Estoppel Certificate**" form published by AIR CRE or a form presented by Lessor's lender or a third party's lender, plus such additional information, confirmation and/or statements as may be reasonably requested by the Requesting Party.

(b)  If the Responding Party shall fail to execute or deliver the Estoppel Certificate within such 10 day period, the Requesting Party may execute an Estoppel Certificate stating that: (i) the Lease is in full force and effect without modification except as may be represented by the Requesting Party, (ii) there are no uncured defaults in the Requesting Party's performance, and (iii) if Lessor is the Requesting Party, not more than one month's rent has been paid in advance.  Prospective purchasers and encumbrancers may rely upon the Requesting Party's Estoppel Certificate, and the Responding Party shall be estopped from denying the truth of the facts contained in said Certificate.  In addition, Lessee acknowledges that any failure on its part to provide such an Estoppel Certificate will expose Lessor to risks and potentially cause Lessor to incur costs not contemplated by this Lease, the extent of which will be extremely difficult to ascertain.  Accordingly, should the Lessee fail to execute and/or deliver a requested Estoppel Certificate in a timely fashion the monthly Base Rent shall be automatically increased, without any requirement for notice to Lessee, by an amount equal to 10% of the then existing Base Rent or $100, whichever is greater for remainder of the Lease.  The Parties agree that such increase in Base Rent represents fair and reasonable compensation for the additional risk/costs that Lessor will incur by reason of Lessee's failure to provide the Estoppel Certificate.  Such increase in Base Rent shall in no event constitute a waiver of Lessee's Default or Breach with respect to the failure to provide the Estoppel Certificate nor prevent the exercise of any of the other rights and remedies granted hereunder.

(c)  If Lessor desires to finance, refinance, or sell the Premises, or any part thereof, Lessee and all Guarantors shall within 10 days after written notice from Lessor deliver to any potential lender or purchaser designated by Lessor such financial statements as may be reasonably required by such lender or purchaser, including but not limited to Lessee's financial statements for the past 3 years.  All such financial statements shall be received by Lessor and such lender or purchaser in confidence and shall be used only for the purposes herein set forth.

**17.  Definition of Lessor.**  The term "**Lessor**" as used herein shall mean the owner or owners at the time in question of the fee title to the Premises, or, if this is a sublease, of the Lessee's interest in the prior lease.  In the event of a transfer of Lessor's title or interest in the Premises or this Lease, Lessor shall deliver to the transferee or assignee (in cash or by credit) any unused Security Deposit held by Lessor.  Upon such transfer or assignment and delivery of the Security Deposit, as aforesaid, the prior Lessor shall be relieved of all liability with respect to the obligations and/or covenants under this Lease thereafter to be performed by the Lessor.  Subject to the foregoing, the obligations and/or covenants in this Lease to be performed by the Lessor shall be binding only upon the Lessor as hereinabove defined.

**18.  Severability.**  The invalidity of any provision of this Lease, as determined by a court of competent jurisdiction, shall in no way affect the validity of any other provision hereof.

**19.  Days.**  Unless otherwise specifically indicated to the contrary, the word "**days**" as used in this Lease shall mean and refer to calendar days.

**20.  Limitation on Liability.**  The obligations of Lessor under this Lease shall not constitute personal obligations of Lessor, or its partners, members, directors, officers or shareholders, and Lessee shall look to the Premises, and to no other assets of Lessor, for the satisfaction of any liability of Lessor with respect to this Lease, and shall not seek recourse against Lessor's partners, members, directors, officers or shareholders, or any of their personal assets for such satisfaction.

**21.  Time of Essence.**  Time is of the essence with respect to the performance of all obligations to be performed or observed by the Parties under this Lease.

**22.  No Prior or Other Agreements; Broker Disclaimer.**  This Lease contains all agreements between the Parties with respect to any matter mentioned herein, and no other prior or contemporaneous agreement or understanding shall be effective.  Lessor and Lessee each represents and warrants to the Brokers that it has made, and is relying solely upon, its own investigation as to the nature, quality, character and financial responsibility of the other Party to this Lease and as to the use, nature, quality and character of the Premises.  Brokers have no responsibility with respect thereto or with respect to any default or breach hereof by either Party.

**23.  Notices.**

23.1  **Notice Requirements**.  All notices required or permitted by this Lease or applicable law shall be in writing and may be delivered in person (by hand or by courier) or may be sent by regular, certified or registered mail or U.S. Postal Service Express Mail, with postage prepaid, or by facsimile transmission, or by email, and shall be deemed sufficiently given if served in a manner specified in this Paragraph 23.  The addresses noted adjacent to a Party's signature on this Lease shall be that Party's address for delivery or mailing of notices.  Either Party may by written notice to the other specify a different address for notice, except that upon Lessee's taking possession of the Premises, the Premises shall constitute Lessee's address for notice.  A copy of all notices to Lessor shall be concurrently transmitted to such party or parties at such addresses as Lessor may from time to time hereafter designate in writing.

23.2  **Date of Notice**.  Any notice sent by registered or certified mail, return receipt requested, shall be deemed given on the date of delivery shown on the receipt card, or if no delivery date is shown, the postmark thereon.  If sent by regular mail the notice shall be deemed given 72 hours after the same is addressed as required herein and mailed with postage prepaid.  Notices delivered by United States Express Mail or overnight courier that guarantees next day delivery shall be deemed given 24 hours after delivery of the same to the Postal Service or courier.  Notices delivered by hand, or transmitted by facsimile transmission or by email shall be deemed delivered upon actual receipt.  If notice is received on a Saturday, Sunday or legal holiday, it shall be deemed received on the next business day.

23.3  **Options**.  Notwithstanding the foregoing, in order to exercise any Options (see paragraph 39), the Notice must be sent by Certified Mail (return receipt requested), Express Mail (signature required), courier (signature required) or some other methodology that provides a receipt establishing the date the notice was received by the Lessor.

**24.  Waivers.**

(a)  No waiver by Lessor of the Default or Breach of any term, covenant or condition hereof by Lessee, shall be deemed a waiver of any other term, covenant or condition hereof, or of any subsequent Default or Breach by Lessee of the same or of any other term, covenant or condition hereof.  Lessor's consent to, or approval of, any act shall not be deemed to render unnecessary the obtaining of Lessor's consent to, or approval of, any subsequent or similar act by Lessee, or be construed as the basis of an estoppel to enforce the provision or provisions of this Lease requiring such consent.

(b)  The acceptance of Rent by Lessor shall not be a waiver of any Default or Breach by Lessee.  Any payment by Lessee may be accepted by Lessor on account of monies or damages due Lessor, notwithstanding any qualifying statements or conditions made by Lessee in connection therewith, which such statements and/or conditions shall be of no force or effect whatsoever unless specifically agreed to in writing by Lessor at or before the time of deposit of such payment.

(c)  THE PARTIES AGREE THAT THE TERMS OF THIS LEASE SHALL GOVERN WITH REGARD TO ALL MATTERS RELATED THERETO AND HEREBY WAIVE THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE TO THE EXTENT THAT SUCH STATUTE IS INCONSISTENT WITH THIS LEASE.

**25.  Disclosures Regarding The Nature of a Real Estate Agency Relationship.**

(a)  When entering into a discussion with a real estate agent regarding a real estate transaction, a Lessor or Lessee should from the outset understand what type of agency relationship or representation it has with the agent or agents in the transaction.  Lessor and Lessee acknowledge being advised by the Brokers in this transaction, as follows:

Hy ____

CT
KK

INITIALS

INITIALS

© 2019 AIR CRE.  All Rights Reserved.
MTN-26.30, Revised 10-22-2020

(i)    _Lessor's Agent._  A Lessor's agent under a listing agreement with the Lessor acts as the agent for the Lessor only.  A Lessor's agent or subagent has the following affirmative obligations: _To the Lessor:_  A fiduciary duty of utmost care, integrity, honesty, and loyalty in dealings with the Lessor.  _To the Lessee and the Lessor:_  (a) Diligent exercise of reasonable skills and care in performance of the agent's duties. (b) A duty of honest and fair dealing and good faith. (c) A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the Parties.  An agent is not obligated to reveal to either Party any confidential information obtained from the other Party which does not involve the affirmative duties set forth above.

(ii)    _Lessee's Agent._  An agent can agree to act as agent for the Lessee only.  In these situations, the agent is not the Lessor's agent, even if by agreement the agent may receive compensation for services rendered, either in full or in part from the Lessor.  An agent acting only for a Lessee has the following affirmative obligations.  _To the Lessee:_  A fiduciary duty of utmost care, integrity, honesty, and loyalty in dealings with the Lessee.  _To the Lessee and the Lessor:_  (a) Diligent exercise of reasonable skills and care in performance of the agent's duties.  (b) A duty of honest and fair dealing and good faith.  (c) A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the Parties.  An agent is not obligated to reveal to either Party any confidential information obtained from the other Party which does not involve the affirmative duties set forth above.

(iii)    _Agent Representing Both Lessor and Lessee._  A real estate agent, either acting directly or through one or more associate licensees, can legally be the agent of both the Lessor and the Lessee in a transaction, but only with the knowledge and consent of both the Lessor and the Lessee.  In a dual agency situation, the agent has the following affirmative obligations to both the Lessor and the Lessee: (a) A fiduciary duty of utmost care, integrity, honesty and loyalty in the dealings with either Lessor or the Lessee. (b) Other duties to the Lessor and the Lessee as stated above in subparagraphs (i) or (ii).  In representing both Lessor and Lessee, the agent may not, without the express permission of the respective Party, disclose to the other Party confidential information, including, but not limited to, facts relating to either Lessee's or Lessor's financial position, motivations, bargaining position, or other personal information that may impact rent, including Lessor's willingness to accept a rent less than the listing rent or Lessee's willingness to pay rent greater than the rent offered.  The above duties of the agent in a real estate transaction do not relieve a Lessor or Lessee from the responsibility to protect their own interests.  Lessor and Lessee should carefully read all agreements to assure that they adequately express their understanding of the transaction.  A real estate agent is a person qualified to advise about real estate.  If legal or tax advice is desired, consult a competent professional.  Both Lessor and Lessee should strongly consider obtaining tax advice from a competent professional because the federal and state tax consequences of a transaction can be complex and subject to change.

(b)    Brokers have no responsibility with respect to any default or breach hereof by either Party.  The Parties agree that no lawsuit or other legal proceeding involving any breach of duty, error or omission relating to this Lease may be brought against Broker more than one year after the Start Date and that the liability (including court costs and attorneys' fees), of any Broker with respect to any such lawsuit and/or legal proceeding shall not exceed the fee received by such Broker pursuant to this Lease; provided, however, that the foregoing limitation on each Broker's liability shall not be applicable to any gross negligence or willful misconduct of such Broker.

(c)    Lessor and Lessee agree to identify to Brokers as "Confidential" any communication or information given Brokers that is considered by such Party to be confidential.

**26.    No Right To Holdover.**  Lessee has no right to retain possession of the Premises or any part thereof beyond the expiration or termination of this Lease.  At or prior to the expiration or termination of this Lease Lessee shall deliver exclusive possession of the Premises to Lessor.  For purposes of this provision and Paragraph 13.1(a), exclusive possession shall mean that Lessee shall have vacated the Premises, removed all of its personal property therefrom and that the Premises have been returned in the condition specified in this Lease.  In the event that Lessee does not deliver exclusive possession to Lessor as specified above, then Lessor's damages during any holdover period shall be computed at the amount of the Rent (as defined in Paragraph 4.1) due during the last full month before the expiration or termination of this Lease (disregarding any temporary abatement of Rent that may have been in effect), but with Base Rent being 150% of the Base Rent payable during such last full month.  Nothing contained herein shall be construed as consent by Lessor to any holding over by Lessee.

**27.    Cumulative Remedies.**  No remedy or election hereunder shall be deemed exclusive but shall, wherever possible, be cumulative with all other remedies at law or in equity.

**28.    Covenants and Conditions; Construction of Agreement.**  All provisions of this Lease to be observed or performed by Lessee are both covenants and conditions.  In construing this Lease, all headings and titles are for the convenience of the Parties only and shall not be considered a part of this Lease.  Whenever required by the context, the singular shall include the plural and vice versa.  This Lease shall not be construed as if prepared by one of the Parties, but rather according to its fair meaning as a whole, as if both Parties had prepared it.

**29.    Binding Effect; Choice of Law.**  This Lease shall be binding upon the Parties, their personal representatives, successors and assigns and be governed by the laws of the State in which the Premises are located.  Any litigation between the Parties hereto concerning this Lease shall be initiated in the county in which the Premises are located.  Signatures to this Lease accomplished by means of electronic signature or similar technology shall be legal and binding.

**30.    Subordination; Attornment; Non-Disturbance.**

30.1    **Subordination.**  This Lease and any Option granted hereby shall be subject and subordinate to any ground lease, mortgage, deed of trust, or other hypothecation or security device (collectively, "**Security Device**"), now or hereafter placed upon the Premises, to any and all advances made on the security thereof, and to all renewals, modifications, and extensions thereof.  Lessee agrees that the holders of any such Security Devices (in this Lease together referred to as "**Lender**") shall have no liability or obligation to perform any of the obligations of Lessor under this Lease.  Any Lender may elect to have this Lease and/or any Option granted hereby superior to the lien of its Security Device by giving written notice thereof to Lessee, whereupon this Lease and such Options shall be deemed prior to such Security Device, notwithstanding the relative dates of the documentation or recordation thereof.

30.2    **Attornment.**  In the event that Lessor transfers title to the Premises, or the Premises are acquired by another upon the foreclosure or termination of a Security Device to which this Lease is subordinated (i) Lessee shall, subject to the non-disturbance provisions of Paragraph 30.3, attorn to such new owner, and upon request, enter into a new lease, containing all of the terms and provisions of this Lease, with such new owner for the remainder of the term hereof, or, at the election of the new owner, this Lease will automatically become a new lease between Lessee and such new owner, for the remainder of the term hereof and (ii) Lessor shall thereafter be relieved of any further obligations hereunder and such new owner shall assume all of Lessor's obligations, except that such new owner shall not: (a) be liable for any act or omission of any prior Lessor with respect to events occurring prior to acquisition of ownership; (b) be subject to any offsets or defenses which Lessee might have against any prior lessor, (c) be bound by prepayment of more than one month's rent, or (d) be liable for the return of any security deposit paid to any prior lessor which was not paid or credited to such new owner.

30.3    **Non-Disturbance.**  With respect to Security Devices entered into by Lessor after the execution of this Lease, Lessee's subordination of this Lease shall be subject to receiving a commercially reasonable non-disturbance agreement (a "**Non-Disturbance Agreement**") from the Lender which Non-Disturbance Agreement provides that Lessee's possession of the Premises, and this Lease, including any options to extend the term hereof, will not be disturbed so long as Lessee is not in Breach hereof and attorns to the record owner of the Premises.  Further, within 60 days after the execution of this Lease, Lessor shall, if requested by Lessee, use its commercially reasonable efforts to obtain a Non-Disturbance Agreement from the holder of any pre-existing Security Device which is secured by the Premises.  In the event that Lessor is unable to provide the Non-Disturbance Agreement within said 60 days, then Lessee may, at Lessee's option, directly contact Lender and attempt to negotiate for the execution and delivery of a Non-Disturbance Agreement.

30.4    **Self-Executing.**  The agreements contained in this Paragraph 30 shall be effective without the execution of any further documents; provided, however, that, upon written request from Lessor or a Lender in connection with a sale, financing or refinancing of the Premises, Lessee and Lessor shall execute such further writings as may be reasonably required to separately document any subordination, attornment and/or Non-Disturbance Agreement provided for herein.

**31.    Attorneys' Fees.**  If any Party or Broker brings an action or proceeding involving the Premises whether founded in tort, contract or equity, or to declare rights hereunder, the Prevailing Party (as hereafter defined) in any such proceeding, action, or appeal thereon, shall be entitled to reasonable attorneys' fees.  Such fees may be awarded in the same suit or recovered in a separate suit, whether or not such action or proceeding is pursued to decision or judgment.  The term, "**Prevailing Party**" shall include, without limitation, a Party or Broker who substantially obtains or defeats the relief sought, as the case may be, whether by compromise, settlement, judgment, or the abandonment by the other Party or Broker of its claim or defense.  The attorneys' fees award shall not be computed in accordance with any court fee schedule, but shall be such as to fully reimburse all attorneys' fees reasonably incurred.  In addition, Lessor shall be entitled to attorneys' fees, costs and expenses incurred in the preparation and service of notices of Default and consultations in connection therewith, whether or not a legal action is subsequently commenced in connection with such Default or resulting Breach ($200 is a reasonable minimum per occurrence for such services and consultation).

**32.    Lessor's Access; Showing Premises; Repairs.**  Lessor and Lessor's agents shall have the right to enter the Premises at any time, in the case of an emergency, and otherwise at reasonable times after reasonable prior notice for the purpose of showing the same to prospective purchasers, lenders, or tenants, and making such alterations, repairs, improvements or additions to the Premises as Lessor may deem necessary or desirable and the erecting, using and maintaining of utilities, services, pipes and conduits through the Premises and/or other premises as long as there is no material adverse effect on Lessee's use of the Premises.  All such activities shall be without abatement of rent or liability to Lessee.

Hy

____
INITIALS

CT
KK

____
INITIALS

© 2019 AIR CRE.  All Rights Reserved.
MTN-26.30, Revised 10-22-2020

Last Edited: 7/30/2021 11:42 AM

**33.    Auctions.**  Lessee shall not conduct, nor permit to be conducted, any auction upon the Premises without Lessor's prior written consent. Lessor shall not be obligated to exercise any standard of reasonableness in determining whether to permit an auction.

**34.    Signs.**  Lessor may place on the Premises ordinary "For Sale" signs at any time and ordinary "For Lease" signs during the last 6 months of the term hereof. Except that ordinary "For Sublease" signs which may be placed only on the Premises, Lessee shall not place any sign upon the Project without Lessor's prior written consent. All signs must comply with all Applicable Requirements.

**35.    Termination; Merger.**  Unless specifically stated otherwise in writing by Lessor, the voluntary or other surrender of this Lease by Lessee, the mutual termination or cancellation hereof, or a termination hereof by Lessor for Breach by Lessee, shall automatically terminate any sublease or lesser estate in the Premises; provided, however, that Lessor may elect to continue any one or all existing subtenancies. Lessor's failure within 10 days following any such event to elect to the contrary by written notice to the holder of any such lesser interest, shall constitute Lessor's election to have such event constitute the termination of such interest.

**36.    Consents.**  All requests for consent shall be in writing. Except as otherwise provided herein, wherever in this Lease the consent of a Party is required to an act by or for the other Party, such consent shall not be unreasonably withheld or delayed. Lessor's actual reasonable costs and expenses (including but not limited to architects', attorneys', engineers' and other consultants' fees) incurred in the consideration of, or response to, a request by Lessee for any Lessor consent, including but not limited to consents to an assignment, a subletting or the presence or use of a Hazardous Substance, shall be paid by Lessee upon receipt of an invoice and supporting documentation therefor. Lessor's consent to any act, assignment or subletting shall not constitute an acknowledgment that no Default or Breach by Lessee of this Lease exists, nor shall such consent be deemed a waiver of any then existing Default or Breach, except as may be otherwise specifically stated in writing by Lessor at the time of such consent. The failure to specify herein any particular condition to Lessor's consent shall not preclude the imposition by Lessor at the time of consent of such further or other conditions as are then reasonable with reference to the particular matter for which consent is being given. In the event that either Party disagrees with any determination made by the other hereunder and reasonably requests the reasons for such determination, the determining party shall furnish its reasons in writing and in reasonable detail within 10 business days following such request.

**37.    Guarantor.**
    37.1 **Execution.**  The Guarantors, if any, shall each execute a guaranty in the form most recently published by AIR CRE.
    37.2 **Default.**  It shall constitute a Default of the Lease if any Guarantor fails or refuses, upon request to provide: (a) evidence of the execution of the guaranty, including the authority of the party signing on Guarantor's behalf to obligate Guarantor, and in the case of a corporate Guarantor, a certified copy of a resolution of its board of directors authorizing the making of such guaranty, (b) current financial statements, (c) an Estoppel Certificate, or (d) written confirmation that the guaranty is still in effect.

**38.    Quiet Possession.**  Subject to payment by Lessee of the Rent and performance of all of the covenants, conditions and provisions on Lessee's part to be observed and performed under this Lease, Lessee shall have quiet possession and quiet enjoyment of the Premises during the term hereof.

**39.    Options.**  If Lessee is granted any option, as defined below, then the following provisions shall apply.
    39.1 **Definition.**  "**Option**" shall mean: (a) the right to extend or reduce the term of or renew this Lease or to extend or reduce the term of or renew any lease that Lessee has on other property of Lessor; (b) the right of first refusal or first offer to lease either the Premises or other property of Lessor; (c) the right to purchase, the right of first offer to purchase or the right of first refusal to purchase the Premises or other property of Lessor.
    39.2 **Options Personal To Original Lessee.**  Any Option granted to Lessee in this Lease is personal to the original Lessee, and cannot be assigned or exercised by anyone other than said original Lessee and only while the original Lessee is in full possession of the Premises and, if requested by Lessor, with Lessee certifying that Lessee has no intention of thereafter assigning or subletting.
    39.3 **Multiple Options.**  In the event that Lessee has any multiple Options to extend or renew this Lease, a later Option cannot be exercised unless the prior Options have been validly exercised.
    39.4 **Effect of Default on Options.**
        (a)    Lessee shall have no right to exercise an Option: (i) during the period commencing with the giving of any notice of Default and continuing until said Default is cured, (ii) during the period of time any Rent is unpaid (without regard to whether notice thereof is given Lessee), (iii) during the time Lessee is in Breach of this Lease, or (iv) in the event that Lessee has been given 3 or more notices of separate Default, whether or not the Defaults are cured, during the 12 month period immediately preceding the exercise of the Option.
        (b)    The period of time within which an Option may be exercised shall not be extended or enlarged by reason of Lessee's inability to exercise an Option because of the provisions of Paragraph 39.4(a).
        (c)    An Option shall terminate and be of no further force or effect, notwithstanding Lessee's due and timely exercise of the Option, if, after such exercise and prior to the commencement of the extended term or completion of the purchase, (i) Lessee fails to pay Rent for a period of 30 days after such Rent becomes due (without any necessity of Lessor to give notice thereof), or (ii) if Lessee commits a Breach of this Lease.

**40.    Security Measures.**  Lessee hereby acknowledges that the Rent payable to Lessor hereunder does not include the cost of guard service or other security measures, and that Lessor shall have no obligation whatsoever to provide same. Lessee assumes all responsibility for the protection of the Premises, Lessee, its agents and invitees and their property from the acts of third parties.

**41.    Reservations.**  Lessor reserves the right: (i) to grant, without the consent or joinder of Lessee, such easements, rights and dedications that Lessor deems necessary; (ii) to cause the recordation of parcel maps and restrictions; and (iii) to create and/or install new utility raceways, so long as such easements, rights, dedications, maps, restrictions, and utility raceways do not unreasonably interfere with the use of the Premises by Lessee. Lessee agrees to sign any documents reasonably requested by Lessor to effectuate such rights.

**42.    Performance Under Protest.**  If at any time a dispute shall arise as to any amount or sum of money to be paid by one Party to the other under the provisions hereof, the Party against whom the obligation to pay the money is asserted shall have the right to make payment "under protest" and such payment shall not be regarded as a voluntary payment and there shall survive the right on the part of said Party to institute suit for recovery of such sum. If it shall be adjudged that there was no legal obligation on the part of said Party to pay such sum or any part thereof, said Party shall be entitled to recover such sum or so much thereof as it was not legally required to pay. A Party who does not initiate suit for the recovery of sums paid "under protest" within 6 months shall be deemed to have waived its right to protest such payment.

**43.    Authority; Multiple Parties; Execution.**
        (a)    If either Party hereto is a corporation, trust, limited liability company, partnership, or similar entity, each individual executing this Lease on behalf of such entity represents and warrants that he or she is duly authorized to execute and deliver this Lease on its behalf. Each Party shall, within 30 days after request, deliver to the other Party satisfactory evidence of such authority.
        (b)    If this Lease is executed by more than one person or entity as "Lessee", each such person or entity shall be jointly and severally liable hereunder. It is agreed that any one of the named Lessees shall be empowered to execute any amendment to this Lease, or other document ancillary thereto and bind all of the named Lessees, and Lessor may rely on the same as if all of the named Lessees had executed such document.
        (c)    This Lease may be executed by the Parties in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

**44.    Conflict.**  Any conflict between the printed provisions of this Lease and the typewritten or handwritten provisions shall be controlled by the typewritten or handwritten provisions.

**45.    Offer.**  Preparation of this Lease by either party or their agent and submission of same to the other Party shall not be deemed an offer to lease to the other Party. This Lease is not intended to be binding until executed and delivered by all Parties hereto.

**46.    Amendments.**  This Lease may be modified only in writing, signed by the Parties in interest at the time of the modification. As long as they do not materially change Lessee's obligations hereunder, Lessee agrees to make such reasonable non-monetary modifications to this Lease as may be reasonably required by a Lender in connection with the obtaining of normal financing or refinancing of the Premises.

**47.    Waiver of Jury Trial. THE PARTIES HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING INVOLVING THE PROPERTY OR ARISING OUT OF THIS AGREEMENT.**

**48.    Arbitration of Disputes.**  An Addendum requiring the Arbitration of all disputes between the Parties and/or Brokers arising out of this Lease ☐ is ☑ is not attached to this Lease.

| Hy | | CT |
|----|--|----|
| | | KK |
| INITIALS | | INITIALS |

© 2019 AIR CRE.  All Rights Reserved.

**49.   Accessibility; Americans with Disabilities Act.**

   (a)   The Premises:

☑  have not undergone an inspection by a Certified Access Specialist (CASp).  Note: A Certified Access Specialist (CASp) can inspect the subject premises and determine whether the subject premises comply with all of the applicable construction-related accessibility standards under state law. Although state law does not require a CASp inspection of the subject premises, the commercial property owner or lessor may not prohibit the lessee or tenant from obtaining a CASp inspection of the subject premises for the occupancy or potential occupancy of the lessee or tenant, if requested by the lessee or tenant. The parties shall mutually agree on the arrangements for the time and manner of the CASp inspection, the payment of the fee for the CASp inspection, and the cost of making any repairs necessary to correct violations of construction-related accessibility standards within the premises.

☐  have undergone an inspection by a Certified Access Specialist (CASp) and it was determined that the Premises met all applicable construction-related accessibility standards pursuant to California Civil Code §55.51 et seq.  Lessee acknowledges that it received a copy of the inspection report at least 48 hours prior to executing this Lease and agrees to keep such report confidential.

☐  have undergone an inspection by a Certified Access Specialist (CASp) and it was determined that the Premises did not meet all applicable construction-related accessibility standards pursuant to California Civil Code §55.51 et seq.  Lessee acknowledges that it received a copy of the inspection report at least 48 hours prior to executing this Lease and agrees to keep such report confidential except as necessary to complete repairs and corrections of violations of construction related accessibility standards.

In the event that the Premises have been issued an inspection report by a CASp the Lessor shall provide a copy of the disability access inspection certificate to Lessee within 7 days of the execution of this Lease.

   (b)   Since compliance with the Americans with Disabilities Act (ADA) and other state and local accessibility statutes are dependent upon Lessee's specific use of the Premises, Lessor makes no warranty or representation as to whether or not the Premises comply with ADA or any similar legislation. In the event that Lessee's use of the Premises requires modifications or additions to the Premises in order to be in compliance with ADA or other accessibility statutes, Lessee agrees to make any such necessary modifications and/or additions at Lessee's expense.

LESSOR AND LESSEE HAVE CAREFULLY READ AND REVIEWED THIS LEASE AND EACH TERM AND PROVISION CONTAINED HEREIN, AND BY THE EXECUTION OF THIS LEASE SHOW THEIR INFORMED AND VOLUNTARY CONSENT THERETO.  THE PARTIES HEREBY AGREE THAT, AT THE TIME THIS LEASE IS EXECUTED, THE TERMS OF THIS LEASE ARE COMMERCIALLY REASONABLE AND EFFECTUATE THE INTENT AND PURPOSE OF LESSOR AND LESSEE WITH RESPECT TO THE PREMISES.

ATTENTION:  NO REPRESENTATION OR RECOMMENDATION IS MADE BY AIR CRE OR BY ANY BROKER AS TO THE LEGAL SUFFICIENCY, LEGAL EFFECT, OR TAX CONSEQUENCES OF THIS LEASE OR THE TRANSACTION TO WHICH IT RELATES.  THE PARTIES ARE URGED TO:
1.   SEEK ADVICE OF COUNSEL AS TO THE LEGAL AND TAX CONSEQUENCES OF THIS LEASE.
2.   RETAIN APPROPRIATE CONSULTANTS TO REVIEW AND INVESTIGATE THE CONDITION OF THE PREMISES.  SAID INVESTIGATION SHOULD INCLUDE BUT NOT BE LIMITED TO: THE POSSIBLE PRESENCE OF HAZARDOUS SUBSTANCES, THE ZONING OF THE PREMISES, THE STRUCTURAL INTEGRITY, THE CONDITION OF THE ROOF AND OPERATING SYSTEMS, COMPLIANCE WITH THE AMERICANS WITH DISABILITIES ACT AND THE SUITABILITY OF THE PREMISES FOR LESSEE'S INTENDED USE.

WARNING:  IF THE PREMISES ARE LOCATED IN A STATE OTHER THAN CALIFORNIA, CERTAIN PROVISIONS OF THE LEASE MAY NEED TO BE REVISED TO COMPLY WITH THE LAWS OF THE STATE IN WHICH THE PREMISES ARE LOCATED.

The parties hereto have executed this Lease at the place and on the dates specified above their respective signatures.

| | |
|---|---|
| Executed at: Los Angeles | Executed at: Los Angeles |
| On: 08/03/2021 | On: 08/02/2021 |
| By LESSOR: | By LESSEE: |
| Kylale, LLC, a California limited liability company | Follow The Leader Food Service Inc., a Florida corporation |
| By: _Hadegaran_ | By: _CEDTet_ |
| Name Printed: Hasty Yadegaran | Name Printed: Clarence Tate |
| Title: Managing Member | Title: CEO |
| Phone: (310) 367-4951 | Phone: (323) 572-1083 |
| Fax: | Fax: |
| Email: | Email: |
| | |
| By: | By: _K-K_        08/02/2021 |
| Name Printed: | Name Printed: Kumi Kawamura |
| Title: | Title: CFO |
| Phone: | Phone: |
| Fax: | Fax: |
| Email: | Email: |
| Address: 3600 S. San Pedro St., Los Angeles, CA 90011 | Address: 1323 1/2 N Orange Dr., Los Angeles, CA 90028 |
| Federal ID No.: | Federal ID No.: |

| | |
|---|---|
| BROKER | BROKER |
| DAUM Commercial Real Estate Services | DAUM Commercial Real Estate Services |
| Attn: Carlos Castillo / David Muir | Attn: Carlos Castillo / David Muir |
| Title: Associate / Executive V.P. | Title: Associate / Executive V.P. |
| Address: 801 S. Figueroa St., Suite 600, Los Angeles, CA 90017 | Address: 801 S. Figueroa St., Suite 600, Los Angeles, CA 90017 |
| Phone: (213) 270-2263 / (213) 270-2244 | Phone: (213) 270-2263 / (213) 270-2244 |
| Fax: (213) 621-0903 | Fax: (213) 621-0903 |
| Email: carlos.castillo@daumcommercial.com / david.muir@daumcommercial.com | Email: carlos.castillo@daumcommercial.com / david.muir@daumcommercial.com |
| Federal ID No.: 95-4342215 | Federal ID No.: 95-4342215 |
| Broker DRE License #: 01129558 | Broker DRE License #: 01129558 |
| Agent DRE License #: 01451618 / 01210653 | Agent DRE License #: 01451618 / 01210653 |

AIR CRE  *  https://www.aircre.com  *  213-687-8777  *  contracts@aircre.com
NOTICE:  No part of these works may be reproduced in any form without permission in writing.

Hy                                                        CT
                                                          KK
INITIALS                                                  INITIALS

© 2019 AIR CRE.  All Rights Reserved.                    Last Edited: 7/30/2021 11:42 AM
MTN-26.30, Revised 10-22-2020                            Page 13 of 13



**Addendum**

**ADDENDUM TO AIR COMMERCIAL REAL ESTATE ASSOCIATION
STANDARD INDUSTRIAL/COMMERCIAL MULTI-TENANT LEASE - NET
BY AND BETWEEN
KYLALE, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY ("LESSOR")
AND
FOLLOW THE LEADER FOOD SERVICE INC., A FLORIDA CORPORATION ("LESSEE")
FOR THE PROPERTY LOCATED AT
3138 W PICO BLVD., LOS ANGELES, CA 90019
DATED JULY 26, 2021**

To the extent these Paragraphs 50 through 59 (the "Addendum") conflict in any way with the preceding provisions of this Lease, the provisions of this Addendum shall control.

**50. Condition of Premises:** The Premises shall be delivered to Lessee AS-IS/WHERE-IS, with all faults.

**51. Rent Abatement:** The Base Rent shall be fully abated for September 2021 and October 2021.

**52. Common Area Operating Expenses:** Lessee shall pay $2,588.00 per month in Common Area Operating Expenses. Monthly Common Area Operating Expenses shall include Lessee's prorated share of property taxes, property insurance and common area maintenance expenses.

**53. Utilities:** Lessee shall obtain and pay own water, electricity, and trash.

**54. Option to Extend:** Attached hereto and made a part hereof.

**55. Lessee Improvements:** All Lessee Improvements shall be non-structural in nature and shall be performed at Lessee's sole cost and expense and in compliance with all applicable laws and in a good and workmanlike manner.

**56. Roof, Foundation & Exterior Walls:** Lessor shall be responsible for the replacement and structural integrity of the roof, exterior walls, floors, embedded plumbing, and foundations, except any damage caused by Lessee.

**57. Access:** Lessee shall have 24-hour, seven day a week access to the Premises and parking area 365 days per year.

**58. Miscellaneous:** Lessee shall be responsible to obtain all required permits, licenses, certificates, or authorizations from federal, state, or local governments or agencies. If federal, state, or local governments or agencies are unable to timely issue such permits, licenses, certificates, and authorizations for any reason, including without limitation, the COVID-19 virus, Lessee shall still be responsible to pay Base Rent and Common Area Operating Expenses as stipulated under this Lease and Addendum. Furthermore, in the event Lessee is unable to operate in the Premises for the Agreed Use due to a COVID-19 delay, Base Rent and Common Area Operating Expenses shall NOT be abated.

**59. Base Rent Schedule:**

| | |
|---|---|
| Month 1 to Month 1: | $4,554.88 per month, plus CAM |
| Month 2 to Month 3: | $0 per month |
| Month 4 to Month 6: | $4,554.88 per month, plus CAM |
| Month 7 to Month 12: | $9,058 per month, plus CAM |
| Month 13 to Month 24: | $9,329.74 per month, plus CAM |
| Month 25 to Month 36: | $9,609.63 per month, plus CAM |

INITIALS:

Hy

Page 1 of 2

INITIALS:

CT

KK

# DAUM
**COMMERCIAL REAL ESTATE SERVICES**

**Addendum**

### ADDENDUM TO AIR COMMERCIAL REAL ESTATE ASSOCIATION
### STANDARD INDUSTRIAL/COMMERCIAL MULTI-TENANT LEASE - NET
### BY AND BETWEEN
### KYLALE, LLC, A CALIFORNIA LIMITED LIABILITY COMPANY ("LESSOR")
### AND
### FOLLOW THE LEADER FOOD SERVICE INC., A FLORIDA CORPORATION ("LESSEE")
### FOR THE PROPERTY LOCATED AT
### 3138 W PICO BLVD., LOS ANGELES, CA 90019
### DATED JULY 26, 2021

| | |
|---|---|
| Month 37 to Month 48: | $9,897.92 per month, plus CAM |
| Month 49 to Month 60: | $10,194.86 per month, plus CAM |
| Month 61 to Month 62: | $10,500.71 per month, plus CAM |

**AGREED AND ACCEPTED:**
**LESSOR: KYLALE, LLC, A CALIFORNIA**
**LIMITED LIABILITY COMPANY**

By: _Hadegaran_____
      Hasty Yadegaran

Print Title: Owner_____

Date: 08/03/2021_____

**AGREED AND ACCEPTED:**
**LESSEE:  FOLLOW THE LEADER FOOD**
**SERVICE INC., A FLORIDA CORPORATION**

By: ___CEO Tate_____
      Clarence Tate, CEO

Date: 08/02/2021_____

By: ___K. K._____
      Kumi Kawamura, CFO

Date: 08/02/2021_____

**INITIALS:**

HY_____

**INITIALS:**

CT_____

KK_____

Page 2 of 2



# OPTION(S) TO EXTEND
## STANDARD LEASE ADDENDUM

**Dated:**   July 26, 2021
**By and Between**
  **Lessor:**   Kylale, LLC, a California limited liability company
  **Lessee:**   Follow The Leader Food Service Inc., a Florida corporation
  **Property Address:**   3138 W Pico Blvd, Los Angeles, CA 90019
               (street address, city, state, zip)

Paragraph:   54

**A.  OPTION(S) TO EXTEND:**
Lessor hereby grants to Lessee the option to extend the term of this Lease for   one (1)   additional   sixty (60)   month period(s) commencing when the prior term expires upon each and all of the following terms and conditions:

(i)    In order to exercise an option to extend, Lessee must give written notice of such election to Lessor and Lessor must receive the same at least   six (6)   but not more than   twelve (12)   months prior to the date that the option period would commence, time being of the essence.  If proper notification of the exercise of an option is not given and/or received, such option shall automatically expire.  Options (if there are more than one) may only be exercised consecutively.

(ii)    The provisions of paragraph 39, including those relating to Lessee's Default set forth in paragraph 39.4 of this Lease, are conditions of this Option.

(iii)    Except for the provisions of this Lease granting an option or options to extend the term, all of the terms and conditions of this Lease except where specifically modified by this option shall apply.

(iv)    This Option is personal to the original Lessee, and cannot be assigned or exercised by anyone other than said original Lessee and only while the original Lessee is in full possession of the Premises and without the intention of thereafter assigning or subletting.

(v)    The monthly rent for each month of the option period shall be calculated as follows, using the method(s) indicated below:

(Check Method(s) to be Used and Fill in Appropriately)

☐ I.    ~~Cost of Living Adjustment(s) (COLA)~~
a.    ~~On (Fill in COLA Dates): _____ the Base Rent shall be adjusted by the change, if any, from the Base Month specified below, in the Consumer Price Index of the Bureau of Labor Statistics of the U.S. Department of Labor for (select one): ☐ CPI W (Urban Wage Earners and Clerical Workers) or ☐ CPI U (All Urban Consumers), for (Fill in Urban Area): _____  All Items (1982-1984 = 100), herein referred to as "CPI".~~

b.    ~~The monthly Base Rent payable in accordance with paragraph A.I.a. of this Addendum shall be calculated as follows: the Base Rent set forth in paragraph 1.5 of the attached Lease, shall be multiplied by a fraction the numerator of which shall be the CPI of the calendar month 2 months prior to the month(s) specified in paragraph A.I.a. above during which the adjustment is to take effect, and the denominator of which shall be the CPI of the calendar month which is 2 months prior to (select one): _____ the first month of the term of this Lease as set forth in paragraph 1.3 ("Base Month") or _____ (Fill in Other "Base Month"): _____.  The sum so calculated shall constitute the new monthly Base Rent hereunder, but in no event, shall any such new monthly Base Rent be less than the Base Rent payable for the month immediately preceding the rent adjustment.~~

c.    ~~In the event the compilation and/or publication of the CPI shall be transferred to any other governmental department or bureau or agency or shall be discontinued, then the index most nearly the same as the CPI shall be used to make such calculation.  In the event that the Parties cannot agree on such alternative index, then the matter shall be submitted for decision to the American Arbitration Association in accordance with the then rules of said Association and the decision of the arbitrators shall be binding upon the parties.  The cost of said Arbitration shall be paid equally by the Parties.~~

☑ II.    **Market Rental Value Adjustment(s) (MRV)**
a.    On (Fill in MRV Adjustment Date(s))   October 1, 2026   the Base Rent shall be adjusted to the "Market Rental Value" of the property as follows:

1)    Four months prior to each Market Rental Value Adjustment Date described above, the Parties shall attempt to agree upon what the new MRV will be on the adjustment date.  If agreement cannot be reached, within thirty days, then:

(a)    Lessor and Lessee shall immediately appoint a mutually acceptable appraiser or broker to establish the new MRV within the next 30 days.  Any associated costs will be split equally between the Parties, or

(b)    Both Lessor and Lessee shall each immediately make a reasonable determination of the MRV and submit such determination, in writing, to arbitration in accordance with the following provisions:

(i)    Within 15 days thereafter, Lessor and Lessee shall each select an independent third party ☐ appraiser or ☑ broker ("Consultant" - check one) of their choice to act as an arbitrator (Note: the parties may not select either of the Brokers that was involved in negotiating the Lease).  The two arbitrators so appointed shall immediately select a third mutually acceptable Consultant to act as a third arbitrator.

(ii)    The 3 arbitrators shall within 30 days of the appointment of the third arbitrator reach a decision as to what the actual MRV for the Premises is, and whether Lessor's or Lessee's submitted MRV is the closest thereto.  The decision of a majority of the arbitrators shall be binding on the Parties.  The submitted MRV which is determined to be the closest to the actual MRV shall thereafter be used by the Parties.

(iii)    If either of the Parties fails to appoint an arbitrator within the specified 15 days, the arbitrator timely appointed by one of them shall reach a decision on his or her own, and said decision shall be binding on the Parties.

(iv)    The entire cost of such arbitration shall be paid by the party whose submitted MRV is not selected, ie. the one that is NOT the closest to the actual MRV.

2)    When determining MRV, the Lessor, Lessee and Consultants shall consider the terms of comparable market transactions which shall include, but not be limited to, rent, rental adjustments, abated rent, lease term and financial condition of tenants.

3)    Notwithstanding the foregoing, the new Base Rent shall not be less than the rent payable for the month immediately preceding the rent adjustment.

b.    Upon the establishment of each New Market Rental Value:

1)    the new MRV will become the new "Base Rent" for the purpose of calculating any further Adjustments, and

Hy
_____
INITIALS

CT
_____
KK
_____
INITIALS

© 2017 AIR CRE.  All Rights Reserved.

Last Edited: 7/30/2021 11:42 AM

2)   the first month of each Market Rental Value term shall become the new "Base Month" for the purpose of calculating any further Adjustments.

3)   the Base Rent for the Option term shall be increased by three percent (3%) annually.

☐  **III.    Fixed Rental Adjustment(s) (FRA)**

The Base Rent shall be increased to the following amounts on the dates set forth below:

|   On (Fill in FRA Adjustment Date(s)):   |   The New Base Rent shall be:   |
|---|---|
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |

☐  **IV.    Initial Term Adjustments**

The formula used to calculate adjustments to the Base Rent during the original Term of the Lease shall continue to be used during the extended term.

**B.    NOTICE:**

Unless specified otherwise herein, notice of any rental adjustments, other than Fixed Rental Adjustments, shall be made as specified in paragraph 23 of the Lease.

**C.    BROKER'S FEE:**

The Brokers shall be paid a Brokerage Fee for each adjustment specified above in accordance with paragraph 15 of the Lease or if applicable, paragraph 9 of the Sublease.

**AIR CRE  *  https://www.aircre.com  *  213-687-8777  *  contracts@aircre.com**
**NOTICE:  No part of these works may be reproduced in any form without permission in writing.**

Hy
_____
_____
INITIALS

CT
_____
KK
_____
INITIALS

© 2017 AIR CRE.  All Rights Reserved.
OE-6.02, Revised 10-22-2020



## DISCLOSURE REGARDING REAL ESTATE AGENCY RELATIONSHIP
**(As required by the Civil Code)**

When you enter into a discussion with a real estate agent regarding a real estate transaction, you should from the outset understand what type of agency relationship or representation you wish to have with the agent in the transaction.

**SELLER'S AGENT**

A Seller's agent under a listing agreement with the Seller acts as the agent for the Seller only. A Seller's agent or a subagent of that agent has the following affirmative obligations:
To the Seller: A fiduciary duty of utmost care, integrity, honesty and loyalty in dealings with the Seller.
To the Buyer and the Seller:
    (a)   Diligent exercise of reasonable skill and care in performance of the agent's duties.
    (b)   A duty of honest and fair dealing and good faith.
(c)   A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the parties.
    An agent is not obligated to reveal to either party any confidential information obtained from the other party that does not involve the affirmative duties set forth above.

**BUYER'S AGENT**

A Buyer's agent can, with a Buyer's consent, agree to act as agent for the Buyer only. In these situations, the agent is not the Seller's agent, even if by agreement the agent may receive compensation for services rendered, either in full or in part from the Seller. An agent acting only for a Buyer has the following affirmative obligations:
To the Buyer: A fiduciary duty of utmost care, integrity, honesty and loyalty in dealings with the Buyer.
To the Buyer and the Seller:
    (a)   Diligent exercise of reasonable skill and care in performance of the agent's duties.
    (b)   A duty of honest and fair dealing and good faith.
    (c)   A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the parties.
An agent is not obligated to reveal to either party any confidential information obtained from the other party that does not involve the affirmative duties set forth above.

**AGENT REPRESENTING BOTH SELLER AND BUYER**

A real estate agent, either acting directly or through one or more salesperson and broker associates, can legally be the agent of both the Seller and the Buyer in a transaction, but only with the knowledge and consent of both the Seller and the Buyer.
In a dual agency situation, the agent has the following affirmative obligations to both the Seller and the Buyer:
    (a)   A fiduciary duty of utmost care, integrity, honesty and loyalty in the dealings with either the Seller or the Buyer.
    (b)   Other duties to the Seller and the Buyer as stated above in their respective sections.
In representing both Seller and Buyer, a dual agent may not, without the express permission of the respective party, disclose to the other party confidential information, including, but not limited to, facts relating to either the Buyer's or Seller's financial position, motivations, bargaining position, or other personal information that may impact price, including the Seller's willingness to accept a price less than the listing price or the Buyer's willingness to pay a price greater than the price offered.

**SELLER AND BUYER RESPONSIBILITIES**

Either the purchase agreement or a separate document will contain a confirmation of which agent is representing you and whether that agent is representing you exclusively in the transaction or acting as a dual agent. Please pay attention to that confirmation to make sure it accurately reflects your understanding of your agent's role. The above duties of the agent in a real estate transaction do not relieve a Seller or Buyer from the responsibility to protect his or her own interests. You should carefully read all agreements to assure that they adequately express your understanding of the transaction. A real estate agent is a person qualified to advise about real estate. If legal or tax advice is desired, consult a competent professional. If you are a Buyer, you have the duty to exercise reasonable care to protect yourself, including as to those facts about the property which are known to you or within your diligent attention and observation. Both Sellers and Buyers should strongly consider obtaining tax advice from a competent professional because the federal and state tax consequences of a transaction can be complex and subject to change.

Throughout your real property transaction you may receive more than one disclosure form, depending upon the number of agents assisting in the transaction. The law requires each agent with whom you have more than a casual relationship to present you with this disclosure form. You should read its contents each time it is presented to you, considering the relationship between you and the real estate agent in your specific transaction. **This disclosure form includes the provisions of Sections 2079.13 to 2079.24, inclusive, of the Civil Code set forth on page 2. Read it carefully. I/WE ACKNOWLEDGE RECEIPT OF A COPY OF THIS DISCLOSURE AND THE PORTIONS OF THE CIVIL CODE PRINTED ON THE BACK (OR A SEPARATE PAGE).**

☐ Buyer    ☐ Seller    ☑ Lessor    ☐ Lessee    _Hadeveanh_     Date: _08/03/2021_

☐ Buyer    ☐ Seller    ☐ Lessor    ☑ Lessee    _CeDZa_     Date: _08/02/2021_

                 Lessee    _K·K_     Date: _08/02/2021_

Agent: _DAUM Commercial Real Estate Services_    DRE Lic. #: _01129558_
        Real Estate Broker (Firm)
By: _____    DRE Lic. #: _01451618 / 01210653_   Date: _08/03/2021  08/03/2021_
     Carlos Castillo / David Muir (Salesperson or
     Broker-Associate)

THIS FORM HAS BEEN PREPARED BY AIR CRE. NO REPRESENTATION IS MADE AS TO THE LEGAL VALIDITY OR ADEQUACY OF THIS FORM FOR ANY SPECIFIC TRANSACTION. PLEASE SEEK LEGAL COUNSEL AS TO THE APPROPRIATENESS OF THIS FORM.

_Hy_
_____
INITIALS

_CT_
_KK_
_____
INITIALS

© 2019 AIR CRE. All Rights Reserved.
Last Edited: 7/30/2021 11:42 AM
AD-3.01, Revised 10-22-2020

## DISCLOSURE REGARDING REAL ESTATE AGENCY RELATIONSHIP
### CIVIL CODE SECTIONS 2079.13 THROUGH 2079.24 (2079.16 APPEARS ON THE FRONT)

**2079.13.** As used in Sections 2079.7 and 2079.14 to 2079.24, inclusive, the following terms have the following meanings:
**(a)** "Agent" means a person acting under provisions of Title 9 (commencing with Section 2295) in a real property transaction, and includes a person who is licensed as a real estate broker under Chapter 3 (commencing with Section 10130) of Part 1 of Division 4 of the Business and Professions Code, and under whose license a listing is executed or an offer to purchase is obtained. The agent in the real property transaction bears responsibility for that agent's salespersons or broker associates who perform as agents of the agent. When a salesperson or broker associate owes a duty to any principal, or to any buyer or seller who is not a principal, in a real property transaction, that duty is equivalent to the duty owed to that party by the broker for whom the salesperson or broker associate functions. **(b)** "Buyer" means a transferee in a real property transaction, and includes a person who executes an offer to purchase real property from a seller through an agent, or who seeks the services of an agent in more than a casual, transitory, or preliminary manner, with the object of entering into a real property transaction. "Buyer" includes vendee or lessee of real property. **(c)** "Commercial real property" means all real property in the state, except (1) single-family residential real property, (2) dwelling units made subject to Chapter 2 (commencing with Section 1940) of Title 5, (3) a mobile home, as defined in Section 798.3, (4) vacant land, or (5) a recreational vehicle, as defined in Section 799.29. **(d)** "Dual agent" means an agent acting, either directly or through a salesperson or broker associate, as agent for both the seller and the buyer in a real property transaction. **(e)** "Listing agreement" means a written contract between a seller of real property and an agent, by which the agent has been authorized to sell the real property or to find or obtain a buyer, including rendering other services for which a real estate license is required to the seller pursuant to the terms of the agreement. **(f)** "Seller's agent" means a person who has obtained a listing of real property to act as an agent for compensation. **(g)** "Listing price" is the amount expressed in dollars specified in the listing for which the seller is willing to sell the real property through the seller's agent. **(h)** "Offering price" is the amount expressed in dollars specified in an offer to purchase for which the buyer is willing to buy the real property. **(i)** "Offer to purchase" means a written contract executed by a buyer acting through a buyer's agent that becomes the contract for the sale of the real property upon acceptance by the seller. **(j)** "Real property" means any estate specified by subdivision (1) or (2) of Section 761 in property, and includes (1) single-family residential property, (2) multi-unit residential property with more than four dwelling units, (3) commercial real property, (4) vacant land, (5) a ground lease coupled with improvements, or (6) a manufactured home as defined in Section 18007 of the Health and Safety Code, or a mobile home as defined in Section 18008 of the Health and Safety Code, when offered for sale or sold through an agent pursuant to the authority contained in Section 10131.6 of the Business and Professions Code. **(k)** "Real property transaction" means a transaction for the sale of real property in which an agent is retained by a buyer, seller, or both a buyer and seller to act in that transaction, and includes a listing or an offer to purchase. **(l)** "Sell," "sale," or "sold" refers to a transaction for the transfer of real property from the seller to the buyer and includes exchanges of real property between the seller and buyer, transactions for the creation of a real property sales contract within the meaning of Section 2985, and transactions for the creation of a leasehold exceeding one year's duration. **(m)** "Seller" means the transferor in a real property transaction and includes an owner who lists real property with an agent, whether or not a transfer results, or who receives an offer to purchase real property of which he or she is the owner from an agent on behalf of another. "Seller" includes both a vendor and a lessor of real property. **(n)** "Buyer's agent" means an agent who represents a buyer in a real property transaction.

**2079.14.** A seller's agent and buyer's agent shall provide the seller and buyer in a real property transaction with a copy of the disclosure form specified in Section 2079.16, and shall obtain a signed acknowledgment of receipt from that seller and buyer, except as provided in Section 2079.15, as follows: **(a)** The seller's agent, if any, shall provide the disclosure form to the seller prior to entering into the listing agreement. **(b)** The buyer's agent shall provide the disclosure form to the buyer as soon as practicable prior to execution of the buyer's offer to purchase. If the offer to purchase is not prepared by the buyer's agent, the buyer's agent shall present the disclosure form to the buyer not later than the next business day after receiving the offer to purchase from the buyer.

**2079.15.** In any circumstance in which the seller or buyer refuses to sign an acknowledgment of receipt pursuant to Section 2079.14, the agent shall set forth, sign, and date a written declaration of the facts of the refusal.

**2079.16** Reproduced on Page 1 of this AD form.

**2079.17(a)** As soon as practicable, the buyer's agent shall disclose to the buyer and seller whether the agent is acting in the real property transaction as the buyer's agent, or as a dual agent representing both the buyer and the seller. This relationship shall be confirmed in the contract to purchase and sell real property or in a separate writing executed or acknowledged by the seller, the buyer, and the buyer's agent prior to or coincident with execution of that contract by the buyer and the seller, respectively. **(b)** As soon as practicable, the seller's agent shall disclose to the seller whether the seller's agent is acting in the real property transaction as the seller's agent, or as a dual agent representing both the buyer and seller. This relationship shall be confirmed in the contract to purchase and sell real property or in a separate writing executed or acknowledged by the seller and the seller's agent prior to or coincident with the execution of that contract by the seller.
**(C)** CONFIRMATION: The following agency relationships are confirmed for this transaction.

Seller's Brokerage Firm  <u>DO NOT COMPLETE, SAMPLE ONLY</u>  License Number  _____
Is the broker of (check one): ☐ the seller; or ☐ both the buyer and seller. (dual agent)
Seller's Agent  <u>DO NOT COMPLETE, SAMPLE ONLY</u>  License Number  _____
Is (check one): ☐ the Seller's Agent. (salesperson or broker associate); or ☐ both the Buyer's Agent and the Seller's Agent. (dual agent)
Buyer's Brokerage Firm  <u>DO NOT COMPLETE, SAMPLE ONLY</u>  License Number  _____
Is the broker of (check one): ☐ the buyer; or ☐ both the buyer and seller. (dual agent)
Buyer's Agent  <u>DO NOT COMPLETE, SAMPLE ONLY</u>  License Number  _____
Is (check one): ☐ the Buyer's Agent. (salesperson or broker associate); or ☐ both the Buyer's Agent and the Seller's Agent. (dual agent)

**(d)** The disclosures and confirmation required by this section shall be in addition to the disclosure required by Section 2079.14. An agent's duty to provide disclosure and confirmation of representation in this section may be performed by a real estate salesperson or broker associate affiliated with that broker.

**2079.18** (Repealed pursuant to AB-1289, 2017-18 California Legislative session)

**2079.19** The payment of compensation or the obligation to pay compensation to an agent by the seller or buyer is not necessarily determinative of a particular agency relationship between an agent and the seller or buyer. A listing agent and a selling agent may agree to share any compensation or commission paid, or any right to any compensation or commission for which an obligation arises as the result of a real estate transaction, and the terms of any such agreement shall not necessarily be determinative of a particular relationship.

**2079.20** Nothing in this article prevents an agent from selecting, as a condition of the agent's employment, a specific form of agency relationship not specifically prohibited by this article if the requirements of Section 2079.14 and Section 2079.17 are complied with.

**2079.21 (a)** A dual agent may not, without the express permission of the seller, disclose to the buyer any confidential information obtained from the seller. **(b)** A dual agent may not, without the express permission of the buyer, disclose to the seller any confidential information obtained from the buyer. **(c)** "Confidential information" means facts relating to the client's financial position, motivations, bargaining position, or other personal information that may impact price, such as the seller is willing to accept a price less than the listing price or the buyer is willing to pay a price greater than the price offered. **(d)** This section does not alter in any way the duty or responsibility of a dual agent to any principal with respect to confidential information other than a seller.

**2079.22** Nothing in this article precludes a seller's agent from also being a buyer's agent. If a seller or buyer in a transaction chooses to not be represented by an agent, that does not, of itself, make that agent a dual agent.

**2079.23 (a)** A contract between the principal and agent may be modified or altered to change the agency relationship at any time before the performance of the act which is the object of the agency with the written consent of the parties to the agency relationship. **(b)** An offer or an auction company entered into by a lender to control aspects of a transaction of real property subject to this part, including validating the sales price, shall not require, as a condition of receiving the lender's approval of the transaction, the homeowner or listing agent to defend or indemnify the lender or auction company from any liability alleged to result from the actions of the lender or auction company. Any clause, provision, covenant, or agreement purporting to impose an obligation to defend or indemnify a lender or an auction company in violation of this subdivision is against public policy, void, and unenforceable.

**2079.24** Nothing in this article shall be construed to either diminish the duty of disclosure owed buyers and sellers by agents and their associate licensees, subagents, and employees or to relieve agents and their associate licensees, subagents, and employees from liability for their conduct in connection with acts governed by this article or for any breach of a fiduciary duty or a duty of disclosure.

**AIR CRE  *  https://www.aircre.com  *  213-687-8777  *  contracts@aircre.com**
**NOTICE:  No part of these works may be reproduced in any form without permission in writing.**

Hy  ____                                                              CT  ____
                                                                     KK  ____
_____                                                         _____
INITIALS                                                             INITIALS
© 2019 AIR CRE.  All Rights Reserved.                                Last Edited: 7/30/2021 11:42 AM
AD-3.01, Revised 10-22-2020                                          Page 2 of 2



**DAUM**
COMMERCIAL REAL ESTATE SERVICES

# Uniform Disclosure and Limitation of Liability Form

**Property Address**:
3138 W Pico Blvd, Los Angeles, CA 90019

*THIS FORM CLARIFIES AND LIMITS THE DISCLOSURES THAT HAVE BEEN MADE, LIMITS BROKER'S LIABILITY WITH RESPECT TO SUCH DISCLOSURES, AND PLACES VARIOUS DUTIES AND RESPONSIBILITIES UPON SELLER/LESSOR AND BUYER/LESSEE. PLEASE READ IT CAREFULLY.*

**I. Notice to Owners, Buyers and Tenants Regarding Hazardous Substances and Underground Storage Tanks:** Comprehensive Federal, state and local regulations have recently been enacted to control the use, storage, handling, clean up, removal and disposal of hazardous and toxic wastes and substances. Extensive legislation has also been adopted with regard to underground storage tanks. As real estate licensees, we are not experts in the area of hazardous substances and we encourage you to consult with your legal counsel with respect to your rights and liabilities with regard to hazardous substances laws and regulations and to obtain technical advice with regard to the use, storage, handling, clean-up, removal or disposal of hazardous substances from professionals, such as a civil engineer, geologist or other persons with experience in these matters to advise you concerning the property. We also encourage you to review the past uses of the property, which may provide information as to the likelihood of the existence of hazardous substances or storage tanks on the property.

DAUM, hereinafter called "Broker", will disclose any knowledge it actually possesses with respect to the existence of hazardous substances or underground storage tanks on the property. Broker has not made any investigations or obtained reports regarding the property, unless so indicated in a separate document signed by Broker. Broker makes no representation or warranty regarding the existence or non-existence of hazardous substances or underground storage tanks on the property.

With regard to the sale of real property, recently enacted California Health and Safety Code Section 25359.7 provides that any owner of non-residential real property who knows, or has reasonable cause to believe, that any release of hazardous substances has come to be located on or beneath real property, shall, prior to the sale of real property, give written notice of that condition to the buyer of the real property. Failure of the owner to provide written notice when required shall subject the owner to actual damages and other remedies provided by the law. In addition, where the owner has actual knowledge of the presence of any hazardous substance and knowingly and willfully fails to provide written notice to the buyer, the owner is liable for a civil penalty not to exceed $5,000 for each separate violation.

With regard to leases of real property, Section 25359.7 of the California Health and Safety Code provides that any lessee of real property who knows, or has reasonable cause to believe, that any release of hazardous substances has come to be located on or beneath the real property shall, upon discovery by the lessee of the presence or suspected presence of a hazardous substance release, give notice of that condition to the owner of the real property. Failure of the lessee to provide written notice as required to the owner shall make the lease voidable at the discretion of the owner. The Health and Safety Code provides that if the lessee has actual knowledge of the presence of any hazardous substance release and knowingly or willfully fails to provide written notice as required to the owner, the lessee is liable for a civil penalty not to exceed $5,000 for each violation.

As used in this notice, the term "hazardous substances" is used in the broadest sense and includes all hazardous and toxic materials, substances, or waste as defined by applicable Federal, state and local laws and regulations and includes, but is not limited to petroleum products, paints and solvents, PCBs, asbestos, pesticides and other substances. Hazardous substances may be found on any type of real property, improved or unimproved, occupied or vacant.

**II. Notice to Owners, Buyers and Tenants Regarding the "Americans with Disabilities Act":** Legislation known as the "Americans with Disabilities Act" ("ADA") was recently adopted and may affect The Property and/or its intended use. As real estate licensees, we are not experts in the legal or technical aspects of ADA as it may pertain to you. We encourage you to consult your legal counsel, architect and/or other professionals with appropriate experience with regard to your rights or obligations for compliance with ADA.

**III. Disclaimer and Indemnification:** This document has been prepared by DAUM ("Broker") at the request of all parties which agree to indemnify and hold DAUM, its principals, shareholders,

officers, agents and employees harmless from any liability which may arise from the preparation of this or any other document relating to this transaction.

All parties acknowledge having been advised to have this and all transaction documents approved by legal counsel and financial counsel prior to execution and delivery.

This transaction is entered into with the understanding that Buyer/Lessee has independently verified to its satisfaction the following items: All measurements, utilities (including power, plumbing, heating and air-conditioning systems), minimum clearance, loading door(s) dimensions, truck access, fire sprinkler system capacity (if any), restrooms, City codes including zoning, setbacks, occupancy permits, hazardous material and waste inspection, and ability to conduct its intended use on the premises.

The items set forth above shall not be considered as an exhaustive list of items, but examples of items Buyer/Lessee should investigate.

Any information provided by Broker has been obtained from sources deemed reliable. While Broker does not doubt its accuracy, Broker has not verified it, assumes no responsibility and makes no guarantee, warranty or representation regarding it. It is Buyer's/Lessee's responsibility to independently confirm its accuracy and completeness. Buyer/Lessee hereby indemnifies and holds harmless Broker named in this transaction, its principals, shareholders, officers, agents and employees from the following: Any claim for personal injury, merchandise or property damage or loss of value arising from or related to physical condition of the property, including, without limitation, soil, roof or structural condition, any claim, dispute or action in connection with completion of work or repairs to the premises, any expense including reasonable attorney fees and costs suffered in connection with any of the above matters.

**IV. Credit and Financial Information:** Broker has provided Seller/Lessor with credit information obtained from Buyer/Lessee, which Broker has not verified and does not guarantee. Seller/Lessor acknowledges that Broker does not guarantee either payment or Buyer's/Lessee's performance of the terms of the purchase/lease agreement. Seller's/Lessor's execution of this document is based strictly on Seller's/Lessor's independent verification of Buyer's/Lessee's credit-worthiness and Seller/Lessor holds Broker harmless in the event of Buyer's/Lessee's default.

**NOTE:** If the property covered by this Uniform Disclosure and Limitation of Liability Form is owned jointly or by a corporation, each individual signing represents and warrants that he/she is authorized to execute and deliver this document and to bind such other owners or corporation having any interest in the property.

DAUM makes no representation or warranty regarding the status of The Property with regard to the items covered in this Uniform Disclosure and Limitation of Liability Form.

APPROVED this  3   day of  August  2021

Kylale, LLC, a California limited liability company

By: _Hadeyaeanh_____
      Hasty Yadegaran, Managing Member

By:_____


APPROVED this  2   day of  August  2021

Follow The Leader Food Service Inc., a Florida corporation

By: _CEOTat_____
      Clarence Tate, CEO

By: _K.K_____  08/02/2021
      Kumi Kawamura, CFO

©2007 – DAUM Commercial Real Estate Services. All rights reserved. This form is for use only in the transaction in which DAUM is involved and is not to be distributed to others.
Form DAUM02 REV2006.02.15


**DAUM**
COMMERCIAL REAL ESTATE SERVICES

**Uniform Disclosure and Limitation of Liability Form**

**Property Address:** 3138 W Pico Blvd, Los Angeles, CA 90019

*THIS FORM CLARIFIES AND LIMITS THE DISCLOSURES THAT HAVE BEEN MADE, LIMITS BROKER'S LIABILITY WITH RESPECT TO SUCH DISCLOSURES, AND PLACES VARIOUS DUTIES AND RESPONSIBILITIES UPON SELLER/LESSOR AND BUYER/LESSEE. PLEASE READ IT CAREFULLY.*

**1.   Notice to Owners, Buyers and Tenants Regarding Risks of Engaging in Cannabis-Related Transactions**

Many states recently have legalized medical and recreational cannabis.  Yet cannabis remains illegal under federal law.  This conflict between federal and state law is difficult for cannabis operators and those who do business with them to navigate.

As a real estate licensee, DAUM ("Broker") is not an expert in this complex and fluid area of law.  Nonetheless, Broker is providing you with a broad overview of potential risks of engaging in cannabis-related transactions.  Broker is not familiar with every possible risk and encourages you to consult with your legal and/or financial counsel regarding your rights and liabilities.

**a.   Federal Law Criminalizes Cannabis Activity and the Trump Administration Might Increase Enforcement of Such Activity**

Cannabis is an illegal Schedule 1 controlled substance under federal law. 21 U.S.C. § 812.
Federal law makes it illegal to engage directly in cannabis activity, including to "manufacture, distribute, or dispense," or "possess with intent to manufacture, distribute, or dispense" medical and recreational cannabis. 21 U.S.C. §§ 812, 841.
Federal law also makes it illegal to engage indirectly in cannabis activity, including to advertise, "aid and abet," and/or conspire to engage in such activity. 18 U.S.C. § 2; 21 U.S.C. §§ 843, 846.  Finally, federal law makes it illegal for financial institutions, including banks, to conduct financial transactions relating to cannabis activities. *See, e.g.,* 18 U.S.C. §§ 1956, 1957, Patriot Act. Pub. L. No. l 107-56, 115 Stat. 272 (2001).
Federal law also regulates the use of real property in connection with cannabis.   Federal law states that real property used to facilitate the commission of cannabis-related crimes is subject to forfeiture. 18 U.S.C. §§ 983, 985; 21 U.S.C. §§ 853, 881.  Federal law clarifies that the property of "innocent" owners, including those not aware of the cannabis-related crimes, shall not be forfeited. 18 U.S.C. § 983(d).
The Obama Administration sought to relax enforcement of these laws.   The Department of Justice issued guiding memoranda, including the "Cole Memorandum," stating that it would not prioritize prosecuting cannabis activity if parties engaging in such activity took necessary precautions and operated in states that maintained "robust" cannabis regulations.  FinCEN issued guidelines to encourage financial institutions to facilitate cannabis-related transactions.   And Congress enacted a law, the Rohrabacher-Farr Amendment, prohibiting the Department of Justice from spending funds to interfere with state medical marijuana laws.
The Trump Administration has indicated it will reverse Obama Administration policy and increase enforcement of these laws. Attorney General Sessions rescinded the Cole Memorandum and issued his own memorandum stating that "marijuana is a dangerous drug," "marijuana activity is a serious crime," and prosecutors can prosecute marijuana-related crimes at their discretion.
It remains unclear whether Sessions' memorandum will increase federal prosecutions of cannabis activity and/or whether the Trump Administration will take additional steps to crackdown on such activity.  As a result, there is substantial uncertainty and risk under federal law for parties engaging in cannabis-related transactions.

**b.   Many States, Including California, Have Legalized Medical and Recreational Cannabis**

Many states, including California, recently have legalized medical and recreational cannabis. State legalization can help protect parties engaged in cannabis activity from state and local enforcement actions.  However, state legalization also requires such parties to navigate and comply with complicated and largely untested legal and regulatory schemes.

In California, for example, every commercial cannabis operator must obtain a state license. Cal. Bus. Prof. Code § 26037(a). To obtain the license, a tenant operator must, among other things, provide a statement from the landowner of the premises where the commercial cannabis activity will occur stating that the landlord consents to the activity. Cal. Bus. Prof. Code § 26051.5(a)(2). The penalties for being "unlicensed" are severe: Unlicensed operators and landlords can be subject to state civil and criminal penalties, including fines, property forfeiture actions and imprisonment. *See, e.g.,* Cal. Health & Safety Code §§ 11366.5, 11470(g).
Compliance with state law alone is not necessarily enough to avoid liability. In California and other states, local governments have inherent power to determine the appropriate use of land within their borders, including for cannabis activities. *See* Cal. Const., Art. XI, § 7; Cal. Bus. & Prof. Code § 26200(a); *City of Riverside v. Inland Empire Patients Health & Wellness Ctr., Inc.,* 56 Cal.4th 729, 759 (2013).  If a locality determines that you have violated its laws and regulations, it can seek civil or criminal penalties against you, along with its fees and costs in bringing the enforcement action. *See* Cal. Code Civ. P. § 731; Cal. Gov't Code § 38773.5.  Localities often target property owners, who tend to have "deeper pockets" than cannabis operators.
State and local laws and regulations legalizing cannabis, including in California, are too complex to address comprehensively in this form.  You should consult with your legal counsel about the relevant state and local laws and regulations in the jurisdiction where the cannabis activity will occur.

**c.   Under Principles of Federalism, Federal Law Criminalizing Cannabis Trumps State Laws Legalizing Cannabis**

Historically, state and local law enforcement officials have prosecuted the vast majority of cannabis offenses.  State and local cannabis legalization helps reduce the risk of such enforcements actions.
Under principles of federalism, however, federal law trumps state: Cannabis remains illegal under federal law even in states and localities that have legalized cannabis.  This means that, if you engage in a cannabis-related transaction in a state and locality that has "legalized" cannabis, there is still a risk you would be subject to federal enforcement action. Depending on the type of cannabis activity, however, this risk might be low: Federal law enforcement officials have limited resources and tend to focus on activity that is particularly reckless and/or "high-profile."

**d.   Other Risks for Owners, Buyers and Tenants Engaging in Cannabis-Related Transactions**

There are other potential risks for owners, buyers and tenants engaging in cannabis-related transactions:

**i.   Cannabis-Related Contracts, Including Leases, Might be Unenforceable**

Courts generally refuse to enforce contracts promoting illegal conduct.  Courts divide on whether to enforce cannabis-related contracts, and there remains a lack of binding precedent on this issue.    California recently enacted a law stating that "commercial activity" relating to cannabis that complies with state and local laws is "a lawful object of a contract." Cal. Civ. Code § 1550.5. There remains uncertainty, however, as courts have yet to interpret this law.

**ii.   Property Financing Documents Might Prohibit Cannabis Activity**

Mortgages and other property financing documents often prohibit federally illegal activity, such as cannabis-related activity, from occurring on the subject property.  If the property covered by this form is encumbered, you should consult with your legal counsel about whether the occurrence of cannabis activity on the property risks breaching any financing documents for the property.

**iii.   Property Insurance Policies Might Not Cover Cannabis Activity**

Property insurance policies also might not cover cannabis activity that takes place on the insured property.  You should consult with your legal counsel about whether the occurrence

©2018 – DAUM Commercial Real Estate Services. All rights reserved. This form is for use only in the transaction in which DAUM is involved and is not to be distributed to others.

Hy                                                                                                    KK      Ct



**Uniform Disclosure and Limitation of Liability Form**

of cannabis activity on the property covered by this form would have property insurance ramifications.

**iv. Financial Institutions Might Deny You Services if You Engage in Cannabis-Related Transactions**

Financial institutions generally are risk adverse. Notwithstanding the efforts of the Obama Administration and states such as California, financial institutions largely have refused to sanction cannabis-related transactions and even have reported clients they suspect are engaging in such transactions. You should consult with your legal counsel about the risk of being denied services from your financial institutions as a result of engaging in cannabis-related transactions.

**v. You Might Lose Protections Under the Bankruptcy Code if You Engage in Cannabis-Related Transactions and Then File for Bankruptcy**

Multiple courts, including in states that have legalized cannabis, have held that, because cannabis remains illegal under federal law, parties engaged in cannabis activity lose protections under the Bankruptcy Code if they file for bankruptcy. *See, e.g., In re Arenas*, 535 B.R. 845, 849 (B.A.P. 10th Cir. 2015). You should consult with your legal counsel about the potential ramifications of engaging in cannabis-related transactions and then filing for bankruptcy.

**vi. You Might Lose Certain Tax Benefits by Engaging in Cannabis-Related Transactions**

Internal Revenue Code Section 280E prohibits businesses from deducting operating expenses incurred relating to business that involve trafficking in controlled substances. Courts agree that, under Section 280E, businesses cannot deduct cannabis-related operating expenses. *See Caregiving Californians Helping to Alleviate Med. Problems, Inc. v. C.I.R.*, 128 T.C. 173, 181 (2007); *Canna Care, Inc. v. I.R.C.*, Tax Ct. No. 5678-12 (9th Cir. July 25, 2017). You should consult with your legal and/or financial counsel about the tax ramifications of engaging in cannabis-related transactions.

**2. Disclaimer and Indemnification**

Broker has prepared this form at the request of all parties, which agree to indemnify and hold Broker, its principals, shareholders, officers, agents and employees harmless from any liability that may arise from the preparation of this or any other document relating to this transaction.

All parties acknowledge that Broker has advised them to have this and all transaction documents approved by their legal and/or financial counsel prior to execution and delivery.

All parties enter into this transaction with the understanding that you and/or your legal and/or financial counsel have independently verified to your satisfaction all relevant federal, state and local laws and regulations relating to cannabis.

The issues set forth above are not exhaustive but instead examples of items you should investigate.

Broker has obtained the above information regarding cannabis from sources it deems reliable, and does not doubt the accuracy of this information. Nonetheless, Broker has not verified, assumes no responsibility, and makes no guarantee, warranty or representation about this information. It is your responsibility to independently confirm the accuracy and completeness of this information. You hereby indemnify and hold harmless Broker, its principals, shareholders, officers, agents and employees from any claim relating to cannabis activity, including reasonable attorney fees and costs.

**3. Credit and Financial Information**

Broker has provided you with credit information that it has not verified and does not guarantee. You acknowledge that Broker does not guarantee either payment or performance of the terms of the purchase/lease agreement. Your execution of this document is based strictly on your independent verification of the relevant credit and financial information and you agree to hold Broker harmless in the event of any default.

**4. Miscellaneous**

If the property covered by this form is owned jointly or by a corporation, each individual signing represents and warrants that he/she is authorized to execute and deliver this document and to bind such other owners or corporations having any interest in the property.

Broker makes no representation or warranty regarding the status of the subject property with regard to the items covered in this form.

APPROVED this   3   day of   August 2021

Kylale, LLC, a California limited liability company

By: _____
　　　Hasty Yadegaran, Managing Member

By: _____

APPROVED this   2   day of   August 2021

Follow The Leader Food Service Inc., a Florida corporation

By: _____
　　　Clarence Tate, CEO

By: _____   08/02/2021
　　　Kumi Kawamura, CFO

©2018 – DAUM Commercial Real Estate Services. All rights reserved. This form is for use only in the transaction in which DAUM is involved and is not to be distributed to others.

citrix | **RightSignature**

| **REFERENCE NUMBER**
| 5DE20436-7E84-4BEB-A0DF-01593A37BBC4

# SIGNATURE CERTIFICATE

## TRANSACTION DETAILS

**Reference Number**
5DE20436-7E84-4BEB-A0DF-01593A37BBC4

**Transaction Type**
Signature Request

**Sent At**
08/02/2021 17:07 PDT

**Executed At**
08/02/2021 17:24 PDT

**Identity Method**
email

**Distribution Method**
email

**Signed Checksum**
66262fa1d501f91440651dbaf3ece331953bcfd176bf11e0d82720ee59eda6ff

**Signer Sequencing**
Disabled

**Document Passcode**
Disabled

## DOCUMENT DETAILS

**Document Name**
3138 W Pico Bl - Mtln Pkg Follow The Leader - 7-26-2021

**Filename**
3138_w_pico_bl_-_mtln_pkg_follow_the_leader_-_7-26-2021.pdf

**Pages**
22 pages

**Content Type**
application/pdf

**File Size**
1.95 MB

**Original Checksum**
36ada2803eafdb1dd93e6dde6fe88858b02397877fd2421b67746921805f0973

# SIGNERS

| SIGNER | E-SIGNATURE | EVENTS |
|---|---|---|
| **Name**<br>Clarence Tate<br><br>**Email**<br>ml500.litigator76@gmail.com<br><br>**Components**<br>33 | **Status**<br>signed<br><br>**Multi-factor Digital Fingerprint Checksum**<br>545836388b98c15190d3661a8a5353654c087865afaaecb9ceb3fbc70ae002cb<br><br>**IP Address**<br>172.58.19.162<br><br>**Device**<br>Chrome Mobile via Android<br><br>**Drawn Signature**<br><br>**Signature Reference ID**<br>0FD469D9<br><br>**Signature Biometric Count**<br>192<br><br>**Drawn Signature**<br><br>**Signature Reference ID**<br>EF1F7577<br><br>**Signature Biometric Count**<br>216 | **Viewed At**<br>08/02/2021 17:13 PDT<br><br>**Identity Authenticated At**<br>08/02/2021 17:24 PDT<br><br>**Signed At**<br>08/02/2021 17:24 PDT |
| **Name**<br>Kumi Kawamura<br><br>**Email**<br>kumikawamura73@gmail.com<br><br>**Components**<br>30 | **Status**<br>signed<br><br>**Multi-factor Digital Fingerprint Checksum**<br>c3302f6e47042c4a70af6347e3d235d7d6a3d5cefe423589bbcf6a7d2c36084d<br><br>**IP Address**<br>172.58.17.87<br><br>**Device**<br>Mobile Safari via iOS | **Viewed At**<br>08/02/2021 17:07 PDT<br><br>**Identity Authenticated At**<br>08/02/2021 17:12 PDT<br><br>**Signed At**<br>08/02/2021 17:12 PDT |

**Drawn Signature**



**Signature Reference ID**
EFE5F12D
**Signature Biometric Count**
139

---

# A U D I T S

| TIMESTAMP | AUDIT |
|---|---|
| 08/02/2021 17:07 PDT | Ashton Cabrinha (ashton.cabrinha@daumcommercial.com) created document '3138_w_pico_bl_-_mtln_pkg_follow_the_leader_-_7-26-2021.pdf' on Chrome via Windows from 38.140.62.98. |
| 08/02/2021 17:07 PDT | Clarence Tate (ml500.litigator76@gmail.com) was emailed a link to sign. |
| 08/02/2021 17:07 PDT | Kumi Kawamura (kumikawamura73@gmail.com) was emailed a link to sign. |
| 08/02/2021 17:07 PDT | Kumi Kawamura (kumikawamura73@gmail.com) viewed the document on Mobile Safari via iOS from 172.58.17.87. |
| 08/02/2021 17:12 PDT | Kumi Kawamura (kumikawamura73@gmail.com) authenticated via email on Mobile Safari via iOS from 172.58.17.87. |
| 08/02/2021 17:12 PDT | Kumi Kawamura (kumikawamura73@gmail.com) signed the document on Mobile Safari via iOS from 172.58.17.87. |
| 08/02/2021 17:13 PDT | Clarence Tate (ml500.litigator76@gmail.com) viewed the document on Chrome Mobile via Android from 172.58.19.162. |
| 08/02/2021 17:24 PDT | Clarence Tate (ml500.litigator76@gmail.com) authenticated via email on Chrome Mobile via Android from 172.58.19.162. |
| 08/02/2021 17:24 PDT | Clarence Tate (ml500.litigator76@gmail.com) signed the document on Chrome Mobile via Android from 172.58.19.162. |

# EXHIBIT "2"

| LLC-1 | Articles of Organization of a Limited Liability Company (LLC) |
|---|---|

**2 0 1 6 0 8 1 1 0 2 9 6**

To form a limited liability company in California, you can fill out this form, and submit for filing along with:

– A **$70** filing fee.

– A separate, non-refundable **$15** service fee also must be included, if you **drop off** the completed form.

**Important!** LLCs in California may have to pay a minimum $800 yearly tax to the California Franchise Tax Board. For more information, go to https://www.ftb.ca.gov.

LLCs may not provide "professional services," as defined by California Corporations Code sections 13401(a) and 13401.3.

Note: *Before submitting the completed form,* you should consult with a private attorney for advice about your specific business needs.

**FILED**
Secretary of State
State of California

**MAR 1 5 2016**

This Space For Office Use Only

**For questions about this form, go to** www.sos.ca.gov/business/be/filing-tips.htm.

**LLC Name** (List the proposed LLC name exactly as it is to appear on the records of the California Secretary of State.)

① **KYLALE, LLC**

Proposed LLC Name

The name must include: LLC, L.L.C., Limited Liability Company, Limited Liability Co., Ltd. Liability Co. or Ltd. Liability Company; and may not include: bank, trust, trustee, incorporated, inc., corporation, or corp., insurer, or insurance company. For general entity name requirements and restrictions, go to www.sos.ca.gov/business/be/name-availability.htm.

**Purpose**

② The purpose of the limited liability company is to engage in any lawful act or activity for which a limited liability company may be organized under the California Revised Uniform Limited Liability Company Act.

**LLC Addresses**

③ a. 3600 S. SAN PEDRO ST.    LOS ANGELES    CA  90011
Initial Street Address of Designated Office in CA - Do not list a P.O. Box    City (no abbreviations)    State    Zip

b. _____
Initial Mailing Address of LLC, if different from 3a    City (no abbreviations)    State    Zip

**Service of Process** (List a California resident or a California registered corporate agent that agrees to be your initial agent to accept service of process in case your LLC is sued. You may list any adult who lives in California. You may not list an LLC as the agent. Do not list an address if the agent is a California registered corporate agent as the address for service of process is already on file.)

④ a. HASTY YADEGARAN
Agent's Name

b. 3600 S. SAN PEDRO ST.    LOS ANGELES    CA  90011
Agent's Street Address (if agent is not a corporation) - Do not list a P.O. Box    City (no abbreviations)    State    Zip

**Management** (Check only one.)

⑤ The LLC will be managed by:

[✓] One Manager    [ ] More Than One Manager    [ ] All Limited Liability Company Member(s)

This form must be signed by each organizer. If you need more space, attach extra pages that are 1-sided and on standard letter-sized paper (8 1/2" x 11"). All attachments are made part of these articles of organization.

Organizer - Sign here

HASTY YADEGARAN
Print your name here

| Make check/money order payable to: **Secretary of State** Upon filing, we will return one (1) uncertified copy of your filed document for free, and will certify the copy upon request and payment of a $5 certification fee. | **By Mail** Secretary of State Business Entities, P.O. Box 944228 Sacramento, CA 94244-2280 | **Drop-Off** Secretary of State 1500 11th Street, 3rd Floor Sacramento, CA 95814 |
|---|---|---|

Corporations Code §§ 17701.04, 17701.08, 17701.13, 17702.01, Revenue and Taxation Code § 17941    2014 California Secretary of State
LLC-1 (REV 01/2014)    www.sos.ca.gov/business/be

# EXHIBIT "3"

**Three-Day Notice by Landlord to Pay Rent or Vacate**

**NOTICE TO PAY RENT OR VACATE THE PREMISES**

To:    Follow the Leader Food Service Inc., a Florida Corporation and
all Unnamed and Unknown Occupants in Possession
3138 W. Pico Blvd., Los Angeles, CA 90019

NOTICE IS HEREBY GIVEN that, within three days after you receive service of this notice, you
must pay the landlord Kylale, LLC in full the rent now due and unpaid on the premises at 3138
W. Pico Blvd., Los Angeles, CA 90019, in the amount estimated to be $18,788.88, which is the
balance of the rent that became due on April 1, 2022 for the period from April 1, 2022 to April
30, 2022, and the rent that became due on May 1, 2022 for the period from May 1, 2022 to May
31, 2022, which is a reasonable estimate of the rent due as of May 24, 2022, as authorized by
*California Code of Civil Procedure* Section 1161.1(a).

ALTERNATIVELY, you must surrender possession of the premises to the landlord Kylale, LLC
at 3600 S. San Pedro Street, Los Angeles, CA 90011 Mondays through Fridays 9:00 a.m. to 5:00
p.m.  If you fail to pay the rent or to surrender possession within the three-day period, legal
proceedings will be commenced against you to recover possession and to recover a judgment for
the rent and damages for your unlawful detention of the premises.

THE PAYMENT MUST BE MADE TO Kylale, LLC at 3600 S. San Pedro Street, Los Angeles,
CA 90011 Mondays through Fridays 9:00 a.m. to 5:00 p.m. (310) 367-4951.

FURTHER NOTICE IS GIVEN that Kylale, LLC elects to declare forfeited the lease agreement
under which you hold possession of the premises if you fail to pay the above-stated rent due
within the three-day period or fail to surrender possession of the premises within the three-day
period.

DATED:    May 24, 2022                    VALERIE F. HORN & ASSOCIATES
                                         A PROFESSIONAL LAW CORPORATION


                                         VALERIE E. HORN
                                         Attorneys for Landlord
                                         1901 Avenue of the Stars, Suite 1900
                                         Los Angeles, CA 90067
                                         Phone: (310) 888-8494
                                         Email: thehornbooklaw@gmail.com

# SUPPLEMENTAL DECLARATION OF VALERIE F. HORN

I, Valerie F. Horn, declare as follows:

1.     I am an attorney at law duly admitted to practice before the United States District Courts for the Central, Northern, Southern and Eastern Districts. I represent Movant Kylale, LLC in this action. I have personal knowledge of the facts stated in this declaration, and if called upon to testify, I could and would competently testify thereto.

2.     On July 26, 2021, Kylale, LLC, a California Limited Liability Company ("Landlord") and Follow the Leader Food Service, Inc., a Florida Corporation ("Tenant") entered into a Commercial Lease (the "Lease") for the real property located at 3138 W. Pico Blvd., Los Angeles, California (the "Subject Property"). [See Exhibit "1" to the Declaration of Hasty Yadagaran].

3.     Attached hereto as Exhibit "1" is a true and correct copy of the Articles of Incorporation for Follow the Leader Food Service, Inc., a Florida Corporation.

4.     Debtor Clarence Demetrius Tate has been declared a Vexatious Litigant by the California Superior Court and his name appears on the Vexatious Litigant List maintained by the California Superior Court. Attached hereto as Exhibit "2" is a true and correct copy of this Notice.

5.     In or about March 2022, Tenant defaulted on the payment of rent and Landlord served tenant with a three day notice to pay or quit. Tenant did not cure the rent arrearages and on May 9, 2022, Landlord instituted an unlawful detainer action against Tenant (the "UD Action").

6.     Tenant is not a debtor in this bankruptcy proceeding. Debtor is not the Tenant under the Lease nor is Debtor a guarantor of the Lease.

7.     On May 24, 2022, Debtor filed documents in the UD Action claiming a right to possession of the Subject Property.

8.     In order to evict Debtor from the Subject Property in the UD Action

1    under Debtor's claim of a right to possession of the Subject Property, Landlord

2    seeks relief from the automatic stay to proceed with eviction proceedings against

3    the Debtor.

4           I declare under penalty of perjury under the laws of the United States of

5    America that the foregoing is true and correct.

6           Executed at Los Angeles, California this 24th day of May, 2022.

7

8    

9           Valerie F. Horn

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT "1"

Electronically FILED by Superior Court of California, County of Los Angeles on 05/18/2022 11:36 AM Sherri R. Carter, Executive Officer/Clerk of Court, by M. Soto,Deputy Clerk

1  Valerie F. Horn, Esq. (CSB No. 151161)
   VALERIE F. HORN & ASSOCIATES
2  A Professional Law Corporation
   1901 Avenue of the Stars, Suite 1900
3  Los Angeles, California 90067-1507
   Telephone:    (310) 888-8494
4  Facsimile:    (310) 888-8499
   Email: thehornbooklaw@gmail.com
5
   Attorney for Plaintiff Kylale, LLC
6

7                SUPERIOR COURT OF THE STATE OF CALIFORNIA

8                     FOR THE COUNTY OF LOS ANGELES

9
   KYLALE, LLC, A CALIFORNIA LIMITED    )    Case No.22STCV15560
10 LIABILITY COMPANY,                   )
                                        )    NOTICE OF CLARENCE DEMETRIUS
11             Plaintiff,               )    TATE'S VEXATIOUS LITIGANT
                                        )    STATUS AND EXISTENCE OF PRE-
12 v.                                   )    FILING ORDER; REQUEST FOR STAY
                                        )    OF ALL AFFIRMATIVE RELIEF
13 FOLLOW THE LEADER FOOD SERVICE,      )    SOUGHT BY CLARENCE DEMETRIUS
   INC., A FLORIDA CORPORATION, and     )    TATE
14 Does 1 Through 10, Inclusive,        )
                                        )
15             Defendants.              )
                                        )
16 _____     )

17

18       TO THE COURT, AND ALL PARTIES NAMED HEREIN:

19       PLEASE TAKE NOTICE that Clarence Demetrius Tate ("Tate") is in violation in the

20 California vexatious litigant statutes.  Specifically, Tate was deemed a vexatious litigant by the

21 Los Angeles Superior Court on or about November 17, 2003 in the matter of Clarence Demetrius

22 Tate v. John A. McDonald, et al, Los Angeles Superior Court Case No. BC295135. A copy of

23 the order deeming Mr. Tate a vexatious litigant in Tate v. McDonald is attached hereto as

24 Exhibit "1".  Mr. Tate's name appears on the Vexatious Litigant List maintained by the

25 Administrative Office of the Courts.  A copy of the Vexatious Litigant List bearing Mr. Tate's

26 name is attached hereto as Exhibit "2".

27       Despite such order, Mr. Tate seeks affirmative relief in this action.  Pursuant to *Code of*

28 *Civil Procedure* §391.7c, the filing of this Notice shall automatically stay any affirmative relief

1  sought by Mr. Tate in this action.  Any affirmative relief must then be automatically dismissed,

2  unless Mr. Tate, within 10 days of this Notice, obtains an order from the presiding justice or

3  prejudice judge, permitting him to seek affirmative relief in this action.

4  DATED:  5/18/2022                          VALERIE F. HORN & ASSOCIATES
                                              A PROFESSIONAL LAW CORPORATION
5

6                                             By: _____

7                                                 Valerie F. Horn
                                                  Attorneys for Plaintiff Kylale, LLC
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT "1"

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

| | |
|---|---|
| DATE: 11/17/03 | DEPT. 42 |

| | | | |
|---|---|---|---|
| HONORABLE ELIHU M. BERLE | JUDGE | N DIGIAMBATTISTA | DEPUTY CLERK |
| HONORABLE 8 | JUDGE PRO TEM | | ELECTRONIC RECORDING MONITOR |
| D C WILLIAMS/C.A. | Deputy Sheriff | L NISHIMOTO | Reporter |

| 9:30 am | BC295135 | Plaintiff Counsel | BY TELEPHONE: IN PRO PER (X) |
|---|---|---|---|
| | CLARENCE DEMETRIUS TATE VS JOHN A MCDONALD ET AL | Defendant Counsel | LORI E. SIDERMAN (X) PETER M. GLICK (X) |

**NATURE OF PROCEEDINGS:**

MOTION OF DEFENDANTS, JOHN A. MCDONALD AND SIMON AVAL,
FOR AN ORDER DECLARING THAT CLARENCE D. TATE IS A
VEXATIOUS LITIGANT;

JOINDER OF DEFENDANT, VICTOR RODRIGUEZ, TO MOTION TO
HAVE PLAINTIFF DECLARED A VEXATIOUS LITIGANT

DEMURRER OF DEFENDANTS, JOHN A. MCDONALD AND SIMON
AVAL, TO PLAINTIFF'S FIRST AMENDED COMPLAINT;

MOTION OF ABOVE DEFENDANTS TO STRIKE PORTIONS OF
PLAINTIFF'S FIRST AMENDED COMPLAINT;

STATUS CONFERENCE                                       AO


Matters come on for hearing and are argued.

The motion to have plaintiff Clarence Demetrius Tate
declared a vexatious litigant and the joinder thereto
are granted.

The court finds that Clarence Demetrius Tate is a
vexatious litigant under Code of Civil Procedure Sec-
tion 391(b)(1), in that during the preceding seven-
year period, six state or federal court cases have
been commenced by plaintiff in propria persona and
were determined adversely to him:
1.  Tate v. City of Los Angeles (U.S.D.C., C.D.
    Cal.)  99-CV-13343

                     Page  1 of  3    DEPT. 42

| MINUTES ENTERED 11/17/03 COUNTY CLERK |
|---|

6+ A

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

| | |
|---|---|
| DATE: 11/17/03 | DEPT. 42 |

| | | | |
|---|---|---|---|
| HONORABLE ELIHU M. BERLE | JUDGE | N DIGIAMBATTISTA | DEPUTY CLERK |
| HONORABLE | JUDGE PRO TEM | | ELECTRONIC RECORDING MONITOR |
| D C WILLIAMS/C.A. | Deputy Sheriff | L NISHIMOTO | Reporter |

| | | | |
|---|---|---|---|
| 9:30 am | BC295135 | Plaintiff Counsel | BY TELEPHONE: IN PRO PER (X) |
| | CLARENCE DEMETRIUS TATE VS JOHN A MCDONALD ET AL | Defendant Counsel | LORI E. SIDERMAN (X) PETER M. GLICK (X) |

NATURE OF PROCEEDINGS:

   2.  Tate v. Perry (U.S.D.C., C.D. Cal.) Case No. 00-CV-678
   3.  Walker, et al v. City of Los Angeles (U.S.D.C., C.D., Cal.) Case No. 00-CV-6064
   4.  Tate v. Fleming (U.S.D.C., S.D. Fla.) Case No. 00-CV-8988
   5.  Tate v. Bear (U.S.D.C., S.D. Fla.), Case No. 01-CV-8980
   6.  Tate v. Bowman (L.A. Superior Court), Case No. BC230173

Further, a prefiling order is hereby entered pursuant to Code of Civil Procedure Section 391.7(a), prohibiting plaintiff Clarence Demetrius Tate from filing any new litigation in the courts of this state without first obtaining leave from the presiding/supervising judge of the court where the litigation is proposed to be filed.

The demurrer of defendants McDonald and Aval is sustained with leave to amend on the grounds of statute of limitations and failure to state sufficient facts to state a cause of action for defamation and for intentional infliction of emotional distress.

Thirty days to amend; thereafter, twenty days to respond.

Counsel for defendants Aval and McDonald is to give notice.

Page   2 of 3   DEPT. 42

| |
|---|
| MINUTES ENTERED 11/17/03 COUNTY CLERK |

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

DATE: 11/17/03                                           **DEPT. 42**

HONORABLE ELIHU M. BERLE            JUDGE  N DIGIAMBATTISTA      DEPUTY CLERK

HONORABLE                    JUDGE PRO TEM          ELECTRONIC RECORDING MONITOR
    8  D C WILLIAMS/C.A.      Deputy Sheriff  L NISHIMOTO      Reporter

| 9:30 am | BC295135 | | |
|---|---|---|---|
| | CLARENCE DEMETRIUS TATE | Plaintiff Counsel | BY TELEPHONE: IN PRO PER (X) |
| | VS JOHN A MCDONALD ET AL | Defendant Counsel | LORI E. SIDERMAN (X) PETER M. GLICK (X) |

**NATURE OF PROCEEDINGS:**

A copy of this minute order is mailed via U.S. Mail to
the vexatious litigation unit of the Judicial Council
addressed as follows:

JUDICIAL COUNCIL OF CALIFORNIA, ADMINISTRATIVE OFFICE
OF THE COURTS, 303 SECOND ST., SOUTH TOWER, SAN FRAN-
CISCO, CA 94107 ATTENTION: VEXATIOUS LITIGANT UNIT

LATER: Pursuant to a telephone conversation with
counsel for defendant Rodriguez, the demurrer set for
December 8, 2003, is ordered advanced to this date and
placed off calendar until the time for filing the sec-
ond amended complaint expires. If the second amended
complaint is filed, the demurrer will be rendered
moot. Otherwise, the demurrer will be placed back on
calendar.

MINUTES ENTERED
11/17/03
COUNTY CLERK

# EXHIBIT "2"

VEXATIOUS LITIGANT LIST
From Prefiling Orders Received from California Courts
Prepared and Maintained by the Judicial Council of California
(Orders prohibiting future filings entered through May 1, 2022)



| LAST NAME | FIRST NAME | MIDDLE | COURT | CASE NO. | DATE | COMMENTS |
|---|---|---|---|---|---|---|
| TAST | Rany | | Sonoma Superior Court | SFL68337 | 03/18/16 | |
| TATE | Clarence | Demetrius | Los Angeles Superior Court | BC295135 | 11/17/03 | |
| TAYLOR | Altheia | | San Bernardino Superior Court | SMCFS1904566 | 09/27/19 | |
| TAYLOR | Freddie | Lee | Los Angeles Superior Court | BS021601 | 04/20/93 | |
| TAYLOR | Gloria | | Los Angeles Municipal Court | 96M16042 | 09/26/96 | |
| TAYLOR | Walter | James | Contra Costa Superior Court | N070046 | 09/27/07 | |
| TAYLOR | Colleen Kayette | Prince | Los Angeles (Long Beach) Muni | 93S03145 | 02/22/94 | Order states specifics. |
| TAYLOR (CDCR #D-4175) | Jeffrey | Lamont | Monterey Superior Court | M94012 | 02/18/09 | |
| TAYLOR (CDC #D41759) | Jeffrey | Lamont | Monterey Superior Court | M91883 | 01/27/09 | |
| TAYLOR (CDC #D41759) | Jeffrey | Lamont | Monterey Superior Court | M91594 | 01/28/09 | |
| TAYLOR (CDC #T-35161) | Kirell | | Kern Superior Court | S1500CV269262SPC | 06/08/10 | |
| TAYLOR, JR. | John | C. | Alameda Superior Court | 71018343 | 03/04/93 | |
| TEANG | Srey | | San Joaquin Superior Court | STKCVUBT20180005289 | 03/02/21 | |
| TEECHER | June | | Los Angeles Superior Court | LC071688 | 01/14/11 | |
| TEMBLADOR | Virdiana | | San Bernardino Superior Court | FAMRS1303536 | 02/10/17 | |
| TEVIS | Larry | | El Dorado Superior Court | PC20200273 | 01/25/21 | |
| TEVIS | Larry | | El Dorado Superior Court | PC20200266 | 07/30/21 | |
| TEVIS | Nancy | | El Dorado Superior Court | PC20200273 | 01/25/21 | |
| TEVIS | Nancy | | El Dorado Superior Court | PC20200266 | 07/30/21 | |
| THAI | Toan | Quy | Orange Superior Court | 30201700958403 | 07/09/18 | see also Minh Nguyet Nguyen |
| THAKAR | Chetan | | Los Angeles Superior Court | YC064739 | 07/12/16 | aka Chetan Thaker |
| THAKER | Chetan | | Los Angeles Superior Court | YC064739 | 07/12/16 | aka Chetan Thakar |
| THAT | Dinh | Ton | Orange County Superior Court | 30201000394102 | 03/01/11 | |
| THEOPHILUS | Brett | Jones | Los Angeles Superior Court | BC460339 | 09/19/11 | aka's Jones-Theophilus;Brach; Toriano Keefe Kana-Shapel Hitrappes Jones-Theophilus; Brach; Branch; B.J. |
| THOMAS | Alden | A. | San Joaquin Superior Court | STKCVEUJ201611578 | 06/16/17 | |
| THOMAS | Brian | Eugene | Los Angeles Superior Court | BC028379 | 01/22/92 | |
| THOMAS | Bruce | | San Diego Superior Court | 3720110005751BCUBTNC | 01/31/12 | |
| THOMAS | Bruce | | San Diego Superior Court | 3720120005926BCUFRNC | 08/20/13 | |
| THOMAS | Dawn | A. | Orange County Superior Court | 94D07791 | 05/27/00 | |
| THOMAS (P64423) | Edward | | Monterey Superior Court | M124658 | 02/15/14 | |
| THOMAS | Joe | | Los Angeles Superior Court | BC326279 | 03/16/05 | |
| THOMAS (T67081) | Keith | | Lassen Superior Court | 54792 | 07/30/12 | |
| THOMAS (T67081) | Keith | | Lassen Superior Court | No case # assigned | 03/27/13 | |
| THOMAS (CDC #T67081) | Keith | | Monterey Superior Court | M112813 | 10/20/11 | |

## PROOF OF SERVICE

STATE OF CALIFORNIA                    )
                                                    ss.
COUNTY OF LOS ANGELES              )

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 1901 Avenue of the Stars, Suite 1900, Los Angeles, CA 90067.

On May 18, 2022, I served the following documents -**NOTICE OF CLARENCE DEMETRIUS TATE'S VEXATIOUS LITIGANT STATUS AND EXISTENCE OF PRE-FILING ORDER; REQUEST TO STAY AFFIRMATIVE RELIEF** - on the interested party(ies) in this action by placing a true copy thereof enclosed in sealed envelopes addressed as follows:

***See attached Service List***

[__] **BY PERSONAL SERVICE**: I caused such envelope(s) to be delivered by hand on this date to the addressee(s).

[__] **BY FACSIMILE**: I served a copy of the above-described document(s) on the following parties or counsel for parties via transmission from facsimile number (310) 888-8499.

[__]**BY FEDERAL EXPRESS**: I served a copy of the above-described document(s) by Federal Express, Overnight Priority Delivery.

[**X**]**BY ELECTRONIC MAIL**: I served a copy of the above-described document(s) by electronic mail to:

Attorney/Party Name E-Mail Address:              Party Represented/In Pro Per:

[X] **BY MAIL**: I deposited such envelope in the mail at Los Angeles, California. The envelope was mailed with postage thereon fully prepaid. I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice, it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Los Angeles, California in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare under penalty of perjury, under the laws of the State of California, that the foregoing is true and correct.

Executed on May 18, 2022 at Los Angeles, California.

_____
Valerie F. Horn

PROOF OF SERVICE

| | | |
|---|---|---|
| Case Name | : | *Kylale, LLC v. Follow the Leader Food Service, Inc.* |
| Court | : | Los Angeles County Superior Court |
| Case Number | : | 22STCV15560 |

## SERVICE LIST

Clarence Demetrius Tate                                    *Third Party*
2401 Martin Luther King Jr. Blvd.
Los Angeles, CA 90008
Email: ml500.litigator76@gmail.com

Follow the Leader Food Service, Inc.                       *Defendant*
A Florida Corporation
2401 Martin Luther King Jr. Blvd.
Los Angeles, CA 90008
Email: ml500.litigator76@gmail.com

PROOF OF SERVICE

# EXHIBIT "2"

# Electronic Articles of Incorporation
## For

P21000066835
FILED
July 22, 2021
Sec. Of State
smharris

FOLLOW THE LEADER FOOD SERVICE INC.

The undersigned incorporator, for the purpose of forming a Florida
profit corporation, hereby adopts the following Articles of Incorporation:

## Article I

The name of the corporation is:

FOLLOW THE LEADER FOOD SERVICE INC.

## Article II

The principal place of business address:

1323 1/2 N ORANGE DRIVE
LOS ANGELES, CA. UN  90028

The mailing address of the corporation is:

1323 1/2 N ORANGE DRIVE
LOS ANGELES, CA. UN  90028

## Article III

The purpose for which this corporation is organized is:

ANY AND ALL LAWFUL BUSINESS. CLOUD KITCHEN

## Article IV

The number of shares the corporation is authorized to issue is:

10000

## Article V

The name and Florida street address of the registered agent is:

MARTINA  WALKER
1323 1/2 N ORANGE DRIVE
LOS ANGELES, FL.   90027

I certify that I am familiar with and accept the responsibilities of
registered agent.

Registered Agent Signature:   MARTINA WALTER

**P21000066835
FILED
July 22, 2021
Sec. Of State**
smharris

# Article VI

The name and address of the incorporator is:

CLARENCE TATE
2401 W MARTIN LUTHER KING JR BLVD
NN/A
LOS ANGELES  CALIFORNIA 90008

Electronic Signature of Incorporator:   CLARENCE TATE

I am the incorporator submitting these Articles of Incorporation and affirm that the facts stated herein are
true.  I am aware that false information submitted in a document to the Department of State constitutes a
third degree felony as provided for in s.817.155, F.S.  I understand the requirement to file an annual report
between January 1st and May 1st in the calendar year following formation of this corporation and every
year thereafter to maintain "active" status.

# Article VII

The initial officer(s) and/or director(s) of the corporation is/are:

> Title:  CEO
> CLARENCE  TATE
> 1323 1/2 N ORANGE DRIVE
> LOS ANGELES, CA.  90028  US

> Title:  CFO
> KUMI  KAWAMURA
> 1323 1/2 N ORANGE DR
> LOS ANGELES, CA.  90028  US

> Title:  VP
> EARLE  JONES
> 1323 1/2 N ORANGE DR
> LOS ANGELES, CA.  90028  UN

# Article VIII

The effective date for this corporation shall be:

07/19/2021

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
1901 Avenue of the Stars, Suite 1900, Los Angeles, CA  90067

A true and correct copy of the foregoing document entitled: **NOTICE OF MOTION AND MOTION FOR RELIEF FROM THE AUTOMATIC STAY OR FOR ORDER CONFIRMING THAT THE AUTOMATIC STAY DOES NOT APPLY UNDER 11 U.S.C. § 362(l) (with supporting declarations) (UNLAWFUL DETAINER)** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On (date) 5/31/2022    , I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

Trustee: EFiling@LATrustee.com                    UNIFY Financial Federal Credit Union: ziggy.valerio@unifyfcu.com
US Trustee:ustpregion16.la.ect@usdoj.gov
Movant's Attorney: thehornbooklaw@gmail.com
Capital One Auto Finance, a division of Capital One, N.A., c/o AIS Portfolio Services, LP:arawal@aisinfo.com

☐ Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:
On (date) 5/312022    , I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

DEBTOR: CLARENCE DEMETRIUS TATE, SR.
2401 W. Martin Luther King Jr. Blvd.
Los Angeles, CA  90008

☐ Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL (state method for each person or entity served)**:  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on (date) 5/31/2022    , I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.

Honorable Sandra R. Klein
255 E. Temple Street, Suite 1582 / Courtroom 1575
Los Angeles, CA 90012

☐ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| 5/31/2022 | Valerie F. Horn | |
|---|---|---|
| Date | Printed Name | Signature |

This form is mandatory.  It has been approved for use in the United States Bankruptcy Court for the Central District of California.